

# ORIGINAL

(22)
9-21-01
sc

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DIANNA LYNN HARRIS | : | |
| | : | |
| Plaintiff | : | CIVIL ACTION NO. CV-01-0270 |
| v. | : | (Judge Kane) |
| | : | |
| PENNSYLVANIA BOARD OF | : | **FILED** |
| PROBATION AND PAROLE, et al., | : | **HARRISBURG** |
| | : | |
| Defendants | : | SEP 2 0 2001 |
| | : | MARY E. D'ANDREA, CLERK |
| | | Per_____ |
| | | DEPUTY CLERK |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

### I.   STATEMENT OF FACTS

Plaintiff's Complaint alleges, among other things, that plaintiff was employed by

defendant Pennsylvania Board of Probation and Parole (Parole Board) from January 1993

through December 1998 (see Plaintiff's Complaint, paragraph 11).  In or about May 1995,

plaintiff was assigned to work at defendant Parole Board's Central Office Building, located at

3101 N. Front Street, Harrisburg, PA (para. 13).  Smoking was permitted in the Central Office

Building and, at that time, defendant Parole Board had a designated smoking area very close to

plaintiff's work area (para. 14-15).

Plaintiff's medical background includes a history of childhood polio, which has

weakened her immune system (para. 12).  As a result, plaintiff is particularly vulnerable to

respiratory and other illnesses brought on by environmental agents, which illnesses pose serious

health hazards to plaintiff in light of her weakened immune system (para. 12).  Plaintiff suffered

numerous adverse health affects as a result of her daily exposure to smoke in defendant's Central Office Building (para. 17).

In June, 1996, plaintiff was diagnosed with allergic rhinitis with secondary headaches and pain, which caused sickness and prevented her from performing her work duties (para. 18). This condition was aggravated by her constant exposure to tobacco smoke in the Central Office Building, which triggered her sickness (para. 17-18). In or about August, 1996, plaintiff informed defendant Parole Board of her disability and requested accommodations for her disability based upon her physician's recommendations (para. 19-20).

In or about October, 1996, plaintiff was provided with an electric air filter in order to relieve the adverse reaction she was having to the smoke to which she was exposed, however, the air filter did not remove the smoke from the area (para. 26). Plaintiff continued to suffer severe adverse health effects despite the air filter (para. 26, 28). Plaintiff requested a transfer to a smoke-free building, but this request was denied by defendant Parole Board (para. 29).

In October, 1997, plaintiff and five other employees sent a letter to Governor Thomas Ridge criticizing defendant Parole Board's refusal to maintain a smoke-free building (para. 32).

In November, 1997, defendant Parole Board transferred plaintiff to its Harrisburg District Office building, located at 1303 North Seventh Street in Harrisburg, PA, despite the fact that defendant Parole Board knew that this building had a significant air quality problem (para. 33-35). Several employees had previously complained of health problems due to the poor air quality in the building (para. 35). Plaintiff believed, and therefore alleged, that this was a retaliatory transfer (para. 36).

U:\DOCS\jlb\Harris, D-rsup-mot-dismiss.wpd

The air quality problem at the Harrisburg District Office building aggravated plaintiff's condition, causing plaintiff to suffer from frontal headaches, pain in her jaw, joint achiness, nausea, rashes, and flushing (para. 37). In addition, she has suffered emotional distress, anxiety, depression and other emotional damage, and loss of the joys and pleasures of life (para. 38). Plaintiff's medical condition gradually worsened, and the Board did nothing to alleviate the air quality problems in the building (para. 41, 45). In August, 1998, plaintiff became totally disabled and was forced to go on leave without pay as a result of the injuries caused by the poor air quality in the Harrisburg District Office Building (para. 45).

In October, 1998, after not having gone to work (and consequently not being exposed to the air in the District Office Building) for two months, plaintiff's medical condition improved and she attempted to return to work, seeking a position at a location other than the Harrisburg District Office building, upon recommendation of her physician (para. 47). Plaintiff further submitted paperwork seeking a reasonable accommodation for her disability (para. 47). Defendant Parole Board, however, refused to allow plaintiff to return to work in a different location, claiming the Harrisburg District Office building was safe and posed no danger to her health (para. 48). Plaintiff refused to return to the building without being provided with a copy of the Department of Health and Safety's inspection report on the building (para. 49). Defendant Parole Board refused to provide a copy of the report to plaintiff (para. 49).

On December 10, 1998, defendant Parole Board sent a letter (copy attached as Exhibit A) via certified mail, return receipt requested, to plaintiff stating that her employment was to be terminated on December 11, 1998 (para. 51). Plaintiff received this letter on or after December

U:\DOCS\jfh\Harris, D\resp-mot-dismiss.wpd

11, 1998, at the earliest.[1]  Around that time, plaintiff spoke with defendant K. Scott Roy, who

stated that he would provide her with an additional opportunity to present documentation on her

behalf.  On December 14, 1998, plaintiff was sent another letter (Exhibit B) via certified mail,

return receipt requested, stating that since plaintiff had not submitted the documentation in

question, the previously issued letter of termination "shall now have full force and effect."

Plaintiff received this second letter on or after December 15, 1998, at the earliest.

Plaintiff's Complaint alleges that she filed an administrative complaint with the

Pennsylvania Human Relations Commission ("PHRC"), based on employment discrimination,

on or about January 13, 1998 (para. 40).  This complaint was cross-filed with the Equal

Employment Opportunities Commission ("EEOC") (para. 40).

Some time after her termination, in 1999, plaintiff went to the offices of the U.S. Equal

Employment Opportunity Commission ("EEOC") to file another charge of discrimination.  This

second charge was formally filed with the EEOC on or about October 8, 1999, and was cross-

filed with the PHRC (para. 52).

Plaintiff, however, attempted to file this charge long before it was actually accepted for

filing by the EEOC.  She traveled to the EEOC office in Philadelphia in April, 1999, with the

intention of filing a charge of discrimination that day, but she was, through no fault of her own,

prevented from actually filing a charge because there were no intake officers available to meet

with her.  Plaintiff was given information forms, which she took home, completed that night, and

mailed back to the EEOC office the next day.  In or about the beginning of June, 1999, the EEOC

---

[1]  Plaintiff requests that the Court take judicial notice that the delivery of a letter by the
United States Postal Service takes at least one day.

sent plaintiff various questionnaire forms to complete and return, which she did immediately. These included a Charge Information Questionnaire, an ADA Intake Questionnaire, a Hiring/Promotion Questionnaire, a Conduct-Related Discipline Questionnaire, a Witness Questionnaire, and a Remedy Information form. These documents, copies of which are attached hereto collectively as Exhibit C, are all signed by plaintiff and are all dated June 9, 1999. These documents further detail numerous specific allegations of employment discrimination and harassment, based on age, gender, disability, and retaliation. On the third page of the Charge Information Questionnaire, plaintiff specifically indicates that she wants to file a charge.

On January 9, 2001, plaintiff filed the present Complaint in the Court of Common Pleas of Dauphin County, alleging discrimination on the basis of disability in violation of the Americans with Disabilities Act, 42 U.S.C. §12101, et seq. ("ADA") and the Pennsylvania Human Relations Act, 63 P.S. §955, et seq. ("PHRA") (para. 55-57); discrimination on the basis of gender in violation of Title VII of the federal Civil Rights Act, 42 U.S.C. §2000e-1, et seq. ("Title VII") and the PHRA (para. 65); discrimination on the basis of age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §623, et seq. ("ADEA") and the PHRA; retaliation in violation of the ADA, Title VII, ADEA, and PHRA (para. 82); aiding and abetting the commission of discriminatory acts in violation of the PHRA (para. 93); wrongful termination in violation of public policy and in violation of the Pennsylvania Worker and Community Right to Know Act, 35 P.S. §7301, et seq. ("Right to Know Act") (para. 102-104); civil rights violations under color of state law, 42 U.S.C. §1983 (para. 110); conspiracy to interfere with civil rights, 42 U.S.C. §1985 (para. 116); violation of the Right to Know Act (para. 122-124); and intentional infliction of emotional distress under state law (para. 130-134).

Plaintiff's Complaint alleges that she exhausted all required administrative remedies and/or such remedies would be futile (e.g., para. 58, 66, 74, 83, 94).

On or about February 12, 2001, counsel for defendants filed a Notice of Removal to remove the action to this Court. Plaintiff then filed a Motion for Remand to state court.

By Order dated July 23, 2001, this Court denied Plaintiff's Motion for Remand. The Court, however, declined to address plaintiff's contention that defendants waived their Eleventh Amendment immunity ("whether by choosing to defend in this Court Defendants waived their Eleventh Amendment rights is a question that will not arise unless and until Defendants attempt to assert such immunity").

Defendants then filed the present Motion to Dismiss, raising, among other things, their defenses based on Eleventh Amendment immunity.

## II.    LEGAL ARGUMENT

When faced with a Rule 12(b)(6) motion, the court must construe the complaint liberally and take all material allegations as admitted. All reasonable inferences must also be drawn in favor of the plaintiff, and there should be no dismissal unless the plaintiff could prove <u>no set of facts</u> that would entitle her to relief. <u>Bald Eagle Area Sch. Dist. v. Keystone Fin.</u>, 189 F.3d 321, 327 (3d Cir. 1999); <u>University of Maryland at Baltimore v. Peat, Marwick, Main & Co.</u>, 996 F.2d 1534, 1537-38 (3d Cir. 1993) (emphasis added) (citations omitted).

### A.    DEFENDANTS HAVE WAIVED THEIR ELEVENTH AMENDMENT IMMUNITY BY REMOVING THIS CASE TO FEDERAL COURT

In the context of a Rule 12(b)(6) motion for failure to state a claim, the Courts have generally recognized three instances where a State is not entitled to Eleventh Amendment

immunity in federal court: (1) where the State consents to suit in federal court, thereby waiving its Eleventh Amendment immunity; (2) where Congress abrogates the State's immunity pursuant to a valid exercise of its power; or (3) where the plaintiff is seeking prospective injunctive relief only. <u>Frederick v. Dept. of Public Welfare</u>, 2001 U.S. Dist. LEXIS 10225 (E.D. Pa. July 23, 2001) (copy attached hereto as Exhibit F); <u>see also</u> <u>Lieberman v. State of Delaware</u>, 2001 U.S. Dist. LEXIS 13624 (D. Del. August 30, 2001) (Exhibit G).

In this case, defendants themselves took the affirmative action of removing this matter to federal court, an act which should be construed as an explicit waiver of Eleventh Amendment immunity. In <u>Wisconsin Department of Corrections v. Schacht</u>, 524 U.S. 381 (1998), Justice Kennedy, in his concurring opinion, observed that the Court "neither reached nor considered the argument that, by giving its express consent to removal of the case from state court, Wisconsin waived its Eleventh Amendment immunity." 524 U.S. at 393. He pointed out that the Supreme Court had held in several cases that a removal from state court by a state defendant in fact constituted a waiver of its Eleventh Amendment defenses. 524 U.S. at 395 (citing <u>Gunter v. Atlantic Coast Line R. Co.</u> 200 U.S. 273 (1906); <u>Clark v. Barnard</u>, 108 U.S. 436 (1883); <u>Employees of Dept. of Public Health and Welfare of Mo. v. Dept. of Public Health and Welfare of Mo.</u>, 411 U.S. 279 (1973); <u>Petty v. Tennessee-Missouri Bridge Comm'n.</u>, 359 U.S. 275 (1959); <u>Missouri v. Fiske</u>, 290 U.S. 18 (1933)).

Justice Kennedy further observed that several Circuits have followed such a rule, finding that consent to removal by a state can constitute a waiver of Eleventh Amendment immunity. 524 U.S. at 396 (citing <u>Newfield House, Inc. v. Massachusetts Dept. of Pub. Welfare</u>, 651 F.2d 32 (1st Cir.), <u>cert. denied</u>, 454 U.S. 1114 (1981); <u>Estate of Porter v. Illinois</u>, 36 F.3d 684 (7th Cir.

1994); Silver v. Baggiano, 804 F.2d 1211 (11th Cir. 1986); Gwinn Area Community Schools v. Michigan, 741 F.2d 840 (6th Cir. 1984)).

Although Schacht permitted the removal to federal court and subsequently allowed the defendants to assert Eleventh Amendment immunity, such does not make proper defendants' assertion of Eleventh Amendment immunity here, as Schacht is distinguishable from the present case. The Supreme Court in Schacht never addressed the question of whether a state defendant's removal to federal court constitutes a waiver of Eleventh Amendment immunity. The Court's opinion in Schacht relied in large part upon the fact that the defendant did not assert its Eleventh Amendment defenses (which are waivable) until after the matter had been removed to federal court. Thus, the Court reasoned, as of the date of removal, it was unknown whether the defendants would waive their Eleventh Amendment immunities. 524 U.S. at 389-390. Therefore, in that case, it would have been improper for the court to find no federal jurisdiction, based on an assertion of Eleventh Amendment immunity, where there was no knowledge that the defendant would seek to assert such immunity. The court was required to analyze the facts before it at the time of the removal petition, which did not include any Eleventh Amendment defenses.

Justice Kennedy offered his own view that a state's removal of a state court Complaint to federal court should in fact constitute an express waiver of Eleventh Amendment immunity, stating:

> [T]he absence of specific authorization, it seems to me, is not an insuperable obstacle to adopting a rule of waiver in every case where the State, through its attorneys, consents to removal from the state court to federal court. If the States know or have reason to expect that removal will constitute a waiver, then it is easy enough to presume that an attorney authorized to represent the State

can bind it to the jurisdiction of the federal court (for Eleventh Amendment purposes) by the consent to removal.

524 U.S. at 397.

Justice Kennedy's view that a defendant's removal to federal court constitutes a waiver of Eleventh Amendment immunity has been followed by at least one Federal District Court. In California Mother Infant Program v. California Dept. of Corrections, 41 F. Supp. 2d 1123 (S.D. Cal. 1999), the plaintiff filed in state court but the defendant removed to federal court. Upon plaintiff's motion for remand, the District Court denied the motion for remand, but ruled that the state agency "explicitly invoked federal jurisdiction to take the case out of its own courts, where it would otherwise be subject to suit." Id. at 1129. Accordingly, " . . . the agency expressly waived its Eleventh Amendment immunity." Id. (emphasis added).

The same circumstances are present in this case, and the same rationale must therefore prevail. Defendants cannot invoke the protections of federal court by removing the case out of state court based on plaintiff's assertion of federal causes of action, and then seek to dismiss the federal claims based on an asserted immunity from suit in federal court. Since plaintiff's motion for remand has been denied, defendants must be denied the ability to assert their Eleventh Amendment immunities.

**B.    PLAINTIFF'S CLAIMS UNDER THE ADA AND THE ADEA ARE NOT BARRED SINCE CONGRESS ABROGATED THE STATES' ELEVENTH AMENDMENT IMMUNITIES WHEN IT VALIDLY ENACTED THESE STATUTES**

In addition to defendants' waiver of their Eleventh Amendment immunity, plaintiff should be permitted to pursue her claims under the ADA and the ADEA because these federal statutes served to abrogate the states' Eleventh Amendment immunities.

9

U:\DOCS\jfb\Harris, D\resp-mol-dismiss.wpd

The United States Constitution's grant of judicial power to the federal courts is very broad. Article 3 of the Constitution states, in pertinent part, as follows:

> **The judicial power shall extend to all cases in law and equity arising under this Constitution, the laws of the United States** and treaties made or which shall be made under their authority; to all cases affecting ambassadors, other public ministers and consuls; to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more States; between a State and citizens of another State; between citizens of different States; between citizens of the same State claiming lands under grants of different States, and between a State or the citizens thereof and foreign states, citizens or subjects.

(Emphasis added). The language of the Constitution therefore provides the federal courts with jurisdiction over all cases arising directly under the Constitution or under federal statutes.

Defendants argue that the Eleventh Amendment precludes plaintiff's ADA and ADEA claims, since defendant Parole Board is a state agency, and, therefore, an arm of the Commonwealth of Pennsylvania, while the other defendants are also state actors.

The Eleventh Amendment to the United States Constitution states as follows:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

Thus, by the language of the Eleventh Amendment itself, this Amendment should only bar a federal court action against a state in two instances: (1) when the suit is brought by a citizen of another state and (2) when the suit is brought by a citizen or subject of a foreign country. That is the rational and reasonable interpretation of the Eleventh Amendment and, as such, a literal reading of the Eleventh Amendment would not preclude a suit in federal court against the Commonwealth of Pennsylvania by plaintiff, a citizen of this very Commonwealth.

1:\DOCS\jfb\Harris, D mot-mot-dismiss.wpd

Plaintiff recognizes that beginning in the late nineteenth century, the United States Supreme Court has interpreted the Eleventh Amendment to extend to situations beyond the text of the Amendment. See, e.g., Hans v. State of Louisiana, 134 U.S. 1 (1890). Thus, federal court lawsuits brought against a state by a citizen of that state have also been barred.

An examination of the origins of this expanded reading of the Eleventh Amendment, however, shows that the prohibition on federal court suits brought by a citizen of a state against that state is not based upon the Eleventh Amendment at all, but rather upon a conception that, at the time of the ratification of the Constitution, "[t]he suability of a State without its consent was a thing unknown to the law." Hans v. Louisiana, 134 U.S. 1, 16 (1890). As Justice Powell noted, the Court has found that the Eleventh Amendment's "greater significance lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III." Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 98 (1984).

Therefore, the stricture against the citizen of a state pursuing a federal court suit against the state is, as Justice Brennan termed it, "nonconstitutional sovereign immunity." Id., at 125. In other words, the Eleventh Amendment immunity posited by defendant is not really an Eleventh Amendment immunity at all, but is rather based on archaic principles of sovereign immunity. The Eleventh Amendment thus should not bar plaintiff's federal claims here.

Plaintiff further recognizes that in Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356 (2001) and Kimel v. Florida Board of Regents, 528 U.S. 62 (2000), the United States Supreme Court held that the Americans with Disabilities Act and the Age Discrimination in Employment Act do not serve to abrogate the States' Eleventh Amendment immunity and therefore do not protect persons from discrimination by state actors, despite

U:\DOCS\jlb\Harris, D\resp-mot-dismiss.wpd

Congress' explicit intent to the contrary expressed in each statute. Plaintiff submits that the

statutory language should be fairly interpreted as written and thus permit plaintiff to pursue her

ADA and ADEA claims against the defendants.

**C.    PLAINTIFF STATES A CLAIM UPON WHICH RELIEF CAN BE GRANTED PURSUANT TO TITLE VII OF THE CIVIL RIGHTS ACT**

**1.    Plaintiff's Title VII Claims are Not Barred by the Statute of Limitations.**

Title VII requires a complainant to file a timely discrimination charge with the EEOC as

a prerequisite to filing a lawsuit in federal court. Generally, under Title VII, a charge of

employment discrimination must be filed with the EEOC within 180 days of the last alleged act

of discrimination. 42 U.S.C. §2000e-5. However, Title VII also provides that in a deferral state

such as Pennsylvania, if a claimant initially files with a state or local agency, a charge can be

filed with the EEOC up to 300 days after the discriminatory act. DuBose v. District 1199C,

National Union of Hospital and Health Care Employees, 105 F.Supp. 2d 403, 410-411 (E.D. Pa.

2000) (citations omitted).

Title VII provides that the deferral state has sixty days of exclusive jurisdiction over the

claim. Id. at 411. The Pennsylvania Human Relations Commission ("PHRC"), meanwhile, has

entered into a worksharing agreement with the EEOC, whereby the PHRC has waived its right to

exclusive jurisdiction over discrimination cases within the initial sixty-day period. Id. at 411.

The worksharing agreement waivers have been construed as self-executing and therefore allow a

plaintiff to bring a lawsuit in federal court and assert a federal claim of discrimination without

first filing with the PHRC. Id. at 411 (citing Woodson v. Scott Paper Co., 109 F.3d 913, 926 (3d

Cir. 1996), cert. denied, 522 U.S. 914 (1997).

U:\DOCS\Jb\Harris, D\resp-mot-dismiss.wpd



Thus, as conceded by defendants in their Amended Brief, plaintiff's federal claims are timely if they were filed with the EEOC within 300 days of the alleged discriminatory act. See, e.g., DuBose, 105 F.Supp. 2d at 411-412 (the 300 day filing period was applicable in a deferral state such as Pennsylvania, even where the plaintiff did not file a charge with the PHRC or inform the EEOC that the charge was to be cross-filed with the PHRC).

Here, defendant Board sent plaintiff a letter on December 10, 1998 (Exhibit A) via certified mail, return receipt requested, stating that plaintiff's employment was to be terminated on December 11, 1998. Plaintiff received this letter on or after December 11, 1998, at the earliest. Prior to the termination taking effect on December 11, 1998, plaintiff spoke with K. Scott Roy, counsel for defendant Parole Board, who stated that he would provide her with an additional opportunity to present documentation on her behalf. On December 14, 1998, plaintiff was sent another letter (Exhibit B) via certified mail, return receipt requested, stating that since plaintiff had not submitted the documentation in question, the previously issued letter of termination "shall now have full force and effect." Plaintiff received this second letter on or after December 15, 1998, at the earliest.

A factual issue to be addressed is when the last discriminatory act of the defendants occurred. If such act occurred on December 10, 1998, then the 300-day deadline ran on October 6, 1999. However, due to defendant Parole Board's representation that plaintiff would be given additional time beyond December 10, 1998 to submit documentation of her medical condition, then plaintiff's limitation period should be extended to the date she received the Board's letter of December 14, 1998. The 300th day after December 15, 1998 (the earliest plaintiff could have

received the December 14 letter) is October 11, 1999, so plaintiff's EEOC filing may be found to have been timely filed if it was filed on or before October 11, 1999.[2]

In this case, the Complaint alleges that plaintiff filed her EEOC charge of discrimination on October 8, 1999. This is within the 300 day deadline and should therefore be deemed timely.

Moreover, the date the formal administrative complaint is actually filed with the EEOC is not the only means of determining when a plaintiff has "filed" a charge, for purposes of determining the timeliness of the charge pursuant to Title VII. A communication to the EEOC in "writing, including an Intake Questionnaire, may constitute a charge if it is of a 'kind that would convince a reasonable person that the grievant has manifested an intent to activate [Title VII's] machinery.'" Gulezian v. Drexel Univ., 1999 U.S. Dist. LEXIS 3276 (E.D. Pa. March 19, 1999) (copy attached hereto as Exhibit H) (quoting Bihler v. Singer, 710 F.2d 96, 99 (3d Cir. 1983)); Getz v. Pennsylvania Blindness & Visual Servs., 1999 U.S. Dist. LEXIS 14911 (E.D. Pa. Sept. 28, 1999) (Exhibit I); Rogan v. Giant Eagle, Inc., 113 F. Supp. 2d 777 (W.D. Pa. 2000); see also H.R. Conf. Rep. No. 950, 95th Cong., 2d Sess. 12 (1978), reprinted in 1978 U.S. Code Cong. & Ad. News 504, 534 ("The basic purpose of the notice requirement . . . is to provide the [EEOC] with sufficient information so that it may notify prospective defendants and to provide the [EEOC] with an opportunity to eliminate the alleged unlawful practices through informal methods of conciliation").

---

[2] Of course, the date of actual receipt of the December 14 letter may add one or more days to the EEOC filing deadline, if plaintiff actually received this letter on a date after December 15, 1999.

U:\DOCS\jth\Harris, D\mtp-mot-dismiss.wpd

Using the Intake Questionnaire to show timeliness is in keeping with the prevailing view that "procedural technicalities should not be used to prevent Title VII claims from being decided on the merits." Revis v. Slocomb Indus., Inc., 814 F. Supp. 1209, 1215 (D.Del. 1993) (quoting Gooding v. Warner-Lambert Co., 744 F.2d 354, 358-59 (3d Cir. 1984)). See also DuBose, 105 F. Supp. 2d at 412 (not only was a "Charge Questionnaire" sufficient for purposes of the limitations period, but the Court declared that the plaintiff was entitled to a tolling of the limitations period as of the date he completed the Charge Questionnaire). Courts have further determined that an unverified charge is timely filed if it is subsequently amended by a charge executed under oath or affirmation. See, e.g., Peterson v. Wichita, 888 F.2d 1307 (10th Cir. 1989).

Plaintiff's Complaint here mistakenly does not refer to her initial EEOC visit in April, 1999 or to her unsuccessful attempts to file a discrimination charge at that time. However, plaintiff signed a number of various forms for the EEOC on June 9, 1999, including a Charge Information Questionnaire, a Hiring/Promotion Questionnaire, a Conduct-Related Discipline Questionnaire, a Witness Questionnaire, and a Remedy Information form (collectively, Exhibit C). Notably, on several of the forms, plaintiff attested to the truth of her averments, under penalty of perjury.

These dated questionnaires accordingly provide evidence of a filing date earlier than October 8, 1999 (the filing date alleged in the Complaint). Moreover, plaintiff may be able to prove a set of facts sufficient to establish that she made substantial efforts to file a charge in April, 1999 such that the limitations period should be tolled as of that date.



For purposes of this motion, all reasonable inferences must be construed in plaintiff's favor. The reasonable inference here is that plaintiff either filed or mailed the various questionnaire forms to the EEOC on June 9, 1999, well within 300 days of her termination in December, 1998. In addition, plaintiff may be able to establish facts which would require the tolling of the limitations period as of April, 1999, when she visited the Philadelphia EEOC office with the intention of filing a charge. In conjunction with the Complaint's averment that plaintiff exhausted all required administrative remedies, and in accordance with notice pleading, plaintiff's discrimination claims should be deemed sufficient to overcome a Rule 12(b)(6) motion to dismiss on timeliness grounds.[3]

**2.  Plaintiff's Title VII Claims against the Individual Defendants Should be Permitted.**

Although the text of the Civil Rights Act would appear to permit a claimant to bring an action against an individual, as an employer, for discrimination, harassment, or retaliation,[4]

---

[3] The exact date of filing with the EEOC should, at a minimum, be a matter for pre-trial discovery and would be more properly addressed in a summary judgment motion rather than a Rule 12(b)(6) motion to dismiss. This is particularly true, given the fact that administrative discrimination complaints are subject to equitable tolling. See, e.g., Kocian v. Getty Refining & Marketing Co., 707 F.2d 748, 753 (3d Cir.), cert. denied, 464 U.S. 852 (1983). Moreover, if defendants' timeliness argument is accepted (based on the four corners allegations of the Complaint), then plaintiff should be granted leave to amend the Complaint to assert the factual basis for her equitable tolling argument, rather than be subjected to the drastic penalty of dismissal of her claims. See, e.g., Shaver v. Corry Hiebert Corp., 936 F. Supp. 313, 315 (W.D. Pa. 1996).

[4] 42 U.S.C. §2000e-2(a)(1) provides that:

It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

defendants' motion correctly states that the Courts of this Circuit have interpreted Title VII such as not to allow for suit against individual employees, despite the clear language of the statute and the definition of an "employer" under the statute.  Plaintiff submits that the statutory language should be fairly interpreted as written and thus permit plaintiff to pursue her Title VII claims against the individual defendants.[5]

### D.     PLAINTIFF'S PHRA CLAIMS SHOULD NOT BE BARRED AS UNTIMELY

In order to proceed with an action under the PHRA, a complainant must file a complaint with the Pennsylvania Human Relations Commission ("PHRC") within 180 days after the alleged discriminatory act occurred.  43 P.S. §959(a), (h).  The failure to exhaust remedies under the PHRA would preclude a court from exercising jurisdiction over a claim for violation of the PHRA.  Parsons v. Philadelphia Coordinating Office of Drug & Alcohol Abuse Programs, 833 F. Supp. 1108, 1112 (E.D. Pa. 1993).

Plaintiff's Complaint alleges that her EEOC charge was cross-filed with the PHRC (Complaint, para. 52) (a copy of the PHRC filing is attached hereto as Exhibit D).  This complaint is not date-stamped by the PHRC, and plaintiff does not know the date it was transmitted to the PHRC.  However, the uncertainty of the actual transmittal date is not relevant

---

The statute further defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees and any agent of such a person."  42 U.S.C. §2000e(b).

[5] Of note, the Pennsylvania Human Relations Act, which uses similar language in defining an "employer" as the Title VII, permits a plaintiff to make a direct claim for discrimination or retaliation against an individual such as a supervisor.  43 P.S. §§ 955(d), (e); see also Wein v. Sun Co., 936 F. Supp. 282, 283 (E.D. Pa. 1996)

U:\DOCS\jfb\Harris, D\resp-mot-dismiss.wpd

for purposes of defendants' motion, as Pennsylvania courts have held that a complaint that has been forwarded by the EEOC to the PHRC pursuant to the worksharing agreement is sufficient to comply with the PHRA's filing requirements. Parsons, 833 F. Supp. at 1112; Lukus v. Westinghouse Elec. Corp., 419 A.2d 431, 452 (Pa. Super. 1980); Lantz v. Hospital of the University of Pennsylvania, 1996 U.S. Dist. LEXIS 11154, *9 (E.D. Pa. July 30, 1996) (copy attached hereto as Exhibit J).  This is true where the plaintiff never filed a separate complaint with the PHRC and even where the plaintiff failed to request that the EEOC cross-file the charge with the PHRC.  Shaver v. Corry Hiebert Corp., 936 F. Supp. 313, 318-319 (W.D. Pa. 1996) (for purpose of determining timeliness, a charge is deemed to have been filed with the PHRC when it is filed with the EEOC).  Since plaintiff's charge was in fact transmitted to the PHRC, the date of filing with the EEOC is deemed to be the PHRC's filing date.  Moreover, Section 962(e) of the PHRA states that "the time limits for filing any complaint or other pleading under this act shall be subject to waiver, estoppel, and equitable tolling."

Equitable tolling of the limitations period is generally allowed in discrimination cases in three types of circumstances: (1) where the plaintiff actively pursues judicial remedies but files a defective pleading during the statutory period, such as filing in the wrong forum; (2) where the deadline for filing has passed due to the plaintiff's reliance on the adversary's misconduct or misrepresentation; or (3) where the plaintiff has been prevented from asserting his or her rights in some extraordinary way.  Altopiedi v. Memorex Telex Corp., 834 F. Supp. 800, 806 (E.D. Pa. 1993) (citations omitted).  Pennsylvania courts have recognized that bureaucratic delay or misrepresentations by the EEOC or PHRC will permit a plaintiff to assert the doctrine of equitable tolling of the limitations period.  See, e.g., Altopiedi, supra (tolling proper where

18

U:\DOCS\jth\Harris, D\resp-mot-dismiss.wpd

plaintiff promptly complied with all of PHRC's requests for information); <u>Shaver</u>, <u>supra</u> (plaintiff entitled to tolling when he relied on EEOC supervisor's representation that EEOC would take care of PHRC filing and that it would be timely); <u>Brennan v. National Telephone Directory Corp.</u>, 881 F. Supp. 986 (E.D. Pa. 1995) (plaintiff reasonably believed EEOC would cross-file with PHRC when she requested such cross-filing).

Plaintiff here was prevented from filing her EEOC charge when she first went to the Philadelphia EEOC office in April, 1999. However, she did fill out an information form and subsequently promptly filled out and signed on June 9, 1999, under penalty of perjury, the various questionnaires for the EEOC which were sent to her. If the last date of discrimination against plaintiff occurred on December 11, 1998, then a charge filed on June 9, 1999 would have been filed within 180 days and therefore been timely. Moreover, since plaintiff's attempted April, 1999 filing was prevented by bureaucratic delay on the part of the EEOC, through no fault of her own, the limitations period should be tolled as of April, 1999, which was well within 180 days of the last alleged act of discrimination.

As stated in <u>Lantz</u>, <u>supra</u>, "At this stage the court must construe all allegations in the light most favorable to Plaintiff. Therefore, because it is possible that the complaint was transmitted in a timely manner to the PHRC," the Court should deny the motion to dismiss plaintiff's PHRA claims. 1996 U.S. Dist. LEXIS 11154, at *10 (Exhibit J).

### E.    PLAINTIFF'S § 1983 AND 1985 CLAIMS

Plaintiff hereby withdraws her claims brought pursuant to 42 U.S.C. §1983 and 42 U.S.C. §1985.

**F.    PLAINTIFF STATES A CLAIM FOR WHICH RELIEF MAY BE
        GRANTED PURSUANT TO THE PENNSYLVANIA WORKER
        AND COMMUNITY RIGHT TO KNOW ACT**

Pursuant to the Right to Know Act, "any person who believes there is a violation by an

employer or supplier of this act or any part thereof may file a complaint, within 180 days of the

violation, with the department." 35 P.S. §7314; see also 34 Pa. Code §321.2(a).  Plaintiff

complied with this requirement, as she filed a complaint with the Pennsylvania Department of

Labor, Bureau of PENNSAFE, as early as May 18, 1999 (a copy of plaintiff's departmental

complaint is attached hereto as Exhibit E).  Plaintiff's Right-to-Know Act complaint thus was

timely filed pursuant to the Right to Know Act and the administrative regulations promulgated

thereunder.

Defendants' reliance on 42 Pa.C.S. § 5522 (mistakenly referred to as §5521 in

Defendants' Amended Brief) as a six-month statute of limitations is inapposite.  Section 5522

pertains to the need for a personal injury plaintiff to provide notification of an intent to bring a

claim for injury against the Commonwealth or a governmental unit within six months of the date

of injury, but does not provide the actual limitations period for such an action.  Here, even if

plaintiff would be required to provide within six months a notice of an intent to bring a claim,

she in fact provided the requisite notification when she filed her Department of Labor complaint.

Under the Right to Know Act, the Department of Labor is required to notify the employer when

an employee has filed a complaint, 35 P.S. §7314.  Plaintiff therefore could rely on the

Department of Labor to make the proper notification to defendant.

Defendant does not represent in its Amended Brief that it was never notified of plaintiff's

departmental complaint.  Defendant instead seems to argue that plaintiff's notification was

improper because it was not sent to the Commonwealth agency and the office of the Attorney General, as required by §5522(a)(1). However, Section 5522(a)(3) also states that "failure to comply with this subsection shall not be a bar if the government unit had actual or constructive notice of the incident or condition giving rise to the claim of a person." Whether defendant received notice of plaintiff's claims is a matter that must be investigated through discovery and should not be the basis of a Rule 12(b)(6) dismissal.

Additionally, defendants acknowledge in their Amended Brief that there is no specific statute of limitations on private actions against an employer under the Right to Know Act. Accordingly, plaintiff's statute of limitations is six years, as 42 Pa.C.S. §5527 provides a six-year limitations period for all actions which are not subject to another specific limitations period.

### G. PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff hereby withdraws her claim for intentional infliction of emotional distress.

## III. CONCLUSION

For the reasons set forth above, plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss Plaintiff's Complaint.

MATTIONI, LTD.

BY: *Joseph F. Bouvier*

EUGENE MATTIONI, ESQUIRE
JOSEPH F. BOUVIER, ESQUIRE
JOSH J.T. BYRNE, ESQUIRE
Attorneys for Plaintiff

H:\DOCS\jfb\Slama, D\resp-mot-dismiss.wpd

21

## CERTIFICATE OF SERVICE

I, JOSEPH F. BOUVIER, ESQUIRE, hereby certify that a true and correct copy of

Plaintiff's Response to Defendants' Motion to Dismiss Plaintiff's Complaint was mailed via first

class mail on September 19, 2001 to the following:

Lisa W. Basial, Esquire
Office of Attorney General
15th Fl., Strawberry Square
Litigation Section
Harrisburg, PA 17120


JOSEPH F. BOUVIER



COMMONWEALTH of PENNSYLVANIA

**Board of Probation and Parole**

1101 S. Front Street
Suite 5600
Harrisburg, PA 17104-2522

Certified - Return Receipt Requested
P 511 135 867

December 10, 1998

Ms. Dianna Harris                 SS#:  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
2329 Penn Street                   Employe #: 170853
Harrisburg, PA  17110          Classification:  Clerk Steno 2

Dear Ms. Harris:

On November 24, 1998, a pre-disciplinary conference was scheduled with you to afford you the opportunity to respond to the following charge, in that :

> You failed to report for work or resign, as directed, in the October 26, 1998 letter from A. Gary Scicchitano, Director, Bureau of Human Resources.

It is noted here that you failed to appear at the pre-disciplinary conference. After reviewing the documentation available, it was found that disciplinary action is warranted on the above charge. Therefore, the following action is being taken against you:

> That you be terminated from your Clerk Steno 2 position effective close of business Friday, December 11, 1998.

This action is taken in accordance with Section 803 of the Civil Service Act and Article 28 of the Collective Bargaining Agreement between AFSCME and the Commonwealth.

If you feel that you need assistance from the State Employe Assistance Program (SEAP), you can contact their office at 1-800-692-7459.  This is a voluntary and confidential program.

*Ms. Dianna Harris*
*December 10, 1998*
*Page 2*


You may appeal this action through either the Civil Service appeal process or the grievance procedure of the AFSCME Master Agreement, but not both. A Civil Service appeal must be made in writing directly to the Civil Service Commission within twenty (20) calendar days of receipt of this notice. Your rights are explained in Part C, Appeal Request, Form SCSC-4112, copies of which are attached. Your appeal rights under the grievance procedure are outlined in Article 38 of the AFSCME Master Agreement.

Sincerely,

William F. Ward
Chairman

WFW/TAM/law

cc:    Mr. Robinson
       Mr. Suleski
       Mr. Fielder
       Mr. Scicchitano
       Ms. Marcinko
       Ms. Collins
       Ms. McNichol
       SCSC
       AFSCME
       Personnel File
       File





COMMONWEALTH of PENNSYLVANIA

**Board of Probation and Parole**

Executive Offices
1101 S. Front Street, Suite 5100
Harrisburg, PA 17104-2517
(717) 787-8126

Certified Mail Z 081 192 132
Return Receipt Requested

December 14, 1998

Ms. Dianna Harris
2329 Penn Street
Harrisburg, PA 17110

Dear Ms. Harris:

On the afternoon of Thursday, December 10, 1998, we spoke via the telephone. At that time, you informed me that you had existing medical documentation which would support your refusal to return to the Harrisburg District Office and also support your request to move to the Central Office location. You also indicated that you had never shared the documentation with the Board.

I informed you that although a letter dated December 10, 1998, providing for your termination for failure to report for work or resign as directed had already been sent, you could forward the alleged medical documentation to me by noon on Friday, December 11, 1998, for consideration by the Board. I explained that the information, if sent, may or may not have changed the Board's decision to terminate you. Although you indicated you would be unable to personally fax or deliver the materials, you did agree to have your physician fax the records to me at 717-772-2157 by noon on Friday, December 11, 1998.

Having received no fax by the agreed upon time of noon Friday, December 11, 1998, the Board is unable to consider the information you have alleged to exist and, therefore, the Board's termination letter of December 10, 1998 shall now have full force and effect.

Sincerely,

K. Scott Roy
Chief Counsel

# CHARGE INFORMATION QUESTIONNAIRE

Please immediately complete the entire form, including any attached questionnaires, and return the entire document to the U. S. Equal Employment Opportunity Commission ("EEOC"). **Answer all questions as completely as possible. REMEMBER**, a charge of employment discrimination must be filed within the time limits imposed by law, generally within 300 days of the alleged discrimination.

**PERSONAL BACKGROUND INFORMATION:**

Name: Mr./Ms. *DIANNA LYNN HARRIS*

Address: *2329 PENN STREET*

*HARRISBURG, PA 17110*

Phone Number: (day) *(717) 232-3969* (night) *(717) 232-3969*

Date of Birth: *10.4.50* Soc. Sec. #: *166.44.8134* Race: *C*

**RESPONDENT INFORMATION** (Employer, union, employment agency against whom the charge is being filed)

Respondent Name *COMMONWEALTH OF PENNSYLVANIA BOARD OF PROBATION & PAROLE*

Address (If employer, the location where you actually worked or sought employment - **If you worked out of your home, state that,** and give the full address of the company home office or headquarters; if union or employment agency, the address where you conducted business)

*CENTRAL OFFICE* *PBPP DISTRICT OFF*
*1101 SOUTH FRONT ST, SUITE 5600* *7TH & HERR ST,*
*HARRISBURG, PA 17104* *HARRISBURG, PA*

City/State/Zip Code *HARRISBURG PA 17104* /County *DAUPHIN*

Approximate total number of employees *1,200*

Type of business *COMMONWEALTH OF PA*

*PAROLE BOARD*

**DATE OF HARM** (last date any harm which you consider discriminatory happened): *12-10-98*

**TYPE OF HARM** (the kind of discrimination that happened to you, for example, discharge, denial of hire, harassment): *UNLAWFULL TERMINATION, DISCRIMINATION, HARASSME DENIED PROMOTION, DENIED RIGHT TO BE PERMITTED TO RETURN TO WORK AT SAFE LOCATIO*

5/96

## CHARGE INFORMATION QUESTIONNAIRE (p. 2)

**BASIS** Check the basis for your complaint (the reason you believe the action was taken against you).

( )race             ( )color           ( )religion      (✓)sex

( )national origin     (✓)age           (✓)disability    (✓)retaliation

Identify yourself in terms of the basis or bases you checked, for example, "I am black" or "I am a disabled person."

_I HAVE A DISABILITY_

If you checked "retaliation," have you ever previously filed a charge with EEOC or another civil rights agency or complained to your employer about discrimination? (✓)yes ( )no

If yes, please explain: _I COMPLAINED ABOUT CONSTANT EXPOSURE TO TOBACCO SMOKE IN THE CENTRAL OFFICE (OLD BLDG) 910 S. FRO. I SUFFERED SEVERE ADVERSE HEALTH EFFECTS. IN 11.97 I WAS TRANSFERRED — A RETALIATORY TRANSFER NOT ALLOWABLE ALSO ..._

If none of the above bases applies, describe the reason you believe the action was taken against you: _BECAUSE PERSONS IN THE BOARD'S CENTRAL OFFICE WANTED TO SMOKE IN THE BUILDING — THEIR SMOKE MADE ME SICK. I COMPLAINED ABOUT IT & WAS RETALIATORILY TRANSFERRED TO THE DISTRICT OFFICE AT 7TH & HELL ST. THIS BUILDING HAD AN AIR QUALITY PROBLEM. SEVERAL EMPLOYEES HAD PREVIOUSLY COMPLAINED OF HEALTH PROBLEMS DUE TO THE POOR AIR QUALITY IN THE BUILDING ON 12-10-98. THIS WOULD ADVERSELY AFFECT MY HEALTH. THE PDPP TERMINATED MY EMPLOYMENT, THIS WAS AN UNLAWFUL TERMINATION & WAS THE RESULT OF DISCRIMINA. AGAINST ME ON THE BASIS OF MY DISABILITY GENDER, AGE & IN RETALIATION FOR HAVING COMPLAINED OF THE PDPP'S FAILURE TO PROVIDE SMOKE-FREE WORK PREMISES AT THE CENTRAL OFFICE LOCATION & FOR HAVING COMPLAINED ABOUT THE POOR AIR QUALITY IN THE DISTRICT OFFICE BUILDING._

_Dianna Lynn Harris_
**Signature**

_6.9.99_
**Date**

## CHARGE INFORMATION QUESTIONNAIRE (p.3)

CONTACT PERSON: Please provide the name of an individual **at a different address** who is in the local area and who would know how to reach you.

Name _MARILYN C. LINKO_ _____ Relationship _FRIEND_ _____

Address _5981 HUNTINGDON CIRCLE_ _____

City _HARRISBURG_ _____ State _PA_ _____ Zip Code _17111_ _____

Area Code/Telephone Number _717. 561. 8983_ _____

## ADDITIONAL INFORMATION

1. Choose one of the following:
   a) (✓) I want to file a charge.
   b) ( ) I DO NOT WANT to file a charge at this time.
   c) (✓) I want to speak with an EEOC Representative before this is filed as a charge.

   _(ONLY IF EEOC THINKS NECESSARY)_

   I can be contacted at (area code/telephone number) _717. 232. 3969_ _____. The best days and times to contact me are _ANY TIME_ _____.

2. Indicate which of the following applies:
   a) (✓) I have not filed a charge with any other agency concerning these same matters.
   b) ( ) I have filed a charge with the agency/agencies named below concerning these same matters:
      Name of Agency _____
      Date Filed _____
      Agency docket number _____
   c) ( ) I am scheduled for an interview with the agency named below:
      Name of Agency _____
      Date of Scheduled Interview: _____
      Location of Interview _____
      Name of Interviewer _____
   d) ( ) I have received a Questionnaire to be completed from the agency named below:
      Name of Agency _____
   e) ( ) I mailed the Questionnaire back to the agency named above on or about:
      _____

Name: DIANNA LYNN HARRIS          Date: 6-15-99

## ADA INTAKE QUESTIONNAIRE

Please answer each question on this questionnaire completely and accurately. Incomplete answers may delay the processing of your charge. If additional space is needed to answer any question(s), please attach additional pages. When all questions are answered, please sign and date the form and return it to this office.

1. Describe your disability. Provide the medical name for your disability, if known, as well as a general description of your disability in non-medical terms. Describe in general what major life activities (such as walking, lifting, breathing or hearing, etc.) are affected by your disability and describe the extent to which that activity is affected.

I BECAME VERY ILL AFTER BEING PLACED
IN A BUILDING WITH KNOW AIR QUALITY
PROBLEMS
I SUFFERED FRONTAL HEADACHES, NAUSEA,
RASHES, DEPRESSION. I BECAME TOTALLY
DISABLED + COULD NOT GET OUT OF BED!
I HAD REPEATED SINUSITIS, RHINITIS
I AM ALLERGIC TO MOLDS, TOBACCO
CHRONIC NAUSEA.

BREATHING BECAME LABORED
I SUFFERED EMOTIONAL DISTRESS +
MILITARY, EMOTIONAL DAMAGE, LOSS
OF JOYS + PLEASURE OF LIFE.

I BECAME TOTALLY DISABLED.

I BELIEVE THIS WAS DONE IN RETALIATION.

2. Is your disability permanent or of a temporary nature? When was your disability first diagnosed? If your impairment was caused by an accident or injury, when did that accident or injury occur? Has your physician indicated that the limitations caused by your disability are of a permanent nature? Is your disability worsening or improving?

MY DISABILITY IS PERMANENT. FIRST DIAGNOSED IN 1996.
MY IMPAIRMENT WAS CAUSED BY POOR INDOOR
AIR QUALITY DUE TO BURNING TOBACCO + SHODDY
MAINTENANCE AT THE PAROLE BOARD FROM 1995-19
YES MY PHYSICIAN + SCIENTIFIC RESEARCH
INDICATES MY DISABILITY IS PERMANENT.
MY CONDITION IS WORSE IN POOR INDOOR AIR QUALITY
AS EXPERIENCED IN A BLDG WITH SICK BLDG SYNDROME
SUCH AS THE HARRISBURG DISTRICT OFFICE.
MY CONDITION IMPROVED AFTER I STAYED AWAY FROM

## ADA INTAKE QUESTIONNAIRE - Pg. 2

_____
_____
_____
_____
_____
_____
_____

3. If your disability was caused by or made worse by a job-related injury or accident, did you apply for workers compensation? If yes, were you awarded workers compensation? For what period of time were you on workers compensation? If you are still on workers compensation (or were on workers compensation at the time of the alleged discrimination), explain how you would be able to perform the essential functions of your regular job with or without an accommodation while still on workers compensation.

I DID NOT APPLY FOR WORKERS COMP.
MY DISABILITY WAS CAUSED BY IMSLE
AT THE MARBLE BOARD & MADE
WORSE IN A " SICK BUILDING "
THAT WAS NOT PROPERLY MAINTAINED.

_____
_____
_____
_____
_____

4. Explain how your particular disability affects your ability to perform the job in question. Also, describe any limitations or restrictions related to this job which have been placed on you by a physician for reasons related to your disability. If your physician recommended that you be placed on "light duty," what type

of light duty assignments were recommended and for what period of time?

Also, does Respondent have a light duty program? If so, is this duty limited in any way (e.g., only to persons who had on-the-job injuries, for a limited period of time, for certain categories of employees only, etc.)?

I CAN DO MY JOB IN A SAFE BUILDING.

5. Provide the names, addresses and phone numbers (if known) of all doctors and/or therapists who have treated you for this disability. For each such person listed, indicate the period of time you were treated by this person.

SEPT - 1996 - PRESENT

1996 - 1998
NORMAN M. WOLDORF, MD
205 GRANDVIEW AVE
CAMP HILL, PA 17011
717-763-7721

DR WM BUSH, MD
5100 LANCASTER ST
HARRISBURG, PA 17110
717-561-0200

JUN 1998 - AUG 1998
ROBERT M. ZUCKERMAN, MD
2151 LINGLESTOWN ROAD
SUITE 160 A, PA 17110
HARRISBURG
717-541-8066

JUNE - AUG 1998
MARIA H BRENNER
3300 NORTH THIRD ST
HARRISBURG, PA 17110
717-234-3839

JUN - OCT 1998
DR. MATTHEW J. TIERNEY
937 S. MARKET ST
ELIZABETHTOWN, PA 17022
717-361-7857

1997
NOV - JAN 1998
DEBORAH GOOD
3544 N. PROGRESS A...
HBG PA
717-540-5451

1995 - 1997
ANNA MARIE MARKEVICH
2445 N 3RD ST. Suite 230
..., PA 17110

ROBERT GILROY, MD
1031 N. FRONT ST. MAY 1998 - JUN 1998
HBG, PA 17110 PULMONARY
717-234-2521

## ADA INTAKE QUESTIONNAIRE pg. 4

_____

_____

_____

6.    Describe how, when and which Respondent management officials became aware of your disability and any job-related limitations or restrictions caused by that disability.

I GAVE THE BOARD A LETTER FROM MY DOCTOR THAT EXPLAINED MY CONDITION = SEPT 1996.

IN APRIL OF 1997 I GAVE THE BOARD A LETTER THAT REITERATED MY DOCTOR'S LETTER. IN APRIL OF 1998 I GAVE THE BOARD DOCUMENTATION REGARDING THE POOR INDOOR AIR QUALITY AT THE HARRISBURG DO. I GAVE THE BOARD DOCUMENTATION FROM MY DOCTOR OCT 1998 THAT BECAUSE OF MY CONDITION I COULD NOT GO BACK TO WORK AT THE HARRISBURG DO. I ASKED FOR A SIMPLE ACCOMMODATION, TO BE RELOCATED TO ANOTHER POSITION AT ANOTHER LOCATION. THE BOARD REFUSED TO ACCOMMODATE ME. — THEY FIRED ME 12-98

_____

7.    Have any Respondent managers or supervisors made negative comments concerning your disability? If so, provide the name and title of each person making the comments and describe those comments in terms of what was said, when it was said, and whether there were any witnesses to those statements.

MY DISABILITY WAS NEVER TAKEN SERIOUSLY BY THIS AGENCY. LINWOOD FIELDER, DIR. HARRISBURG DISTRICT OFFICE POPP SAID THE BUILDING DIDN'T HAVE A PROBLEM, SOMEONE HE WOULD LAUGH ABOUT THE SMELL AFTER SOMEONE USED THE RESTROOM. HE SAID IN A STAFF MTG WE ALL HAD PROBLEMS AT HOME WITH OUR RESTROOM. HE SAID THE SMELL OF CAR EXHAUST WAS BECAUSE WE WERE SO CLOSE TO THE ROAD ON 7th ST. HE WAS & IS NOT QUALIFIED TO MAKE SUCH STATEMENTS I WAS MADE SICK FROM THESE ISSUES.

⬤ ADA INTAKE QUESTIONNAIRE ⬤ pg. 5

THE AFFIRMATIVE ACTION OFFICE, ADA & EEOL OFFICE
LADELL INGRAM STORMED OUT OF HER OFFICE
& SAID "THIS GOD DAMN PLACE DOINT SMOKERS HAVE
RIGHTS TOO" ARLENE GOTTLEMUER HEARD THIS ALSO
BOB YERGER, DIR. ADMINISTRATIVE SERVICES.
GAVE ME A WHITE MASK TO PUT ON WHEN I
COMPLAINED ABOUT A DIRTY WAREHOUSE HE WAS
SENDING ME TO.
DAVID PAYTON, DIR. OFFICE SERVICES LAUGHED AT
ME WHEN I SAID THE BLDG HAD A COMMON-AIR
VENT-SYSTEM.
MIKE NEUMYER, DIR. MAT SERVICE. SAID NOTHING
WAS WRONG WITH THE BLDG.
MARIA MARLINKO, PERSONNEL, LAUGHED WHEN I TOLD HER
HOW SICK THE BLDG MADE ME.

8.  Do you (or did you) need a reasonable accommodation in order to perform the job in question? If yes, describe for what part or parts of the job you required an accommodation. Indicate how frequently this part of the job is done and the importance of this part of the job to the total job.

I NEEDED MOVED OUT OF A
TOXIC BUILDING THAT MADE
ME ILL.
I COULD NOT WORK IN THAT
BUILDING

9.  Are you (or were you) able to perform all parts of the job in question other than the part(s) described above for which you require an accommodation? Describe the major functions of the job which you are able to perform without an accommodation.

NA

ADA INTAKE QUESTIONNAIRE - 6

10. Have you ever sought a reasonable accommodation because of your disability?
If yes, describe the circumstances surrounding your request to include: date of
request, name and job title of the person(s) to whom the request was made,
the type of accommodation requested, and response(s), if any, to the request.

OCTOBER 1998 REQUESTED A
REASONABLE ACCOMMODATION
I SEND A LETTER & MY
DOCTOR'S PAPERWORK TO THE
CHAIRMAN OF THE PAROLE BOARD
~~THOMAS~~ WILLIAM WARD TO BE MOVED TO
ANOTHER LOCATION.
THE REQUEST WAS DENIED &
I WAS FIRED DEC 1998.

ADA INTAKE QUESTIONNAIRE - 7

11.  Are there any witnesses, written records or other means available to verify that you made this request for reasonable accommodation and/or that your request was denied, was not acted upon, or was not met in a manner satisfactory to you?  If yes, please describe the means by which this can be verified.

I HAVE COPIES OF THE PAPERWORK
I SENT THE BOARD CHAIRMAN.
I HAVE COPIES OF THE DENIED
REQUEST & COPIES OF MY
TERMINATION PAPERS.

12.  If you are claiming that you are not disabled, but Respondent incorrectly "perceived" you to have a disability, describe what disability you are perceived as having.  In addition, indicate which Respondent representative(s), by name and job title, perceive you to have this disability and what makes you believe that those persons have this perception.

ADA INTAKE QUESTIONNAIRE - pg. 8

13. If the Respondent has taken an action against you because you are viewed as being a **"direct threat"** (i.e., that because of your disability you pose a threat to your own safety or the safety of co-workers), provide the name and title of the Respondent representative who informed you of this, when this occurred, whether this was done orally or in writing, and what reason(s) was(were) given for considering you a direct threat, and describe to what extent this was based on medical information. Also, describe whether Respondent attempted to provide a reasonable accommodation to you to reduce the threat or to transfer you to another position.

THE PA BOARD OF PROBATION DID NOT EVER TAKE MY CONDITION SERIOUSLY. I BELIEVE BECAUSE THE CHAIRMAN & BOARD MEMBERS ARE APPOINTED BY THE GOVERNOR & SEVERAL SMOKED TOBACCO — MANAGEMENT WERE INTIMIDATED TO STOP THE SMOKE THAT IS A HEALTH HAZARD. I BECAME VERY ILL FROM THE SECOND HAND SMOKE. OTHERS ALSO BECAME ILL. THIS SITUATION WAS ALL BUT IGNORED FOR YEARS. COMPLAINTS WENT UN-HEARD. I DID NOT FEEL I SHOULD HAVE TO WORK IN THIS CONTAMINATED ATMOSPHERE. I COMPLAINED & WAS LIED TO REGARDING STATE LAWS. & WAS ABUSED & PUNISHED WHEN I REPORTED THE SITUATION TO OTHER STATE AGENCIES & THE GOVERNOR'S OFFICE. I WAS PUNISHED & MOVED TO A BUILDING WITH A KNOW IN DOOR AIR QUALITY PROBLEM THAT HAS EXISTED FOR YEARS. I BECAME SICKER. I GAVE THE BOARD PAPER WORK FROM MY DOCTOR I COULD NOT RETURN TO THAT BUILDING. I ASKED FOR A SIMPLE REQUEST. TO BE MOVED TO ANOTHER LOCATION. THERE WAS NO REASON I SHOULD NOT HAVE BEEN RELOCATED. ON 12-10-98, I WAS FIRED IN RETALIATION FOR HAVING COMPLAINED OF THE BOARD'S FAILURE TO PROVIDE A SMOKE FREE WORK PREMISES & FOR HAVING COMPLAINED ABOUT THE POOR INDOOR AIR QUALITY.

I declare under penalty of perjury that I have read the above statements and that they are true and correct.

_Dianna Lynn Harris_
Signature

6-15-99
Date

13. NO ATTEMPT ●'S MADE TO GIVE ● AN ACCOMMODATION, TO REDUCE THE THREAT OR TO TRANSFER ME TO ANOTHER POSITION.

I RECEIVED NOTIFICATION I WAS FIRED IN THE FORM OF A LETTER FROM THE CHAIRMAN OF THE BOARD, WILLIAM WARD.

THIS WAS AN UNLAWFUL TERMINATION ON THE BASIS OF MY DISABILITY, GENDER, AGE, & IN RETALIATION.

Name: _Dorinda Ann Harris_    Date: _May 5, 97_

# HIRING/PROMOTION QUESTIONNAIRE

1. Name of position you applied for: _OPERATIONS CENTER MONITOR_

2. How did you learn of the vacancy? _POSITION WAS A POSTED POSITION_

3. What were the requirements for the position? _CIVIL SERVICE STATUS GRADUATION FROM HIGH SCHOOL OR EQUIVALENT. APPLICANTS MUST SUBMIT A NOTARIZED CIVIL SERVICE APPLICATION, MUST BE A PENNSYLVANIA RESIDENT AT THE TIME OF APPLICATION._

4. How do you know what the requirements were? _THE REQUIREMENTS WERE STATED IN THE ANNOUNCEMENT._

5. Describe how you met all of the known requirements: _I HAD CIVIL SERVICE STATUS, I GRADUATED FROM HIGH SCHOOL, I SUBMITTED A NOTARIZED CIVIL SER. APPLICATION, I AM A PENNSYLVANIA RESIDENT. I WAS DOING ELECTRONIC MONITORING AT THE HARRISBURG DISTRICT AS ONE OF MY JOB DUTIES. I WORKED FOR THE BOARD & WAS FAMILIAR WITH ITS STRUCTURE._

5/96

## HIRING/PROMOTION QUESTIONNAIRE (p. 2)

6. When did you apply for the position? _SEPTEMBER 28, 1998_

7. Did you apply in writing or orally? _I APPLIED IN WRITING_ )

8. What were the name and the title of the person to whom you addressed your application or, if done orally, to whom you indicated that you had an interest in the position in question?

_DIANE M. ZEIGLER, CHIEF, EMPLOYEE SERVICES_
_BUREAU OF HUMAN RESOURCES_

9. Were you interviewed for the position? If yes, how many times? For each time you were interviewed, identify by name and title the person(s) who interviewed you.

_I WAS NOT INTERVIEWED._

10. Were you given any type of written or oral test? If yes, describe the type of test and the results, if known:

_NO - I WAS NOT GIVEN ANY TYPE_
_OF WRITTEN OR ORAL TEST_

11. How and when were you notified that you were not selected for the position?

_I CAN'T REMEMBER IF I WAS_
_SENT A LETTER. I DON'T RECALL_
_GETTING ONE._

## HIRING/PROMOTION QUESTIONNAIRE (p. 3)

12. What reason(s) was/were given for not selecting you?

I DON'T RECALL GETTING NOTIFICATION OF REJECTION OR ANY REASONS

13. What are the name and the title of the person who notified you that you had not been selected?

14. Was the person identified in #13 above the person who made the selection? _____.
If not, identify (if known) the name and the title of the person who made the selection.

SELECTION WAS MADE IN HUMAN RESOURCES GARY SCICCHITANO IS THE DIRECTOR

15. If you know, name the person who got the position you applied for.

JOSEPH BUTCHKO A FORMER STOCK ROOM EMPLOYEE.

16. What are that person's sex M, race W, national origin _____, approximate age 35.

17. Did that person meet the stated requirements for the position? NO. OFFICE SERVICES I WAS WORKING IN THE DIVISION OF STOCK PERSON WHEN MR. BUTCHKO WAS HIRED AS A HE NEVER WORK IN PBPP ELECTRONIC MONITORING

18. If he/she did not meet the requirements, in what way did he/she not meet them?
MR. BUTCHKO & THE FIVE OTHER PERSONS SELECTED FOR THESE POSITIONS HAVE NEVER WORKED WITH PBPP CLIENTS & PBPP PAROLE AGENTS AS I HAVE. THEY DON'T HAVE PRIOR EXPERIENCE PLACING CLIENTS ON ELECTRONIC MONITORING — I AM I HAVE HAD THIS EXPERIENCE PREVIOUSLY IN ONE OF THREE TRAINED PREVIOUSLY IN THIS AREA.
OTHERS DIDN'T WORK FOR THE PBPP PRIOR

## HIRING/PROMOTION QUESTIONNAIRE (p. 4)

19. Why do you believe that you should have been selected instead of the person who was selected?

*[handwritten, largely illegible]* I was a PPP paid employee & was familiar with its structure. I was one of three ranked for this position. I did most of the duties of this position while I was employed at the Harrisburg [...] I had experience working with [...] that would put these [...] I have experience [...] with [...] electrical [...]. I was familiar with its structure.

20. Why do you believe that you were not selected because of your race, sex, color, religion, national origin, age, disability or in retaliation for having opposed a practice made unlawful by one of the statutes administered by EEOC?

*[handwritten, largely illegible]* I believe it was because of my age, my sex & that being a male dominated industry & my disability & my having complained about the [smoke] [unhealthy] conditions & the poor indoor air quality. This [...] [they] [...] under "the ADA" [...] of these unlawful acts. I did not get this position in retaliation. The person in [the] [...] in charge of personnel, affirmative action, human [resources] are the same persons I complained to [...] Governor's office & Human Relations for having opposed a practice made unlawful by one of the statutes administered by the Equal Employment Opportunity Commission.

I declare under penalty of perjury that I have read the above statements and that they are true and correct.

Signature *[handwritten signature]*

Date 6. 9. 99

Name: _Donna Lee Fallis_    Date: _6-1-99_

## CONDUCT-RELATED DISCIPLINE QUESTIONNAIRE

1.    Provide your employment history with the Respondent employer as follows:

a)    date of hire: _MAY, 1995_

b)    position title at time of hire: _CLERK STENOGRAPHER II_

c)    position title at time of most recent discipline:

_CLERK STENOGRAPHER II_

d)    date you were selected for the job you held at the time of the most recent discipline: _11.97_

e)    name of section/department at time of most recent discipline:

_PA BOARD OF PROBATION & PAROLE_
_DISTRICT OFFICE, HARRISBURG_

f)    name and title of your immediate supervisor:

_LINWOOD FEEDER, DIRECTOR, HARRISBURG DISTRICT OFFICE_

2.    Describe the most recent discipline (discharge, suspension, demotion, etc.) given you:

_I WAS TERMINATED FROM MY_
_POSITION_

3.    What explanation was given to you as to the reason(s) for your receiving this most recent discipline?

_I WAS TERMINATED BECAUSE I_
_WOULD NOT RETURN TO WORK_
_AT THE HARRISBURG D.O._
_THE BOARD SAID THE BUILDING WAS_
_SAFE._
_THE BOARD REFUSED TO ALLOW ME TO_
_WORK IN A BUILDING THAT WOULD_
_NOT MAKE ME SICK._
_I BECAME TOTALLY DISABLED BECAUSE (in Feb_
_OF THE POOR INDOOR AIR QUALITY_
_AT THE HARRISBURG DISTRICT OFFICE._

5/96

## CONDUCT-RELATED DISCIPLINE QUESTIONNAIRE (p. 2)

4.    On what date were you told of the discipline to be given you?

_12-10-96_

5.    Were you informed orally or in writing of this discipline?

_IN WRITING_

6.    What are the name and the title of the person who informed you of the discipline to be given you?

_WILLIAM WARD, CHAIRMAN, PA BOARD OF PROBATION & PAROLE_

7.    If known, what are the name and the title of the person(s) who recommended that you receive this most recent discipline? _WM. WARD, CHAIRMAN_
_MIKE NEWMYER, DIRECTOR, OFFICE OF MANAGEMENT SERVICES_
_GARY (SOMETHING), DIRECTOR HUMAN RELATIONS_
_JEFF LAY, CHIEF COUNSEL, OFFICE OF CHIEF COUNSEL_

8.    What is the discipline policy related to the rules, policies or practices which you were charged with violating?

_I DON'T THINK THERE IS ANY POLICY IN THE STATE OF PENNSYLVANIA THAT WOULD ALLOW AN EMPLOYER TO TERMINATE AN EMPLOYEE ON THE GROUND IF HE/SHE DISABILITY & IN RETALIATION FOR MAKING COMPLAINTS WHEN THE AGENCY BREAKED, WHICH, THEY TO PROVIDE ME ANOTHER POSITION_

9.    How do you know what the discipline policy is?

_I HAVE READ STATE & FEDERAL laws RE: CLEAN FOR ACT
     ADA Act, FEDERAL COMPENSATION Act_

10.    Did you commit the offense(s) or violate the rule(s) for which you were disciplined? If not, what is your version of what happened and how can you demonstrate that you did not commit this offense?

_I DON'T HAVE A DISCIPLINARY PROBLEM. I HAVE A DISABILITY.
I DID NOTHING WRONG EVER. I WAS NEVER DISCIPLINED PRIOR. I NEVER RECEIVED PRIOR DISCIPLINARY ACTION UNTIL I COMPLAINED THE GRAY WAS VIOLATING laws IN A MANNER MADE UNLAWFUL BY THE STATE OF PA_

management [illegible] [illegible] [illegible]
[illegible] [illegible] at the [illegible] [illegible]

## CONDUCT-RELATED DISCIPLINE QUESTIONNAIRE (p. 3)

11. What disciplines have you previously received? Describe each discipline including the date, reason, type of discipline, and name and title of your immediate supervisor at the time of each discipline.

I have never received previous discipline. I am a professional & conduct myself accordingly.

12. Identify all persons who have committed offenses/rules violations similar to those you were charged with committing, but who received a lesser discipline than you received. For each person named, provide the following information (adding pages to complete your answer if more than one person is named).

a) name: ______

b) race ______, sex ______, national origin ______, and approximate age ______.

c) job title: ______

d) name/job title of immediate supervisor: ______

e) description of what offense or violation the person committed:

I think my situation is special & a single situation. ONE OF A KIND. Board members & upper level management were not reported for [illegible] [illegible] [illegible] because I continued to stand up for my rights & [illegible] [illegible] [illegible] they wanted me gone away [illegible] so they would not have to [illegible] [illegible] laws.

[illegible] interest & apathy [illegible] management in this agency [illegible] feel they are above state & federal regulations.

## CONDUCT-RELATED DISCIPLINE QUESTIONNAIRE (p. 4)

f) type of discipline, if any, given to this person:

______________________________

______________________________

______________________________

g) when did this occur? ______________________________

h) which management officials, by name and title, were aware of this offense/rules violation?

______________________________

______________________________

i) how do you know about the above circumstances?

______________________________

______________________________

______________________________

______________________________

13. Identify all persons who have committed offenses/rules violations similar to those you were charged with committing and who were disciplined in the same manner as you were. For each person named, provide the following information (adding pages to complete your answer if more than one person is named):

a) name: ______________________________

b) race ______, sex ______, national origin ______________ and approximate age ______.

c) job title: ______________________________

d) name/job title of immediate supervisor: ______________________________

e)    description of offense or rules violation this person committed

_____

_____

### CONDUCT-RELATED DISCIPLINE QUESTIONNAIRE (p. 5)

_____

_____

_____

_____

f)    discipline given to this person: _____

_____

g)    when did this occur? _____

h)    how do you know about the above circumstances?

_____

_____

_____

14.   Why do you believe that there was a difference in the discipline given you and the person(s) cited in #13 above from the discipline given the person(s) you cited in #12 above?

_____

_____

_____

_____

_____

_____

I HAVE A DISABILITY.
I DON'T WANT ANOTHER PERSON PUT IN THE SAME
POSITION THE PA BOARD OF PROBATION & PAROLE PUT
ME IN. THEY JEOPARDIZED MY HEALTH & CAUSED
ME A GREAT DEAL OF EMOTIONAL STRESS & MONETARY
LOSS.

**CONDUCT-RELATED DISCIPLINE QUESTIONNAIRE (p. 6)**

15.  Why do you believe that you were discriminated against because of your race, sex, color,
religion, national origin, age, disability or in retaliation in a manner made unlawful by the
statutes administered by EEOC? I AM FIRST OF ALL A WOMAN
IN A "WHITE MALE DOMINATED" AGENCY.
THEY EXPECT WOMEN TO SIT DOWN SHUT UP & TAKE
THE HARASSMENT BY MEN IN THIS AGENCY.
LAWS & REGULATIONS APPLY TO EVERYONE NO MATTER
HOW FAR UP THE CHAIN - OF-COMMAND YOU ARE POSITIONED.
YOU ARE NOT ELIMINATED ON THE BASIS OF PA TO
HARASS WOMEN IN STATE AGENCIES.
MEN THAT HAVE HARASSED WOMEN HAVE BEEN PROMOTED
TO HIGH POSITIONS WITHIN THE AGENCY.
THIS AGENCY (MALE DOMINATED) RESENTS ME BECAUSE
I STOOD UP FOR MYSELF & OTHER WOMEN
THAT WERE BEING MADE ILL BECAUSE OF SMOKE
FROM THE CHAIRMAN OF THE BOARD, BOARD MEMBERS
& UPPER LEVEL MANAGEMENT THAT THEIR LAWS
DON'T APPLY TO THEM. FOR SOME REASON
I REPORTED THESE VIOLATIONS TO STATE AGENCIES
& THE GOVERNOR. THIS AGENCY LAUNCHED A
PERSONAL ATTACK AGAINST ME BECAUSE I WAS
EXERCISING MY RIGHTS & THEY DON'T WANT WOMEN
TO EXERCISE THEIR RIGHTS.
I HAVE A RIGHT UNDER THE RIGHT TO KNOW ACT
TO REFUSE WORK WITHOUT BEING SUBJECT TO PENALTY
BY MY EMPLOYER, IF I REQUESTED AN MSDS REPORT
& THE PROPER STEPS HAVE NOT BEEN TAKEN TO ISSUE
ME THE REPORT.
THERE IS NOT ONE PERSON AT THE PBPP QUALIFIED TO
MAKE DECISIONS REGARDING MY CONDITION, MY
HEALTH, OR WHAT OFFICE I SHOULD WORK IN.
MIKE NEWMYER KNEW AT THE TIME HE ASSIGNED
ME TO THE HARRISBURG DISTRICT OFFICE IT
WOULD MAKE ME ILL. HE KNEW OF MY
CONDITION & KNEW OF THE POOR AIR QUALITY
AT THE HARRISBURG DISTRICT OFFICE

I WAS A CENTRAL OFFICE EMPLOYEE. THERE WERE TWO OTHER CENTRAL OFFICE LOCATIONS I COULD HAVE BEEN REASSIGNED TO. I WAS TRAINED FOR POSITIONS IN BOTH OF THESE LOCATIONS

I ASKED FOR A SIMPLE REQUEST -- TO BE MOVED TO A BUILDING WITH A SAFER ENVIRONMENT BECAUSE OF MY CONDITION.                    BECAUSE THE BUILDING MADE ME VERY SICK

I INFORMED MIKE NEWMYER I WOULD NOT GO BACK TO WORK AT THE HARRISBURG DISTRICT OFFICE. HE ARRANGED FOR A PDL TO BE HELD IN THIS OFFICE. A SICK BUILDING WHY WASN'T THE MEETING ARRANGED TO BE HELD AT ANOTHER OFFICE WITHOUT ALL THE INDOOR AIR QUALITY PROBLEMS I NEVER WANTED MOVED OUT OF THE CENTRAL OFFICE. I WANTED THE "SMOKE" THAT WAS MAKING ME & OTHERS ILL MOVED! I WHO NEVER CONSULTED REGARDING THIS MOVE I WHO TOLD THE END OF THE DAY & HAD ONE-HOUR TO COLLECT MY THINGS & GET OUT WHY? I DID NOTHING WRONG! MIKE NEWMYER TOLD OTHERS IN THE MORNING OF THIS DAY I WAS MOVED. NOT TO TELL ME BECAUSE HE "DON'T WANT HER TO GET ANYMORE IDEAS" I DIDN'T HAVE IDEAS I HAD LEGITIMATE CONCERNS & WANTED SOME COMMON-SENSE REFORM.

MIKE NEWMYER WANTED ME "OUT" & USED HIS POSITION AGAINST ME SO I WOULDN'T BE IN THE CENTRAL OFFICE TO COMPLAIN ABOUT BOARD MEMBERS SMOKING — BOARD MEMBERS THAT ARE APPOINTED BY THE GOVERNOR OF PA ALSO — I CONFRONTED HIM ABOUT A SICK, PERVERTED SEXIST, RACIEST JOKE THE DIRECTOR OF HUMAN RELATIONS TOLD IN MR. NEWMYERS PRESENCE. MR. NEWMYER IS MR. SCICCHITANO'S SUPERVISOR. MR. SCICCHITANO IS IN CHARGE OF PERSONNEL (HE WANTED ME "OUT" BECAUSE OF THIS) HE IS IN CHARGE OF ADA, AFFIRMATIVE ACTION, HEALTH & SAFETY.

WHO ARE WOMEN TO GO TO RE SUCH JOKES & SEXUAL HARASSMENT IF MR. SCICCHITANO IS IN CHARGE.
THIS IS NOT APPROPRIATE BEHAVIOR FOR PERSONS SUPERVISING THE AFFIRMATIVE ACTION POSITION, THAT WHO PRESIDE DIRECTLY POSITIONS UNDER THE

THE WAY THE (BOARD) RE-STRUCTURED THE AFFIRMATIVE
ACTION POSITION SO LOW IN THE CHAIN-OF-
COMMAND NEEDS INVESTIGATED — BECAUSE WOMEN
LIKE MYSELF CAN NOT & WILL NOT GET PROTECTED.

**I declare under penalty of perjury that I have read the above statements and that they are true and correct.**

Signature _____     Date  6.9.99

THIS AFFIRMATIVE ACTION POSITION TIES IN WITH
FEDERAL AMERICAN DISABILITY ACTS SUIT AS
WELL I AM PROTECTED by.

DID THE PA BOARD OF PROBATION & PAROLE PLACE THIS
AFFIRMATIVE ACTION POSITION UNDER MIKE
NEUMYER & GARY SCICCHITANO TO INFILTRATE
SUCH COMPLAINTS. THIS NEEDS INVESTIGATED.

ALSO TO COMPLICATE MY SITUATION FURTHER GARY
SCICCHITANO IS SUPERVISOR OF THE HEALTH & SAFETY
POSITION AT THE (BOARD) — THIS IS THE POSITION
RESPONSIBLE FOR THE AIR QUALITY THAT MADE ME SICK
AT THE DISTRICT OFFICE.

MR. SCICCHITANO DOES NOT TELL THE TRUTH
WHEN I COMPLAIN TO OTHER AGENCIES. I HAVE
PROOF OF THIS.

WHEN MR. SCICCHITANO ARRIVED AT THE (BOARD) FOR THE
PERSONAL POSITION HE CARRIED A GUN WITH/OR WITHOUT
A STATE BUILDING PERMIT I DON'T KNOW. THIS ALARMED
& FRIGHTENED SOME EMPLOYEES. HIS POSITION — IN THE
JOB DESCRIPTION DID NOT REQUIRE THIS THE PERSONS
PREVIOUSLY IN THIS POSITION OR AT OTHER STATE
AGENCIES DON'T CARRY GUNS — WHY IS/WAS IT NECESSARY
FOR MR. SCICCHITANO.

AT A TRAINING FOR SUPERVISORS HE GAVE THE USE AN
EXAMPLE OF THROWING HIS 10 YEAR OLD AGAINST THE
WALL. I WAS RELATED TO SOMEONE WHO...

ENTIRE AREA IN QUESTION IN THIS CASE WAS A FOUR FLOOR BLDG.
THE FIRST FLOOR WAS THE NON-SMOKING FLOOR OF
THE CENTRAL OFFICE. THE LUNCH ROOM ANOTHER ROOM
TRAINING ROOM & 3 OR 4 OTHER DIVISIONS WERE
LOCATED ON THE FIRST FLOOR.

WHEN MR. SICCHITANO MOVED HIS OFFICES TO
THE FIRST FLOOR — HE SMOKED & LET HIS
EMPLOYEES THAT SMOKED SMOKE IN THEIR OFFICES
(THIS WAS THE NON-SMOKING FLOOR) HE LEFT THE
NON-SMOKING SIGN UP WHICH WAS A DELUSION
TO THE UNION ETC.

IN DEC. OF 1996 THE BOARD MOVED THE DESIGNATED
SMOKING AREAS TO THE FIRST FLOOR.

UPPER LEVEL MANAGEMENT WERE PERMITTED TO SMOKE
IN THEIR OFFICES. THE BUILDING HAD A COMMON
AIR VENTILATION SYSTEM.

AFTER I WROTE THE GOVERNOR IN OCT 1997
THE YB&Y WAS TOLD TO TAKE CARE OF THE
SMOKING SITUATION.

MR. SICCHITANO REPORTED TO THE GOVERNORS' OFFICE
BARBARA A. BERKOBEN PERSONNEL MANAGEMENT
REVIEW DIVISION (THE CORRESPONDANCE WAS GIVEN TO
MR. SICCHITANO) BECAUSE OF HIS POSITIONS ETC.
PERSONNEL DIRECTOR, HEALTH & SAFETY COORDINATOR)
THAT SMOKING WILL BE CONFINED TO THE DESIGNATED
SMOKING ROOMS ON THE FIRST FLOOR & THAT SMOKING
WILL NOT BE PERMITTED IN PRIVATE OFFICES.

HE LIED. I SAW HIM SMOKING IN HIS OFFICE
IN JAN 1998 WHEN I WAS SITTING IN MARGIE
COLLINS' OFFICE FOR A TRAINING. THE SMOKE MADE
M.S. COLLINS SICK & I AM ALLERGIC TO TOBACCO
KNOWING HOW SICK SMOKE MADE ME THEN MAN DID NOT HAVE
THE DECENCY NOT TO SMOKE.

HE WAS STILL SMOKING IN MARCH OF 1998 WHEN MS. COLLINS
CALLED ME AND ASKED IF THERE WAS ANYTHING I COULD

MR. SCECCHITANO WAS IN VIOLATION OF SAID RULES, & THE CHAIRMAN KNEW IT.

SCOTT ROY, THE PBTF'S CHEIF COUNSEL ANSWERED TO PA HUMAN RELATIONS WHEN I FILED A COMPLAINT IN OCT 1999 — THAT IS THAT I WAS ACCOMMODATED AWAY FROM THE SMOKER WHILE I WAS AT THE DENTAL OFFICE. HE LIED TO HUMAN RELATIONS — WILLINGLY GIVING FALSE & MISLEADING STATEMENTS TO HUMAN RELATIONS, THIS IS ILLEGAL ACTION THIS WAS REPORTED TO THE CHAIRMAN WILLIAM F. WARD PERSING THAT TO THIS ESPECIALLY A LAW ENFORCEMENT AGENCY, THAT KNOWING-OF DOES THIS STATE REGULATION STATE THAT THE PERSON WHO DELIBERATELY GIVE MISLEADING STATEMENTS MAY BE SUBJECT TO CRIMINAL PENALTIES & DISCIPLINARY ACTION UP TO & INCLUDING TERMINATION OF EMPLOYMENT. MR. ROY'S ACTIONS INTERFERED WITH MY RIGHTS & PUT MY HEALTH IN DANGER. I HAD TO GO TO THE FIRST FLOOR SEVERAL TIMES A DAY TO DO MY JOB DUTIES. THE ONLY TRAINING ROOM, LUNCH ROOM & BREAK ROOM, WERE ON THE FIRST FLOOR WHERE A ZERO ENFORCEMENT OF THE SMOKING POLICY WAS PERMITTED & MR. SCECCHITANO CONTINUED SMOKE IN IS OFFICE & LET HIS EMPLOYEES SMOKE THE CHAIRMAN, WILLIAM WARD KNEW THIS ALONG WITH KNOWING MR. ROY WAS HARASSING MS. JEANIE SPECHT-MORRISON, SHE REPORTED IT TO THE CHAIRMAN.

NEVERTHELESS MR ROY WAS APPOINTED
TO THE POSITION OF CHIEF COUNSEL
THE PA (BOARD) OF PROBATION & PAROLE IS
AN AGENCY THAT HAS CREATED AN
ATMOSPHERE THAT HAS PERMITTED THESE
TYPE OF ACTION.

AGENTS SEXUALLY HARASSED WOMEN WHEN
TAKING THEM TO CORRECTIONS FACILITIES
THE MUNCY ? SITUATION WAS RECOGNIZED
BY THE PA SENATE AND ACLU WAS
INVESTIGATED BY THE SENATE THE HEARINGS
WERE TELEVISED.

MR. OCCASHETANO IS IN CHARGE OF
TRAINING AGENTS. AT THE TIME THESE
SENATE INVESTIGATIONS WERE GOING ON WAS
THE TIME MR. OCCASHETANO TOLD A DIRTY
JOE, PERVERTED SEXIST RACIST JOKE. (AT MY TRAINING)
HIS POSITION IS SUPERVISOR OVER
PERSONNEL
HUMAN RESOURCES, AFFIRMATIVE ACTION.
MY POINT IS IF PEOPLE IN HIS POSITION
DON'T HAVE RESPECT FOR LAWS THIS CREATE AN
ATMOSPHERE WHERE OTHER MEN THINK THESE
TYPES OF BEHAVIORS ARE O.K.
THE PA BOARD OF PROBATION & PAROLE HAS HAD
PROBLEMS BEFORE & WILL CONTINUE TO HAVE
PROBLEMS

my concern is to prevent reoccurrence
& things that have it person hire
every misconstruing in charge of
positions such as Health & Safety &
Affirmative Action. That should be there
to protect my rights.

I will not put myself at risk, like I did
previously. I cannot TRUST the PBPP to
protect me. I am at this point
responsible for my own well being.

The PBPP can grasp the concept & have
shown their ability, & reasonable means
to control the air quality as evidenced
in their effort to keep the computer
control room a controlled atmosphere.
If this agency would have respected me as
much as one of the computers I would
not have been made so ill.

I who placed in a building the PBPP did not
properly maintain. components became
contaminated & made me ill.

Name: _Richard Fore Harris_    Date: _6.9.99_
_DIANNA JAY HALL_

# WITNESS QUESTIONNAIRE

Identify all witnesses who you believe have information which would support your allegations.  For each witness identified, provide his/her name, address (if known), phone number (if known) or other means to contact the witness.  In addition, indicate what type(s) of information you believe the witness can provide:

## WITNESS

Name and Job Title: _Fannie E Porter, CLERK TYPIST III_

Home Address:    _1001 GREGS ROAD_
(*if known*)    _HARRISBURG, PA 17110_

Home Telephone: _( 717 ) 238- 9704_

This witness can provide the following information in support of my charge:
_WAS ALSO MADE ILL IN SILL BUILDING_

## WITNESS

Name and Job Title: _DEBORAH GINTER, CLERK TYPIST II_

Home Address:    _680 GREGS DR._
(*if known*)    _APT 45_
    _HARRISBURG, PA 17111_

Home Telephone: _( 717 ) 566- 3987_

This witness can provide the following information in support of my charge:
_WAS ALSO MADE ILL IN SILL BUILDING_

2/97    _SEE ATTACHED_    Use additional pages if needed

ARLENE STOTTLEMYER
3835 BOOSER AVE.
HARRISBURG, PA 1703
717 238. 3955

KNOWS I WAS TREATED & DISCRIMINATED
AGAINST AT THE YARD.


JEANNE M SPECHT - MORRISON, SUPERVISOR
                                PREP UNIT HARRISBURG DO
    (SEE ATTACHED).

NAME: DIANNA LYNN HAGER    DATE: 6, 9, 99

# REMEDY INFORMATION

1.  If your charge alleges failure to hire or failure to promote, what was the salary or salary range of the job you applied for? $25,000 GROSS. What was the salary of the position you held at the time you applied for the position in question? $17,000 NET. (YR)

2.  If your charge alleges discharge or suspension without pay, what was the salary of the position you held at the time of discharge or suspension? $16,000 YR. NET

3.  If your charge alleges demotion, what was the salary of the position you held before you were demoted? $_____. After you were demoted? $_____.

5.  <u>Other than loss of salary</u>, what money have you lost as a result of the alleged discrimination (e.g., cost of looking for new job, cost of health insurance you had to buy, etc.)? Describe each type of loss and provide an approximate dollar value for each type of loss. (NOTE: You should save receipts or other proof of all such expenses.)

    COST OF HEALTH INSURANCE & HAVING TO PAY FOR MY DOCTOR & MEDICATION MYSELF.
    $500.00 TO DATE.

    I HAVE NOT PURCHASED HEALTH INS. AS OF THIS TIME AS I AM EXPECTING TO BE PERMITTED UNDER FEDERAL LAW TO BE PERMITTED TO RETURN TO WORK.

    HOWEVER I WILL NEED HEALTH INSURANCE THAT IS EXPECTED TO COST $400 PER MONTH OR MORE.

6.  <u>Other than monetary losses</u>, what losses have you incurred as a result of the alleged discrimination (e.g., loss of seniority, no longer being part of a pension plan, loss of company car, had to seek psychiatric services)?

    LOSS OF SENIORITY, NO LONGER BEING PART OF A PENSION PLAN. I HAVE HAD TO SEEK PSYCHIATRIC SERVICES. I REGULARLY SUFFERED FROM FRONTAL HEADACHES, PAIN IN MY JAW JOINT & ACHINESS NAUSEA, RASHES & FLUSHING. I HAVE SUFFERED EMOTIONAL DISTRESS, ANXIETY DEPRESSION & OTHER EMOTIONAL DAMAGE & LOSS OF THE JOYS & PLEASURES OF LIFE. I BECAME TOTALLY DISABLED & WAS FORCED TO GO ON LEAVE WITHOUT PAY AS A RESULT OF THE INJURIES CAUSED BY THE POOR AIR QUALITY & THE WAY I WAS TREATED. THE PO PP REFUSED TO ALLOW ME TO RETURN TO WORK IN A DIFFERENT LOCATION. THE PO PP UNLAWFULLY REFUSED TO PROVIDE ME WITH A COPY

5/96

## REMEDY INFORMATION (p. 2)

7. **What relief or remedy are you seeking in response to filing a charge with EEOC?**

I AM REQUESTING AN INVESTIGATION AS TO WHY & HOW THIS WAS ALLOWED TO HAPPEN TO ME. THE PA BOARD OF PROBATION & PAROLE IS IN VIOLATION OF STATE & FEDERAL REGULATIONS THAT ARE PUT IN PLACE TO PROTECT PERSONS SUCH TO ME. PERMISSION IS REQUIRED WORK AT THE CENTRAL OFFICE. PAY FOR MY SICK & ANNUAL DAYS, PAID FOR DOCTOR & HOSPITAL & MEDICATIONS DUE TO MY CONDITION WHO CAUSED BY THE PBPP, PAID FOR PAIN & SUFFERING. PAID AUGUST THROUGH PRESENT, & UNTIL I RETURN TO WORK FREE FROM HARASSMENT & FURTHER RETALIATION & DISCRIMINATION.

8. **If your charge alleges discharge or failure to hire, have you obtained other employment since the date of the alleged discrimination?  If yes, please indicate the date of employment and the salary you earn with this new employer.  (If there has been more than one employer, please indicate all dates of employment and salary with each employer since your date of discharge or the date you were denied hire by the employer named in your charge.)**  I HAVE NOT OBTAINED OTHER EMPLOYMENT

I WAS DENIED HIRE OF A POSITION I WAS TRAINED IN WHILE EMPLOYED AT THE CENTRAL DISTRICT OFFICE 11.97 — 8.98. THAT WAS MOVED TO THE CEN. OFF. SALARY AUG —SEPT $2,000 = $12,000 NOT YET YR. THAT AT PRESENT $13,000 GROSS YR YR. I WAS ONE OF THREE PERSONS TRAINED FOR THIS POSITION IN THE PBPP & THE PBPP DID NOT GIVE ME THE POSITION OR LET ME RETURN TO WORK WHEN I FELT WELL ENOUGH TO RETURN

THE LAWS PROTECT ME FROM BEING DISCHARGED OR IN ANY WAY BEING DISCRIMINATED AGAINST, BECAUSE I HAVE FILED A COMPLAINT.

MY CONDITION RENDERED ME A HANDICAPPED PERSON WITHIN THE MEANING OF THE REHABILITATION ACT OF 1973, A FEDERAL ANTIDISCRIMINATION STATUTE

**I declare under penalty of perjury that I have read the above statements and that they are true and correct.**

_Dianna Lynn Harris_
Signature

6. 9. 99
Date



# COMMONWEALTH OF PENNSYLVANIA

## GOVERNOR'S OFFICE

### PENNSYLVANIA HUMAN RELATIONS COMMISSION

## COMPLAINT

Dianna L Harris,                              :
                                             :
      COMPLAINANT(s)        :
                                             :
        vs.                  :  DOCKET NO(s): L 06065
                                             :
                                             :
                                             :
PA Board of Probation & Parole,              :
                                             :
      RESPONDENT(s)         :
                                             :


1. The Complainant(s) herein is/are:

    Name:    Dianna L Harris

    Address:    2329 Penn Street   Harrisburg, PA  17110

    Name:

    Address:

2. The Respondent(s)s herein is/are:

    Name:    PA Board of Probation & Parole

    Address:    1101 S Front Street   Harrisburg, PA   17104

    Name:

    Address:

    Name:

    Address:

# CHARGE OF DISCRIMINATION

| | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form. | ☐ FEPA<br>☒ EEOC | 170A00363 |

| Pennsylvania Human Relations Comm. | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Ms. Dianna L. Harris | (717) 232-3969 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 2329 Penn Street, Harrisburg, PA 17110 | | 10/04/1950 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| PA Board Of Probation & Parole | Cat D (501 +) | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 1101 S. Front St., Harrisburg, PA 17104 | | 043 |

| NAME | | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| | | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))* | DATE DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE   ☐ COLOR   ☒ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN<br>☐ RETALIATION   ☒ AGE   ☒ DISABILITY   ☐ OTHER *(Specify)* | EARLIEST  09/28/1998    LATEST  12/10/1998<br>☐ CONTINUING ACTION |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

I.  I was hired by the Commonwealth of Pennsylvania, Board of Probation and Parole (The "Respondent") in February, 1993.  In or about May 1995, I was assigned as a Clerk Stenographer II to Respondent's Central Office building, located at 3101 N. Front Street, Harrisburg, PA.  Smoking was permitted in the Central Office building and, at that time, Respondent had a designated smoking area very close to my work area.  I suffered numerous adverse health affects as a result of my daily exposure to smoke in the Central Office building and, in June, 1996, I was diagnosed with allergic rhinitis with secondary headaches and pain, which caused sickness and prevented me from performing my work duties.  This condition was aggravated by my continued exposure to tobacco smoke in the Central Office building, which originally triggered my sickness.

In September, 1996, I informed Respondent of my disability and requested accommodations for my disability based upon my physician's recommendations.  In or about October, 1996, I was provided with an electric air filter in order to relieve the adverse reaction that I was having to the smoke to which I was exposed.  I continued to suffer severe adverse health effects despite the air filter.  In October, 1997, I and five other employees of Respondent sent a letter to Governor Thomas Ridge concerning Respondent's refusal to maintain a smoke-free building.

In November, 1997, Respondent transferred me to Respondent's District Office building, located at 7th and Herr Streets in Harrisburg, PA. This was a retaliatory transfer and was not an acceptable or reasonable

| ☐ I want this charge filed with both the EEOC and the State or local Agency, if any.  I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - *(When necessary for State and Local Requirements)* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | |
| Date *10-29-99*   *Dianna L. Penn Harris*<br>Charging Party *(Signature)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE<br>*(Month, day and year)* |

EEOC FORM 5 (Rev. 06/99)                                                                          **FEPA COPY**

Oct 08 12:20 1999  CP Initials _____   Chg # , Attachment Page 1

---------------------------------------------------------------------
Equal Employment Opportunity Commission
Form 5 - Charge of Discrimination, Additional Text
---------------------------------------------------------------------

accommodation.  The District Office building, while a smoke-free
facility, had an air quality problem.  At the time when the decision to
transfer me was made, Respondent and its agents and employees were well
aware of the poor air quality in the District Office building.  Several
employees had previously complained of health problems due to the poor
air quality in the building.  I was transferred to a building which
would adversely affect my health.  The actions taken were as a result of
discrimination on the basis of my disability, gender, age, and were also
in retaliation for my complaining about Respondent's failure to maintain
a smoke-free building.  The air quality problem at the District Office
building aggravated my condition.  While working in the District Office,
I regularly suffered from frontal headaches, pain in my jaw, joint
achiness, nausea, rashes, and flushing.  In addition, I have suffered
emotional distress, anxiety, depression and other emotional damage, and
loss of the joys and pleasures of life.  My medical condition gradually
worsened, and Respondent did nothing to alleviate the air quality
problems in the building.

In August, 1998, I became totally disabled and was forced to go on leave
without pay as a result of the injuries caused by the poor air quality
in the District Office Building.

In October, 1998, after not having gone to work (and consequently not
being exposed to the air in the District Office Building) for two
months, my medical condition improved and I attempted to return to work,
seeking a position at a location other than the District Office
building, upon recommendation of my physician.  Respondent refused to
allow me to return to work in a different location, claiming the
District Office was safe and posed no danger to her health.  I refused
to return to the building without being provided with a copy of the
Department of Health and Safety's inspection report on the building,
which Respondent unlawfully refused to provide to me.  On December 10,
1998, Respondent terminated my employment.

II.  Rationale for Alleging Discrimination: I believe that I have been
discriminated against (refused a reasonable accommodation including
reassignment to another vacant position for which I was qualified,
disciplinarily transferred, and terminated) because of my disability, in
violation of the Americans with Disabilities Act of 1990 (the "ADA");
because of my gender, female, in violation of Title VII of the Civil
Rights Act of 1964 ("Title VII"), as amended; because of my age, in
violation of the Age Discrimination in Employment Act of 1967 (the
"ADEA"); and in retaliation for having complained of Respondent's
failure to provide smoke-free work premises at the Central Office

Oct 08 12:20 1999  CP Initials _____  Chg # , Attachment Page 2

building and for having complained about the air quality in the District
Office building, in violation of the ADA, Title VII and the ADEA.

## Certificate of Service

I hereby certify that I have this day served the foregoing document upon all parties of record in this proceeding in accordance with the requirements of 1 Pa. Code § 33.31 (relating to service by an agency).

Dated at this _25Th_ day of _February_, 2000

**DIANNA LYNN HARRIS**
2329 PENN STREET
HARRISBURG, PENNSYLVANIA 17110
717.232.3969

May 18, 1999

Mr. Johnny J. Butler, Secretary
Commonwealth of Pennsylvania, Department of Labor and Industry
Bureau of PENNSAFE
1503 L & I Building
7th and Forster Streets
Harrisburg, PA 17120

Dear Mr. Butler:

In January, I filled out a form requesting information be obtained through the Right to Know Act. The Pennsylvania Board of Probation and Parole has refused to give me a copy of the report and information I requested.

I, at this time would like to file a written complaint with the Department of Labor and Industry, Bureau of PENNSAFE. I believe I was discharged and discriminated against by the Pennsylvania Board of Probation and Parole (PBPP). I exercised my rights granted under the Pennsylvania Worker and Community Right to Know Act, I have 180 days to file a written complaint.

COMPLAINT:

On December 10, 1998, the PBPP terminated my employment. This was an unlawful termination and was the result of discrimination against me on the basis of my disability and in retaliation for having complained when the PBPP breached their duty to provide a smoke-free premises at the PBPP Central Office building and for having complained about the air quality in the HDO building.

The PBPP is in violation of state and several federal regulations. They breached their duty to provide a reasonable safe workplace for me. When I requested another location and they did not give it to me I should be receiving disability payments along with my health benefits. I am not.

I am covered by the Americans with Disabilities ACT (ADA) passed in 1990. (42 USC 12101 et seq.) whose purpose is to end discrimination against people with disabilities. The Act gives people with disabilities protection in state government.

It is my understanding that the law protects me from being discharged or in any way being discriminated against because I have: Filed a complaint, assisted with an inspection, instituted or caused to be instituted any proceeding under or related to the Right to Know Act, testified or will testify in a proceeding under or related to the Right to Know Act, requested information under the Right to Know Act, properly refused to work with a specific hazardous substance under the conditions provided for in the Right to Know Act, exercised any right afforded by the Right to Know Act.

I have concerns regarding the way I have been treated by the PBPP, and the way the PBPP has handled the HDO indoor air quality problem over the years.

I asked for a simple request -- to be moved to a building without all the problems that have continued to exist at the PBPP/HDO. I do not know why the PBPP would not honor this request. I requested under the Right to Know Act a copy of the report completed by Judith Gostin, the Department of Health, on July 17, 1998. The Board refused my request.

The PBPP should be committed to complying with all applicable laws and to cooperate fully with any reasonable employee inquiry.

I wanted a copy of the report to help to determine what made me so ill. This information would have been beneficial to me in my treatment and rehabilitation.

I sent documentation to Governor Ridge and have requested his office do an investigation into this situation. I need to be permitted to return to work. My rights to earn a living, I feel, have been taken away from me because of this whole situation.

The PBPP knew the HDO building was a problem when they sent me there to work, November, 1997. I should not have been moved to the HDO. I was a Central Office employee. There were two other Central Office locations, (smoke-free), that would be moved to the new location at 1101 South Front Street. I could have been relocated to Pine Street or Second Street, and avoided the air quality problems that have existed for years at the HDO.

The PBPP had letters from my physician and my attorney that stated my health problems. Moving me from the Central Office to the HDO building only exasperated the problems. The PBPP jeopardized my health and caused me a great deal of stress and financial loss. My medical condition worsened. In August, 1998, I became totally disabled. I was forced to go on leave without pay.

In October, 1998, my medical condition improved after being out of the HDO and the air quality problems that exist there. I attempted to return to work, seeking a position at another location other than the HDO building, upon recommendation of my physician.

My primary physician, Doctor William Bush, signed forms. I also gave William Bush, MD, copies of the documentation other employees signed, that indicated they were also made ill at the HDO. I turned the information over to the PBPP, the PBPP called my physician in November, 1998, were informed verbally. "Her condition has rendered her disabled, she cannot return to work at the HDO location."

Being off work for nine months, without pay has caused me a great financial hardship, and I a stranded without my medical benefits.

Persons at the PBPP deliberately give misleading statements when I file complaints with other state agencies. This is illegal, there are laws stating involved employees may be subject to criminal penalties and disciplinary action up to and including termination of employment.

The PBPP refused to take my disability seriously. -- Had I trusted the PBPP and returned to work, I would have continued to become ill. The building was never tested for molds by the health department, as they do not have the equipment. Again both Mike Neumyer and Gary Scicchitano said the building was safe and I should return to that building.

It is my position persons that are not qualified, should not be making these decisions that could end up killing me.

Stachybotrys, a toxin producing fungus that can suppress immunity and cause headaches, fatigue, and in large doses even death. Research indicates that Stachybotrys may exist in a large percent of buildings that have had water damage. High level exposure to Stachybotrys will kill people. I am very allergic to molds.

My immune system became weak from continued sinus infections. If your immune system is weak you cannot fight off infection. I developed a virus I will have for the rest of my life that causes when active -- my spleen to swell up and I become very tired. I am bed ridden until I am strong enough to get up.

I was so sick when I left the building in August, I thought I was going to die. I had no energy. I could not eat. I was throwing-up. No one should have been put in the position the PBPP put me in.

The PBPP informed me I can't say where I want to work -- when I asked them to be relocated. As stated previously they are not taking my disability seriously, and insinuated I was telling them where I want to work. This is absurd.

My condition rendered me a handicapped person within the meaning of the Rehabilitation Act of 1973, a federal antidiscrimination statute.



I asked for a simple request, to be relocated to a building with a safer environment, which is my right. I have a right to refuse work without being subject to penalty by my employer, if I request an MSDS and the proper steps have not been taken to issue me the report.

I will not put myself at risk again, like I did previously. I cannot trust the PBPP to protect me. I am at this point responsible for my own well being. I am responsible for using information to make a safer and healthier workplace for myself.

In Mr. Scicchitano's letter to me, dated October 26, 1998, he stated, an extensive investigation was conducted in cooperation with the landlord, the firm managing the building for the landlord, the Department of Health, and the Board. "All problems which were identified by the expert, who completed the testing, have been rectified."

With regard to the landlord if he conducted his extensive investigation the same way it was conducted in January, 1996, there is great cause for concern. The company, Herbert, Rowland and Grubic, Inc. when contacted stated their office did not do any air quality checks or analysis of the air in the HDO, they did an inspection of the HVAC system.

Mike Neumyer, stated, the HDO was checked out and safe. Safe for whom, certainly not me. Mike Neumyer knew when he assigned me to the HDO that the building has a serious indoor air quality problem, and with my disability, it would make me very ill.

He knew of my condition, and had a letter from my physician, dated September, 1996, regarding my condition, the letter stated my condition was made worse in poor indoor air quality conditions. This was also reiterated in a letter from one of my attorneys, to the PBPP dated, April, 1997.

Mike Neumyer also knew I became very ill in May, of 1997, when in retaliation of the letter from my attorney, The PBPP ignored my legal right to refuse to work with a specific hazardous substance, they did not take the appropriate actions for obtaining an MSDS report, and demanded I work in a warehouse that was very dusty and dirty and lacked proper ventilation, had an eighteen-wheeler truck running in the building. When I informed the PBPP I could not work in the warehouse I was issued a white paper mask and told I had to work in the warehouse.

PLEASE NOTE: I AM A SECRETARY.

There is not one person at the PBPP qualified to made decisions regarding my condition, my health, what office I should work in. That is why I have doctors.

I would like my immunotoxicologist to review all the results of the tests, along with the expert's report. (I need the report.)

People in the HDO are still getting sick and have concerns regarding the air quality. You can still smell fuel oil in the building. (I am highly sensitive to solvents). Employees have requested air purifiers. Previously, healthy persons without my disabilities became ill from working in the HDO which was previously the old Harrisburg bus station, this alone could be a factor.

I also have some questions regarding the testing.

Was an environmental-engineering firm used and was a complete hygiene inspection completed, was a prevention program introduced?

Was a chemical scouring of the heating, ventilation and air-condition system completed?

What are the bacterial levels and are they within the range of OSHA's "contamination threshold?"

What are the airborne spore counts?

How many days were the air samples taken? Fungi don't produce spores all the time. Typically, you should sample over a series of days. Testing for mycrotoxins and bacterial endotoxins.

In my case the air blew down on me that was contaminated with mold due to moisture caused by a leak. Insulation gets wet or moldy and cannot be effectively cleaned and should be removed and replaced. The carpet and padding also got wet around my desk and should have been cleaned or replaced.

I requested several times the air purifier that my doctor recommended, be brought over from the PBPP Central Office. I never got the purifier.

I know for a fact duct cleaning has never been shown to actually prevent health problems. If not properly installed, maintained and operated components become contaminated with particles of dust, pollen or other debris. If moisture is present, and was present above my desk, the potential for microbiological growth (e.g., mold) is increased and spores from such growth may be released. I am allergic to mold.

Bacteria, fungi, and molds -- found in water-damaged walls, floors, and ceilings can cause allergic reactions, sinus infections, breathing problems, and joint aches. Ducts are infested with vermin, e.g. rodents or insects); or ducts are clogged with excessive amounts of dust and debris and/or particles are actually released into the air from supply registers.



Some of these contaminants may cause allergic reactions or other symptoms in people if they are exposed to them as I was. I was taking medication and getting allergy shots that were not helping me. Sickness related to indoor air quality often mimic allergies or the flu.

Knowledge about the potential benefits and possible problems of air duct cleaning is limited. Duct cleaning can cause indoor air problems. For example, and inadequate vacuum collection system can release more dust, dirt and other contaminates than if you had left the duct alone.

Repeated exposure to toxins given off by molds and bacteria may hypersensitive people to the point that they react to even low levels of those toxins. I may also weaken their tolerance to everyday chemicals in car exhaust, (the building is surrounded by parking lot), perfumes, and cleaning agents.

Carbon Monoxide drawn in through vents can inhibit oxygen intake, causing dizziness, impaired vision, and reduced brain function.

Since the complaints the employees expressed in 1994, 1995, 1996, 1997, OSHA should have received reports of record descriptions of illnesses and injuries. OSHA will fine for the failure to maintain. Under the general duty clause of the Occupational Safety and Health Act, Congress imposes on an employer a duty to eliminate all foreseeable and preventable hazards in the workplace. I would like a copy of the reports.

Plenty of data is available to support the link between indoor air-quality problems and dry throat, dry eyes, nasal congestion, fatigue, headaches. There is strong circumstantial evidence linking exposure to chemical pollutants and fungal contaminants with asthma and sinus infections. (See employee statements).

Shoddy maintenance, which has made some buildings breeding grounds for bacteria, molds, and fungi. Unhealthful gases can become trapped because the building had inadequate ventilation systems.

Scientific fact some people are made severely sick, while others experience only minor symptoms - or none at all.

Volatile organic compounds (VOCs) used in copiers, cleaners, solvents, and paints can cause eye, nose, and throat irritation; headaches, and dizziness if the building is poorly ventilated.

If the service provider proposed or did in fact apply chemical biocides, or used chemical treatment (sealants or other encapsulants). These practice have yet to be fully researched and persons should be fully informed before deciding to permit the use of biocides or sealants in air ducts.



If ozone was used to clean inside ducts this may cause much of the material to be transported through the system and released into the air. Some people may react negatively to the biocide or ozone, causing adverse health reactions.

Management has known about the problem for years, and failed to maintain complete records of employee illnesses and injuries at the Harrisburg District Office since, March, 1994.

Please review the signed statements from employees dated, 1998, and 1996. Their conditions are consistent with persons that are working in buildings with "sick building syndrome".


Sincerely,

Dianna Lynn Harris

cc: Governor Ridge

7

*DIANNA LYNN HARRIS*
2329 PENN STREET
HARRISBURG, PENNSYLVANIA 17110
717.232.3969

June 28, 1999

Mr. Doug Baker
Commonwealth of Pennsylvania, Department of Labor and Industry
Bureau of PENNSAFE
1503 L & I Building
7th and Forster Streets
Harrisburg, PA 17120-0019

Dear Mr. Baker:

Enclosed are copies of a letter you requested, dated December 1, 1998, that was sent to the PA Board of Probation and Parole, requesting a copy of a report completed by Judith Gostin, Department of Health, dated July 1998. I requested a copy of this report verbally in June, and September of 1998. In November, of 1998, I called the Chairman's office to request the report. I wanted a copy of the report to help to determine what made me so ill. This information would have been beneficial to me in my treatment and rehabilitation. The Board refused my request.

In January, I filled out a form requesting information under the Right to Know Act, and sent the form to your office, as of this date I have not received the report. Due to the way I have been treated by the Board and the time it has taken to get this matter resolved I am sending a report to the PA Senate, House, United States Congress, and Senate and asking for an independent investigation as state and federal regulations have been ignored by the PBPP. Because of this fact I am the one that has been made to suffer. Being off work without pay, since August 1998, has caused me a great financial hardship, and I a stranded without my medical benefits.

It is my understanding that I should be receiving disability payments along with my benefits. I am not. I am at this time requesting your office to look into this matter for me as soon as possible and advise me on how to go about getting my disability until this matter is resolved and I am permitted to return to work.

It is also my understanding that the law protects me from being discharged or in any way being discriminated against because I have: Filed a complaint, assisted with an inspection, instituted or caused to be instituted any proceeding under or related to the Right to Know Act, testified or will testify in a proceeding under or related to the Right to Know Act, requested information under the Right to Know Act, properly refused to work with a specific hazardous substance under the conditions provided for in the Right to Know Act, exercised any right afforded by the Right to Know Act.

I have a right to refuse work without being subject to penalty by my employer, if I request an MSDS and the proper steps have not been taken to issue me the report.

On December 10, 1998, the PBPP terminated my employment. This was an unlawful termination and was the result of discrimination against me on the basis of my disability and in retaliation for having complained when the PBPP breached their duty to provide a smoke-free premises at the PBPP Central Office building and for having complained about the air quality in the HDO building.

The PBPP knew the HDO building was a problem when they sent me there to work, November, 1997. I should not have been moved to the HDO. I was a Central Office employee. There were two other Central Office locations, (smoke-free), that would be moved to the new location at 1101 South Front Street. I could have been relocated to Pine Street or Second Street, and avoided the air quality problems that have existed for years at the HDO.

The PBPP had letters from my physician and my attorney that stated my health problems. Moving me from the Central Office to the HDO building only exasperated the problems. The PBPP jeopardized my health and caused me a great deal of stress and financial loss. My medical condition worsened. In August, 1998, I became totally disabled. I was forced to go on leave without pay.

In October, 1998, my medical condition improved after being out of the HDO and the air quality problems that exist there. I attempted to return to work, seeking a position at another location other than the HDO building, upon recommendation of my physician.

My primary physician, Doctor William Bush, signed forms. I also gave William Bush, MD, copies of the documentation other employees signed, that indicated they were also made ill at the HDO. I turned the information over to the PBPP, the PBPP called my physician in November, 1998, were informed verbally, "Her condition has rendered her disabled, she cannot return to work at the HDO location."

The PBPP refused to take my disability seriously. -- Had I trusted the PBPP and returned to work, I would have continued to become ill. The building was never tested for molds, I was informed of this by the health department, they do not have the equipment. Again both Mike Neumyer and Gary Scicchitano said the building was safe and I should return to that building. It is my position persons that are not qualified, should not be making these decisions that could end up killing me.

Stachybotrys, a toxin producing fungus that can suppress immunity and cause headaches, fatigue, and in large doses even death. Research indicates that Stachybotrys may exist in a large percent of buildings that have had water damage.



In my case the air blew down on me that was contaminated with mold due to moisture caused by a leak. Bacteria, fungi, and molds -- found in water-damaged walls, floors, and ceilings can cause allergic reactions, sinus infections, breathing problems, and joint aches. I had all these symptoms and they are documented by my physicians.

Insulation gets wet or moldy and cannot be effectively cleaned and should be removed and replaced. The carpet and padding also got wet around my desk and should have been cleaned or replaced. The building smelled of mold and when I would enter it I would become sick and start to throw-up and have to leave the building.

Ducts are infested with vermin, e.g. rodents or insects); or ducts are clogged with excessive amounts of dust and debris and/or particles are actually released into the air from supply registers. Some of these contaminants may cause allergic reactions or other symptoms in people if they are exposed to them as I was.

I requested several times the air purifier that my doctor recommended, in a letter to the Board dated, September 1996, be brought over from the PBPP Central Office. I never got the purifier. I was laughed at by management. The fact is high level exposure to Stachybotrys will kill people. I am very allergic to molds and have documentation from my doctor stating such.

If your immune system is weak you cannot fight off infection. I developed a virus I will have for the rest of my life that causes when active -- my spleen to swell up and I become very tired. I am bed ridden until I am strong enough to get up.

My immune system became weak from continued sinus infections due to continued exposure to the poor indoor air quality in the HDO Building. I was so sick when I left the building in August, I thought I was going to die. No one should have been put in the position the PBPP put me in.

My condition rendered me a handicapped person within the meaning of the Rehabilitation Act of 1973, a federal antidiscrimination statute.

There is not one person at the PBPP qualified to made decisions regarding my condition, my health, what office I should work in. That is why I have doctors. I will not put myself at risk again, like I did previously. I cannot trust the PBPP to protect me. I am at this point responsible for my own well being. I am responsible for using information to make a safer and healthier workplace for myself.

In Mr. Scicchitano's letter to me, dated October 26, 1998, he stated, an extensive investigation was conducted in cooperation with the landlord, the firm managing the building for the landlord, the Department of Health, and the Board. "All problems which were identified by the expert, who completed the testing, have been rectified."

With regard to the landlord if he conducted his extensive investigation the same way it was conducted in January, 1996, there is great cause for concern. The company, Herbert, Rowland and Grubic, Inc. when contacted stated their office did not do any air quality checks or analysis of the air in the HDO, they did an inspection of the HVAC system.

Mike Neumyer, stated, the HDO was checked out and safe. Safe for whom, certainly not me. Scientific fact -- some people are made severely sick, while others experience only minor symptoms - or none at all.

Mike Neumyer knew when he assigned me to the HDO that the building has a serious indoor air quality problem, and with my disability, it would make me very ill. He was well aware of my condition, had a letter from my physician, dated September, 1996, the letter stated my condition was made worse in poor indoor air quality conditions. This was also reiterated in a letter from one of my attorneys, to the PBPP dated, April, 1997.

Knowledge about the potential benefits and possible problems of air duct cleaning is limited. Duct cleaning can cause indoor air problems. For example, and inadequate vacuum collection system can release more dust, dirt and other contaminates than if you had left the duct alone.

Repeated exposure to toxins given off by molds and bacteria may hypersensitive people to the point that they react to even low levels of those toxins. I may also weaken their tolerance to everyday chemicals in car exhaust, (the building is surrounded by parking lot), perfumes, and cleaning agents.

Carbon Monoxide drawn in through vents can inhibit oxygen intake, causing dizziness, impaired vision, and reduced brain function.

Since the complaints the employees expressed in 1994, 1995, 1996, 1997, OSHA should have received reports of record descriptions of illnesses and injuries. OSHA will fine for the failure to maintain. Under the general duty clause of the Occupational Safety and Health Act, Congress imposes on an employer a duty to eliminate all foreseeable and preventable hazards in the workplace. I would like a copy of the reports.

Plenty of data is available to support the link between indoor air-quality problems and dry throat, dry eyes, nasal congestion, fatigue, headaches. There is strong circumstantial evidence linking exposure to chemical pollutants and fungal contaminants with asthma and sinus infections. (See employee statements I sent your office previously).



Shoddy maintenance, which has made some buildings breeding grounds for bacteria, molds, and fungi. Unhealthful gases can become trapped because the building had inadequate ventilation systems. Volatile organic compounds (VOCs) used in copiers, cleaners, solvents, and paints can cause eye, nose, and throat irritation; headaches, and dizziness if the building is poorly ventilated.

If the service provider proposed or did in fact apply chemical biocides, or used chemical treatment (sealants or other encapsulants). These practice have yet to be fully researched and persons should be fully informed before deciding to permit the use of biocides or sealants in air ducts.

If ozone was used to clean inside ducts this may cause much of the material to be transported through the system and released into the air. Some people may react negatively to the biocide or ozone, causing adverse health reactions. Management has known about the problem for years, and failed to maintain complete records of employee illnesses and injuries at the Harrisburg District Office since, March, 1994.

Persons at the PBPP deliberately give misleading statements when I file complaints with other state agencies. Mr. Gary Scicchitano, Director of Human Resources at the Board has done this. This is illegal, there are laws stating involved employees may be subject to criminal penalties and disciplinary action up to and including termination of employment.

Mr. Scicchitano was in violation of the Board's smoking policy when I was working in the Central Office. His continued burning of tobacco made me ill. He is in charge of the Board's Health and Safety position, Affirmative Action, American Disabilities Act, and EEOC, all are through his office. I complained and wrote letters to the Governor's office and was relocated so he and others could continue to smoke.

Please review the signed statements from employees dated, 1998, and 1996, I sent your office. Their conditions are consistent with persons that are working in buildings with "sick building syndrome".

Sincerely,

Dianna Lynn Harris

cc: Governor Ridge
    Mr. Butler

F

FREDERICK L., ET AL., Plaintiffs, v. DEPARTMENT OF PUBLICWELFARE, ET AL., Defendants.
CIVIL ACTION No. 00-4510

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OFPENNSYLVANIA

2001 U.S. Dist. LEXIS 10225

July 23, 2001, Decided

DISPOSITION: [*1] GRANTED IN PART AND DENIED IN PART.

## CASE SUMMARY

PROCEDURAL POSTURE: Plaintiff individuals, four adults with mental disabilities institutionalized at a psychiatric hospital operated by defendant state agency, sued defendants, including the state agency and an agency official, alleging violations of *42 U.S.C.S. § 1983,* Title II of the Americans with Disabilities Act (ADA), *42 U.S.C.S. § 12131* et seq., and § 504 of the Rehabilitation Act of 1973, codified at *29 U.S.C.S. § 794*(a). Defendants moved to dismiss.

OVERVIEW: Plaintiff individuals alleged that defendants failed to properly assess their community service needs and fund sufficient appropriate community-based programs to serve them. Defendants moved to dismiss, arguing Eleventh Amendment immunity and failure to state a claim. The court granted in part and denied in part the motion to dismiss. The Eleventh Amendment was not a bar to suit in federal court for violations of § 504 of the Rehabilitation Act. However, claims brought under the ADA against the state agency were dismissed because two individuals were voluntarily committed and the other two individuals could not satisfy the "congruence and proportionality" test under the Fourteenth Amendment. The court also determined that the agency official was a proper defendant because suit was brought against her in her official capacity. In addition, the court determined that *42 U.S.C.S. § 1983* could be used to enforce § 504 and the ADA. Also, recent court decisions did not preclude the individuals' claims.

OUTCOME: Motion to dismiss was granted as to ADA claims brought against the state agency, but denied as to the remaining claims.

CORE TERMS: disability, Eleventh Amendment, immunity, regulation, federal funds, Rehabilitation Act, placement, integration, recommended, enacting, institutionalized, disabled, Fourteenth Amendment, integrated, quotation, financial assistance, segregation, community-based, sovereign immunity, mental health, handicapped, abrogation, constitutional right, motion to dismiss, residents, implied waiver, psychiatric, parte, federal law, funding

CORE CONCEPTS -

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Failure to State a Cause of Action
In considering a Fed. R. Civ. P. 12(b)(6) motion, the court must accept as true all of the allegations set forth in the complaint and all reasonable inferences must be drawn in favor of the plaintiffs. Dismissal of the plaintiffs' claim is appropriate only if the plaintiffs can prove no set of facts in support of their claim which would entitle them to relief.

Civil Procedure: State & Federal Interrelationships: Amendment 11
Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Failure to State a Cause of Action
The Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction. Such a motion may be filed pursuant to Fed. R. Civ. P. 12(b)(1). However, Eleventh Amendment immunity does not implicate federal subject matter jurisdiction in the ordinary sense because it can be expressly waived by a party, or forfeited through non-assertion. As such, Eleventh Amendment immunity should be analyzed as an affirmative defense to be established by the party



raising it. Where Eleventh Amendment immunity is asserted in a motion to dismiss for lack of subject matter jurisdiction, the court evaluates the motion under the standard provided for by Fed. R. Civ. P. 12(b)(6).

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Motions to Dismiss
There are two types of Fed. R. Civ. P. 12(b)(1) motions. With regard to the first type, a facial attack on the court's subject matter jurisdiction, the court is required to assume that plaintiff's allegations are true. When confronted with the second type, a factual attack, the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case because there is no presumptive truthfulness attached to plaintiff's allegations. Factual evaluations under Rule 12(b)(1) are appropriate at any stage in the proceedings after the filing of an answer.

Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Motions to Dismiss
Civil Procedure: Pleading & Practice: Defenses, Objections & Demurrers: Failure to State a Cause of Action
The Third Circuit cautions against treating a Fed. R. Civ. P. 12(b)(1) motion as a Fed. R. Civ. P. 12(b)(6) motion and reaching the merits of the claims because the standard for surviving a Rule 12(b)(1) motion is lower than that for a Rule 12(b)(6) motion.

Constitutional Law: State Autonomy
While by its precise terms, the Eleventh Amendment bars federal court actions against the States brought by a citizen of other States, its prohibition also applies to suits against the States by their own citizens. The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court.

Constitutional Law: State Autonomy
See U.S. Const. amend. XI.

Constitutional Law: State Autonomy
While the States are generally immune from suit brought by private individuals, there are three well-established exceptions to the bar. First, the States may consent to suit, waiving their immunity. Second, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. Third, under the Ex parte Young doctrine, an individual seeking only prospective injunctive relief for ongoing

violations of federal law may bring suit against state officials in federal courts.

Constitutional Law: Civil Rights Enforcement: Discrimination Claims
See 29 U.S.C.S. 794(a).

Constitutional Law: State Autonomy
In interpreting the Eleventh Amendment, the United States Supreme Court recognizes two types of waiver: express and implied. A finding of express waiver is appropriate only where the State's intention to subject itself to suit in federal court is stated by the most express language or by "overwhelming implications." The State's consent must be unequivocally expressed. Thus, the test for determining whether a State has waived its immunity from federal court jurisdiction is a stringent one.

Constitutional Law: State Autonomy
Constructive waiver of Eleventh Amendment immunity is not found absent a statement from Congress indicating in some way by clear language that the constitutional immunity was swept away.

Constitutional Law: State Autonomy
The mere fact that a State participates in a program through which the Federal Government provides assistance for the operation by the State of a system of public aid is not sufficient to establish consent on the part of the State to be sued in the federal courts.

Constitutional Law: State Autonomy
Waiver of Eleventh Amendment immunity requires an unequivocal expression that Congress intended to override Eleventh Amendment immunity.

Constitutional Law: Congressional Powers & Duties: Spending & Taxation
Constitutional Law: State Autonomy
Pursuant to its Spending Clause authority, Congress can legitimately invite the States to consent to suit in exchange for federal funds.

Constitutional Law: Congressional Powers & Duties: Spending & Taxation
Constitutional Law: Civil Rights Enforcement: Discrimination Claims
Section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C.S. § 794(a), is an exercise of Congress' Spending Clause power.

Constitutional Law: Congressional Powers & Duties:





Spending & Taxation
Incident to its power under U.S. Const. art. I, § 8, Congress may attach conditions to the receipt of federal funds, thereby allowing Congress to reach objectives not within Article I's enumerated legislative fields. This creates a relationship of a contractual nature between Congress and the States. A valid exercise of Congress' Spending Clause power is dependent upon a State's knowing and voluntary acceptance of the "contractual" terms. Thus, conditions on the grant of federal financial assistance must be stated unambiguously. By insisting that Congress speak with a clear voice, the States are able to exercise their choice knowingly, cognizant of the consequences of their participation.

Constitutional Law: Congressional Powers & Duties:
Spending & Taxation
There are limitations on Congress' spending power: (1) Congress must act in pursuit of "the general welfare;" (2) federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs; and (3) other constitutional provisions may create an independent bar to the conditional grant of federal monies.

Constitutional Law: State Autonomy
Constitutional Law: Civil Rights Enforcement:
Discrimination Claims
See 42 U.S.C.S. § 2000d-7(a)(1).

Constitutional Law: Congressional Powers & Duties:
Spending & Taxation
Constitutional Law: Civil Rights Enforcement:
Discrimination Claims
Section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C.S. § 794(a), unambiguously expresses Congress' intent to condition the grant of federal funds on a States' consent to suit through 42 U.S.C.S. § 2000d-7(a)(1).

Constitutional Law: Civil Rights Enforcement:
Discrimination Claims
Section 504 of the Rehabilitation Act of 1973 (Section 504), codified at 29 U.S.C.S. § 794(a), prohibits discrimination against a qualified individual with a disability by any program or activity receiving federal financial assistance. 29 U.S.C.S. § 794(a). "Program or activity" is defined as the department or agency that receives or distributes the federal funds. 29 U.S.C.S. § 794(b). Such receipt, however, does not affect other state agencies or the State as a whole. A State and its instrumentalities can avoid Section 504's waiver

requirement on a piecemeal basis, by simply accepting federal funds for some departments and declining them for others. At all times, the State has the option to accept federal funds, which it can choose to exercise or not.

Constitutional Law: Civil Rights Enforcement:
Americans With Disabilities Act
See 42 U.S.C.S. § 12132.

Constitutional Law: State Autonomy
A two-pronged test governs the court's analysis of congressional abrogation of Eleventh Amendment immunity: First, the must consider whether Congress' intent to nullify the States' immunity was expressed unequivocally. Second, the court must determine whether Congress acted pursuant to a valid grant of constitutional authority. With regard to the first prong, a legitimate abrogation requires that Congress make its intention unmistakably clear in the language of the statute.

Constitutional Law: State Autonomy
Constitutional Law: Civil Rights Enforcement:
Americans With Disabilities Act
See 42 U.S.C.S. § 12202.

Constitutional Law: State Autonomy
It is well established that Congress can properly abrogate the sovereign immunity of the States only when acting pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment. Pursuant to § 5, Congress is vested with the authority to enact legislation to enforce § 1 of the Fourteenth Amendment, which, inter alia, guarantees individual freedom from State deprivation of life, liberty, or property without due process of law and State denial of equal protection of the laws. U.S. Const. amend. XIV, § 1. Congress' enforcement power encompasses the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text. While Congress holds enforcement authority, it is within the purview of the courts to identify the substantive scope of constitutional guarantees.

Public Health & Welfare Law: Healthcare: Mental
Health Services
An individual who is involuntarily committed to a psychiatric institution retains a liberty interest in freedom from bodily restraint. But this constitutional right is not absolute. It is limited to the extent professional judgment deems bodily restraint necessary to assure safety or



provide needed training. Those committed to institutions are entitled to minimally adequate training, defined as training that is reasonable in light of the individual's liberty interests in safety and freedom from unreasonable restraints. Courts are to be guided by the judgment of a qualified professional in determining what is reasonable.

Public Health & Welfare Law: Healthcare: Mental Health Services
Constitutional Law: Substantive Due Process: Scope of Protection
The substantive due process rights of institutionalized individuals are not held by individuals whose institutionalization is voluntary. It applies to individuals who are committed against their will. In the substantive due process analysis, it is the States' affirmative act of restraining the individual's freedom to act on his own behalf -- through incarceration, institutionalization, or other similar restraint of personal liberty -- which is the "deprivation of liberty" triggering the protections of the Due Process Clause.

Public Health & Welfare Law: Healthcare: Mental Health Services
Not all forays by the States into areas of important human rights rise to the level of constitutional violations. There must be a balance between the interest of the States in regulating certain areas of human life and the interest of individuals in remaining free from governmental interference. State conduct with regard to the mentally disabled is constitutional if the State's actions bear any rational relationship to any interest the state may legitimately promote. The State is not obligated to articulate the reasons for its policy decisions at the time that they are made. The challenging party must bear the heavy burden of negating any reasonably conceivable rational basis for the State's actions.

Constitutional Law: State Autonomy
Congress is empowered to enact legislation reaching conduct that is not prohibited by § 1 of the Fourteenth Amendment in order to deter violations of the rights guaranteed by § 1. In so doing, Congress cannot dissolve the sovereign immunity of the States for suits involving alleged violations of its legislation unless the "congruence and proportionality" test is satisfied.

Constitutional Law: State Autonomy
Constitutional Law: Civil Rights Enforcement: Americans With Disabilities Act
Valid Fourteenth Amendment § 5 legislation requires the congressional identification of a "history and pattern" of

conduct on the part of the States that transgresses the Fourteenth Amendment's substantive provisions and a legislative scheme tailored to remedying such conduct. If Title II of the Americans with Disabilities Act, *42 U.S.C.S. § 12131* et seq., is an effort to substantively redefine the constitutional right at issue, it is not appropriate prophylactic legislation.

Constitutional Law: Substantive Due Process: Scope of Protection
In determining whether a particular statutory enactment is appropriate legislation under § 5 of the Fourteenth Amendment, the United States Supreme Court examines the legislative record.

Constitutional Law: Civil Rights Enforcement: Americans With Disabilities Act
See *28 C.F.R. § 35.130(b)(7)* (2000).

Governments: State & Territorial Governments: Claims By & Against
The Ex parte Young doctrine generally allows private individuals to seek prospective injunctive relief in federal court against state officials for violations of federal law.

Governments: Courts: Judicial Precedents
A federal district court must consider the United States Supreme Court's dicta with deference, given the High Court's paramount position in the three-tier system of federal courts.

Governments: State & Territorial Governments: Claims By & Against
Suit is appropriately brought under Title II of the Americans with Disabilities Act, *42 U.S.C.S. § 12131* et seq., against a state official in her official capacity in the context of Ex parte Young. This conclusion extends with equal force to § 504 of the Rehabilitation Act of 1973, codified at *29 U.S.C.S. § 794*(a).

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871
See *42 U.S.C.S. § 1983*.

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871
Suit brought under *42 U.S.C.S. § 1983* is an appropriate vehicle through which to redress violations of federal statutes as well as constitutional violations. Although the coverage of the statute must be broadly construed, § 1983 is not available for enforcement of every federal



law. Section 1983 is unavailable if: (1) Congress forecloses such enforcement of the particular statute or (2) the statute creates no enforceable rights, privileges or immunities, as defined by § 1983.

Constitutional Law: Civil Rights Enforcement: Civil Rights Act of 1871
The availability of administrative mechanisms to protect the plaintiff's interests is not necessarily sufficient to demonstrate that Congress intended to foreclose a *42 U.S.C.S. § 1983* remedy. Rather the statutory framework must be such that allowing a plaintiff to bring a § 1983 action would be inconsistent with Congress' carefully tailored scheme. The burden to demonstrate that Congress has expressly withdrawn the remedy is on the defendant. Courts do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right.

Constitutional Law: Civil Rights Enforcement: Americans With Disabilities Act
See *42 U.S.C.S. § 12201*(b).

Public Health & Welfare Law: Healthcare: Mental Health Services
One § 504 of the Rehabilitation Act of 1973, codified at *29 U.S.C.S. § 794*(a), regulation, which became effective in 1981, states: Recipients of federal funds shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons. *28 C.F.R. § 41.51(d)* (2000).

Constitutional Law: Civil Rights Enforcement: Americans With Disabilities Act
See *28 C.F.R. § 35.130(d)*.

Governments: Legislation: Statutory Rights & Remedies
Private rights of action to enforce federal law must be created by Congress. It is for the courts to interpret the statute in order to determine, not only whether it displays an intent to create a private right, but also to determine whether it creates a private remedy. Without this requisite congressional intent, a private cause of action does not exist.

Constitutional Law: Civil Rights Enforcement: Discrimination Claims
Too facile an assimilation of Title VI of the Civil Rights Act of 1964 law to § 504 of the Rehabilitation Act of 1973, codified at *29 U.S.C.S. § 794*(a), must be resisted.

Constitutional Law: Civil Rights Enforcement:

Americans With Disabilities Act
The protections found in the Americans with Disabilities Act (ADA) and in the Rehabilitation Act of 1973 are interpreted similarly. The courts are required to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act.

Constitutional Law: Civil Rights Enforcement: Americans With Disabilities Act
Individuals with mental disabilities are protected under the Americans with Disabilities Act against the type of discrimination Congress intended to remedy with § 504 of the Rehabilitation Act of 1973, codified at *29 U.S.C.S. § 794*(a).

Constitutional Law: Civil Rights Enforcement: Americans With Disabilities Act
Title II of the Americans with Disabilities Act, *42 U.S.C.S. § 12131* et seq., requires that persons with mental disabilities be placed in community settings rather than in institutions when three conditions have been met: the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

Civil Procedure: Pleading & Practice: Pleadings: Construction
The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.

COUNSEL: For FREDERICK L., NINA S., KEVIN C., STEVEN F., ON BEHALF OF THEMSELVES AND ALL PERSONS SIMILARLY SITUATED, PLAINTIFFS: MARK J. MURPHY, PITTSBURGH, PA USA, ROBERT W. MEEK, DISABILITIES LAW PROJECT, PHILA, PA USA.

For DEPARTMENT OF PUBLIC WELFARE OF THE COMMONWEALTH OF PENNSYLVANIA, FEATHER O. HOUSTOUN, IN HER OFFICIAL CAPACITY AS SECRETARY OF PUBLIC WELFARE FOR THE COMMONWEALTH OF PENNSYLVANIA, DEFENDANTS: CLAUDIA M. TESORO, OFFICE OF ATTORNEY GENERAL, PHILA, PA USA, HOWARD

ULAN, DEPT. OF PUBLIC WELFARE, OFFICE OF LEGAL COUNSEL, HARRISBURG, PA USA.

JUDGES: Berle M. Schiller, J.

OPINIONBY: Berle M. Schiller

OPINION: OPINION AND ORDER

Schiller, J.

July 23, 2001

Four adult individuals institutionalized at Norristown State Hospital ("NSH") bring this five-count action against the Department of Public Welfare of the Commonwealth of Pennsylvania ("DPW"), which operates NSH, a psychiatric hospital located in Norristown, Pennsylvania, and Feather O. Houstoun, Secretary of Public Welfare for the Commonwealth of Pennsylvania. Plaintiffs allege violations of Title II of the Americans with Disabilities Act ("ADA" or "Title II"), *42 U.S.C. § 12131*[*2] (1994), et seq., the Rehabilitation Act of 1973 ("section 504"), *29 U.S.C. § 794*(a) (1994 & Supp. IV 1998), and *42 U.S.C. § 1983* (1994) ("section 1983"). Plaintiffs are suing on behalf of themselves and other similarly situated individuals institutionalized at NSH, n1 in order "to challenge their unnecessary segregation in NSH and Defendants' failure to provide them with appropriate services in the community -- the most integrated setting appropriate to their needs." (First Am. Compl. at P 1).

n1 Plaintiffs seek to represent "a class comprised of all persons institutionalized at Norristown State Hospital ("NSH"), other than those in the Regional Forensic Unit and Juvenile Forensic Unit." (First Am. Compl. at P 17). Plaintiffs' motion for class certification is pending.

In addition to disturbing factual allegations, this case presents complicated and unsettled questions of law, both constitutional and statutory. Several of these questions have been the subject[*3] of splits among the courts and debates among commentators.

Presently before the Court is Defendants' motion to dismiss n2 (Document Nos. 4 and 18), attacking Plaintiffs' claims on the grounds that they are barred by the Eleventh Amendment and that Plaintiffs have

otherwise failed to state a claim upon which relief can be granted. For the reasons that follow, Defendants' motion is granted in part and denied in part. Counts II and IV of the first amended complaint, consisting of claims brought under the ADA against the DPW are dismissed. Plaintiffs may proceed on their section 504 claims against both defendants, their ADA claims against Houstoun, and their section 1983 claim against Houstoun.

n2 Defendants filed their motion to dismiss the complaint on November 27, 2000. During oral argument held on this motion, plaintiffs addressed a claim pursuant to *42 U.S.C. § 1983*. Defendants indicated that they were unaware that such a claim was being asserted. Because the complaint included only a single reference to *42 U.S.C. § 1983* in the context of pleading a basis for this Court's jurisdiction, I directed Plaintiffs to file an amended complaint more clearly setting forth their *42 U.S.C. § 1983* claim. Plaintiffs filed their first amended complaint on May 4, 2001. Thereafter, Defendants moved for its dismissal. I address both motions herein and refer to them generally in the collective sense as Defendants' "motion to dismiss." Where appropriate, I will cite either to Defendants' motion to dismiss or Defendants' motion to dismiss Plaintiffs' first amended complaint.

[*4]

I. BACKGROUND n3

n3 The facts contained in this section were drawn from Plaintiffs' first amended complaint.

The four Plaintiffs, Frederick L., Nina S., Kevin C., and Steven F., are individuals with mental disabilities institutionalized at NSH. Frederick L. has been recommended for discharge to a community program since at least July of 1997. Nina S. has not been officially recommended for discharge. Kevin C. has been recommended for discharge to a community program since at least February of 1999. Steven F. has also been recommended for discharge to a community program. The pleadings do not reflect the date of this recommendation.

A. Funding of Pennsylvania's mental health services

In Pennsylvania, mental health services are funded by the Commonwealth, its counties, and the federal government. Services to individuals with mental disabilities can be provided in many settings, ranging from independent living arrangements, where the individual may reside alone, to psychiatric institutions. There[*5] is a complex scheme for the allocation of financial responsibility among these governmental entities. At this stage, a brief rehearsal of the manner in which mental health services are funded is necessary.

The Commonwealth is responsible for all of the treatment and care costs of residents at state psychiatric hospitals. See 50 PA. CONS. STAT. ANN. § 4507(a)(1) (1969); 55 PA. CODE § 4300.23(a)(1) (Supp. 244 1995). Community-based mental health services are funded by the Commonwealth and its counties, each paying 90 percent and 10 percent, respectively. See 50 PA. CONS. STAT. ANN. § 4509(1) (Supp. 2001); 55 PA. CODE § 4300.23(b). Federal funding, through various programs, including the Medical Assistance Program n4 and social services  block grants n5 is available to defray part of the Commonwealth's costs for non-residential, community-based services provided by the counties.

n4 Pennsylvania's Medical Assistance Program is administered by the DPW.

> The Medical Assistance Program is a cost-sharing arrangement authorized by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (1992 & Supp. 1997). Under this program, the state and federal governments finance Medical Assistance to individuals whose resources are insufficient to cover the costs of their medical care.
>
> *Anderson v. Dept. of Pub. Welfare, 1 F. Supp. 2d 456, 459, 459 n.1 (E.D. Pa. 1998).*

[*6]

n5 Social services block grants, available under Title XX of the Social Security Act, 42 U.S.C. §§ 1397-1397f (1994), provide funding for, inter alia, "preventing or reducing inappropriate institutional care by providing for community-based care, home-based care, or other forms of less intensive care." 42 U.S.C. § 1397(4).

Additionally, over recent years, the DPW has intermittently provided funds to the counties through the Community Hospital Integrated Project Program ("CHIPP"). n6 Funds distributed through this program are earmarked for use in developing the resources necessary to discharge institutionalized individuals from state psychiatric hospitals. As counties receive CHIPP/SIPP funds, the number of beds in state psychiatric hospitals that can be used by individuals from recipient counties without cost to those counties is reduced.

n6 In the southeast region of the Commonwealth, this program is now known as the Southeastern Integrated Project Program ("SIPP").

[*7]

The DPW has the authority to shift funds used for institutionalized care to community care. The counties make annual requests to the DPW for funds needed to provide appropriate community-based services. The DPW, however, has consistently failed to satisfy the requests of those counties whose residents are institutionalized at NSH (Bucks, Chester, Delaware, Montgomery, and Philadelphia). As a result, all of the individuals with mental disabilities who could be appropriately served in the community cannot be accommodated and remain unnecessarily institutionalized where they are either not recommended for discharge or placed on waiting lists for community care indefinitely.

B. Averments

Plaintiffs allege that with the appropriate services, they could live successfully in the community, which is the most integrated setting appropriate to their needs. Defendants are ultimately responsible for assuring that mental health services are provided to all Pennsylvania residents who need them. The Defendants have failed to properly assess the Plaintiffs' community service needs and fund sufficient appropriate community-based programs to serve them. NSH residents are not evaluated in order[*8] to determine whether their needs could be served in the community if appropriate programs were established. Instead, residents are recommended for discharge "based on the capacity of the individual to fit -- however awkwardly -- into existing programs." (First Am. Compl. at P 62). Compounding this problem is the fact that some NSH professionals do not know what

services are available in the community. As a result, residents who could be served in the community are not recommended for discharge. This occurred in the case of Plaintiff Nina S.

Plaintiffs further allege that in the 2001-02 fiscal year, NSH plans to discharge 60 elderly and medically fragile non-forensic residents of NSH and provide them with community-based services due to structural problems requiring that the medical/elderly unit be closed, not individualized assessments of the residents to determine their needs. As a result of this discharge plan, Plaintiffs will be "institutionalized indefinitely at NSH," as the DPW has no plan to discharge them. (First Am. Compl. at P 2).

In Counts I and II of the first amended complaint, Plaintiffs claim that Defendants DPW and Houstoun violate section 504 and Title II of the ADA, [*9]respectively, "by failing to provide services to Plaintiffs in the most integrated setting appropriate to their needs." ("integration mandate claims") (First Am. Compl. at PP 72, 77). In Counts III and IV, Plaintiffs charge that Defendants DPW and Houstoun violate section 504 and Title II of the ADA, respectively, by "using methods of administration that have the effect of subjecting Plaintiffs and the proposed class to discrimination on the basis of disability." ("methods of administration claims") (First Am. Compl. at PP 80, 83). Count V embodies the allegation that Defendant Houstoun violated the Plaintiffs' rights under section 504 and Title II of the ADA by establishing a DPW policy of refusing and failing to "provide mental health services to Plaintiffs and the class they represent in the most integrated setting appropriate to their individual needs," as prohibited by section 1983. (First Am. Compl. at P 88).

C. Relief requested

Plaintiffs seek a declaration that the Defendants have violated Plaintiffs' rights and an injunction compelling the Defendants to remedy the ongoing violations of federal law.

D. Motion to dismiss

Defendants filed their motion to dismiss[*10] pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that this Court lacks subject matter jurisdiction over this action because the DPW is immune from suit under the Eleventh Amendment. Moreover, Defendants contend

that Plaintiffs fail to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) because (1) Houstoun is not a proper Defendant under the ADA or section 504; (2) Section 1983 is not a proper mechanism to enforce rights conferred by section 504 and the ADA; (3) Section 504 does not obligate states to provide community care for the mentally ill; and (4) Plaintiffs' section 504 and ADA claims are foreclosed by the Supreme Court's decision in *Alexander v. Sandoval, U.S. , 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001)*. Finally, if Plaintiffs' ADA claims are not completely barred on other grounds, Defendants argue that the Plaintiffs' claims are limited by the Supreme Court's decision in *Olmstead v. L.C., 527 U.S. 581, 119 S. Ct. 2176, 144 L. Ed. 2d 540 (1999)*.

II. LEGAL STANDARD

In considering a Rule 12(b)(6) motion, the Court must accept as true all of the allegations set forth in the complaint and all reasonable inferences must be drawn[*11] in favor of the Plaintiffs. See *Ford v. Schering-Plough Corp., 145 F.3d 601, 604 (3d Cir.1998)*. Dismissal of Plaintiffs' claim is appropriate only if Plaintiffs "can prove no set of facts in support of [their] claim which would entitle [them] to relief." Id. (quotation omitted).

Defendants raise the issue of Eleventh Amendment immunity under Rule 12(b)(1) on subject matter jurisdiction grounds. In *Blanciak v. Allegheny Ludlum Corporation, 77 F.3d 690 (3d Cir. 1996)*, the Third Circuit recognized that "the Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction." *Id. at 694 n.2* (citing *Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98-100, 79 L. Ed. 2d 67, 104 S. Ct. 900 (1984))*. The Third Circuit went on to say that such a motion may be filed pursuant to Rule 12(b)(1). See id. One year before, however, our court of appeals stated that Eleventh Amendment immunity "does not implicate federal subject matter jurisdiction in the ordinary sense" because it "can be expressly waived by a party, or forfeited through non-assertion." *Christy v. Pa. Turnpike Comm'n, 54 F.3d 1140, 1144 (3d Cir. 1995)*.[*12] As such, the Third Circuit determined in Christy that Eleventh Amendment immunity should be analyzed as an affirmative defense to be established by the party raising it. See id. Where Eleventh Amendment immunity was asserted in a motion to dismiss for lack of subject matter jurisdiction, this Court has evaluated the motion under the standard provided for by Rule 12(b)(6). See *Elman v.*

United States, 1998 U.S. Dist. LEXIS 5140, 1998 WL 195905, at *1 (E.D. Pa. Apr. 6, 1998).

There are two types of Rule 12(b)(1) motions. With regard to the first type, a facial attack on the court's subject matter jurisdiction, the court is required to assume that plaintiff's allegations are true. See Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). When confronted with the second type, a factual attack, the court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" because there is "no presumptive truthfulness attached to plaintiff's allegations." Id. Factual evaluations under Rule 12(b)(1) are appropriate at any stage in the proceedings after the filing of an answer. See id. at 891-92. Here, [*13] no answer has been filed. Thus, regardless of whether I treat Defendants' assertion of the Eleventh Amendment bar as a motion under Rule 12(b)(1) or Rule 12(b)(6), I am required to take Plaintiffs' facts as true.

I am mindful that the Third Circuit has "cautioned against treating a Rule 12(b)(1) motion as a Rule 12(b)(6) motion and reaching the merits of the claims" because "the standard for surviving a Rule 12(b)(1) motion is lower than that for a 12(b)(6) motion." Gould Elecs. Inc. v. United States, 220 F.3d 169, 178 (3d Cir. 2000) (citation omitted). In considering whether Defendants' are protected from suit by the Eleventh Amendment, I will avoid evaluation of the merits of Plaintiffs' claims.

III. DISCUSSION

A. Eleventh Amendment

Defendants argue that Plaintiffs' section 504 and ADA claims against the DPW are precluded by the Eleventh Amendment. While by its precise terms, the Eleventh Amendment bars federal court actions against the States brought by a citizen of other States, the Supreme Court has long recognized that its prohibition also applies to suits against the States by their own citizens. n7 See Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, [*14] , 121 S. Ct. 955, 962, 148 L. Ed. 2d 866 (2000) (citations omitted); Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 627 at 666, 669, 144 L. Ed. 2d 575, 119 S. Ct. 2199 (1999). "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." Garrett, 121 S. Ct. at 962 (citation omitted); see Alden v. Maine, 527 U.S. 706,

713, 144 L. Ed. 2d 636, 119 S. Ct. 2240 (1999) (observing that "as the Constitution's structure, and its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution and which they retain today").

n7 The Eleventh Amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.

[*15]

Thus, while the States are generally immune from suit brought by private individuals, there are three well-established exceptions to the bar. First, the States may consent to suit, waiving their immunity. See Alden, 527 U.S. at 755. Second, "Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority." Garrett, 121 S. Ct. at 962 (quotation omitted). Third, under the doctrine announced in Ex parte Young, 209 U.S. 123, 159-60, 52 L. Ed. 714, 28 S. Ct. 441 (1908), and refined in subsequent decisions, an individual seeking only prospective injunctive relief for ongoing violations of federal law may bring suit against state officials in federal courts. See Alden, 527 U.S. at 757; Seminole Tribe v. Florida, 517 U.S. 44, 73, 134 L. Ed. 2d 252, 116 S. Ct. 1114 (1996); Green v. Mansour, 474 U.S. 64, 68, 88 L. Ed. 2d 371, 106 S. Ct. 423 (1985); Fitzpatrick v. Bitzer, 427 U.S. 445, 456, 49 L. Ed. 2d 614, 96 S. Ct. 2666 (1976).

1. State Waiver under Section 504[*16]

Defendants argue that the Eleventh Amendment prohibits suit against the DPW brought under section 504 (Counts I and III). n8 Plaintiffs assert that their claims can proceed under the first exception to the Eleventh Amendment bar.

n8 Section 504 provides:

No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the

benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

*29 U.S.C. 794*(a).

In interpreting the Eleventh Amendment, the Supreme Court has recognized two types of waiver: express and implied. The Supreme Court has repeatedly emphasized that a finding of express waiver is appropriate only where the State's intention to subject itself to suit in federal court is stated "by the most express language" or by "overwhelming implications." *Edelman v. Jordan, 415 U.S. 651, 673, 39 L. Ed. 2d 662, 94 S. Ct. 1347 (1974)*[*17] (quotation omitted); see *Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 305-06, 109 L. Ed. 2d 264, 110 S. Ct. 1868 (1990); Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241, 87 L. Ed. 2d 171, 105 S. Ct. 3142 (1985)*. The Court has "insisted . . . that the State's consent be unequivocally expressed." *Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99, 79 L. Ed. 2d 67, 104 S. Ct. 900 (1984)* ("Pennhurst II") (citation omitted).

Our reluctance to infer that a State's immunity from suit in the federal courts has been negated stems from recognition of the vital role of the doctrine of sovereign immunity in our federal system. A State's constitutional interest in immunity encompasses not merely whether it may be sued, but where it may be sued.

Id. Thus, the "test for determining whether a State has waived its immunity from federal court jurisdiction is a stringent one." *Coll. Sav. Bank, 527 U.S. at 675* (quoting Atascadero *, 473 U.S. at 241*).

The instant Plaintiffs do not and cannot argue that Pennsylvania consented to suit by expressing a clear waiver via statute[*18] or constitutional amendment. Instead, Plaintiffs take the position that suit under section 504 is proper because Pennsylvania's DPW n9 implicitly consented to suit by accepting federal funds. n10 (Pl. Resp. to Mot. to Dismiss at 7). The Supreme Court examined the doctrine of implied waiver in *Parden v. Terminal Ry. of Ala. State Docks Dept., 377 U.S. 184, 12 L. Ed. 2d 233, 84 S. Ct. 1207 (1964)*. In Parden, the Court concluded that by choosing to operate an interstate railroad approximately 20 years after the enactment of the Federal Employers' Liability Act (FELA), Alabama

implicitly consented to suit by injured railroad employees. *Id. at 192.* The Court stated:

By adopting and ratifying the Commerce Clause, the States empowered Congress to create such a right of action against interstate railroads; by enacting the FELA in the exercise of this power, Congress conditioned the right to operate a railroad in interstate commerce upon amenability to suit in federal court as  provided by the Act; by thereafter operating a railroad in interstate commerce, Alabama must be taken to have accepted that condition and thus to have consented to suit. [*19]

Id.

n9 Section 504 regulates the conduct of any "program or activity" receiving federal financial assistance. See *29 U.S.C. § 794*(a). "Program or activity" is defined as the department or agency that receives or distributes the federal funds. See *29 U.S.C. § 794*(b). Here, Plaintiffs allege that the DPW receives federal funds. Such receipt, however, does not affect other state agencies or the state of Pennsylvania as a whole. See *Jim C. v. United States, 235 F.3d 1079, 1081 (8th Cir. 2000)*.

n10 There exists some debate regarding whether there is a conceptual difference between the related doctrines of implied waiver (such as pursuant to a Spending Clause condition) and congressional abrogation. One commentator noted that despite being "hopelessly confused and conflated for some time," the two concepts are distinct. Kit Kinports, Implied Waiver After Seminole Tribe, *82 MINN. L. REV. 793, 807 (Feb. 1998)*. Kinports separates the two concepts as follows: "Implied waiver presupposes a voluntary decision on the part of the states to forego their Eleventh Amendment protection, whereas abrogation is an exercise of congressional power to remove the states' immunity regardless of their wishes." Id. However, a district court in Illinois concluded that "the difference between constructive waiver and abrogation is purely semantic." *Digiore v. Illinois, 962 F. Supp. 1064, 1075 (N.D. Ill. 1997)*. Without pounding a stake in either camp, and simply in order to distinguish the arguments made by counsel, I will refer to suit in the context of Spending Clause legislation as a type of waiver and suit authorized by Congress in a valid exercise under § 5 of the Fourteenth Amendment as abrogation.

[*20]

Subsequently, the Court declined to find constructive waiver absent a statement from Congress "indicating in some way by clear language that the constitutional immunity was swept away." *Employees of the Dept. of Pub. Welfare v. Dept. of Pub. Health & Welfare, 411 U.S. 279, 284-85, 36 L. Ed. 2d 251, 93 S. Ct. 1614 (1973)* (concluding state health facility employees could not sue the state for failure to comply with the Fair Labor Standards Act after distinguishing Parden by noting that states can opt not to operate a railroad, but cannot choose not to provide basic public services like hospitals); cf. *Coll. Sav. Bank, 527 U.S. at 677* ("In Employees, we began to retreat from Parden "). Similarly, in *Edelman, 415 U.S. at 673,* the Court ruled that Illinois had not impliedly waived its sovereign immunity by accepting federal monies under a welfare program. The Court noted that "constructive consent is not a doctrine commonly associated with the surrender of constitutional rights, and we see no place for it here." *Id. at 673.* The Court observed that the "mere fact that a State participates in a program through[*21] which the Federal Government  provides assistance for the operation by the State of a system of public aid is not sufficient to establish consent on the part of the State to be sued in the federal courts." Id.; see *Atascadero, 473 U.S. at 246-47.*

In 1987, the Supreme Court explicitly adopted the requirement of "an unequivocal expression that Congress intended to override Eleventh Amendment immunity." *Welch v. Texas Dept. of Highways and Pub. Trans., 483 U.S. 468, 478, 97 L. Ed. 2d 389, 107 S. Ct. 2941 (1987)* (citations omitted) (overruling Parden to the extent that it is "inconsistent with the requirement that an abrogation of Eleventh Amendment immunity by Congress must be expressed in unmistakably clear language").

Since 1987, legal scholars have debated the continued vitality of the constructive waiver doctrine in light of the development of Eleventh Amendment jurisprudence from Parden to Welch. Compare, ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 7.6 (3d ed. 1999) (stating "in short, constructive waiver of the Eleventh Amendment immunity is virtually nonexistent"), with Kit Kinports, Implied Waiver After Seminole Tribe[*22] , *82 MINN. L. REV. 793, 831 (Feb. 1998)* (concluding that the "doctrine of implied waiver continues to be viable").

The Supreme Court's 1999 decision in *College Savings Bank v. Florida Prepaid, 527 U.S. 666, 119 S. Ct. 2219, 144 L. Ed. 2d 605* however, is instructive in determining the current availability of implied waiver. In College Savings Bank, the Court held that Florida did not constructively waive its immunity from suit under the Lanham Act. *Id. at 691.* In so finding, the Court expressly overruled any surviving notions of Parden: "We think that the constructive-waiver experiment of Parden was ill conceived, and see no merit in attempting to salvage any remnant of it." *Id. at 680.*

Despite this apparent extinguishment of the constructive waiver doctrine, College Savings Bank does not foreclose Plaintiffs' section 504 claims here. The Court in College Savings Bank noted "fundamental" differences between the case before it and the type of case instantly at bar.  *Id. at 686.* The Court recognized:

Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take, and that acceptance of[*23] the funds entails agreement to the actions. . . . Congress has no obligation to use its Spending Clause power to disburse funds to the States; such funds are gifts. In the present case, however, what Congress threatens if the State refuses to agree to its condition is not the denial of a gift or gratuity, but a sanction: exclusion of the State from otherwise permissible activity.

Id. (citing *South Dakota v. Dole, 483 U.S. 203, 97 L. Ed. 2d 171, 107 S. Ct. 2793 (1987)).* This distinction compels the finding that pursuant to its Spending Clause authority, Congress can legitimately invite the States to consent to suit in exchange for federal funds.

As a threshold position, Defendants argue that section 504 was enacted pursuant to Congress' power under § 5 of the Fourteenth Amendment, not under the Spending Clause. n11 There exists some ambiguity regarding the authority pursuant to which Congress enacted section 504. Congress itself was silent on the issue. See *Armstrong v. Wilson, 942 F. Supp. 1252, 1262 (N.D. Cal. 1996)* ("the Rehabilitation Act is silent as to the constitutional authority under which it was enacted"), aff'd, *124 F.3d 1019 (9th Cir. 1997),*[*24] cert. denied, *524 U.S. 937, 141 L. Ed. 2d 711, 118 S. Ct. 2340 (1998).* The Supreme Court has not squarely addressed the issue. In *Welch, 483 U.S. at 470, 472 n.2,* the Court commented as follows:

The question in [Atascadero v.] Scanlon was whether § 504 of the Rehabilitation Act of 1973, *29 U.S.C. § 794,* makes state agencies subject to suits for retroactive monetary relief in federal court. The Rehabilitation Act was passed pursuant to § 5 of the Fourteenth Amendment. *Atascadero v. Scanlon, 473 U.S. 234, 244-245, n.4, 105 S. Ct. 3142, 3149 n.4, 87 L. Ed. 2d 171 (1985).* Congress therefore had the power to subject unconsenting States to suit in federal court. See *Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S. Ct. 2666, 49 L. Ed. 2d 614 (1976).*

Without deciding which of its powers Congress exercised in enacting section 504, the Supreme Court in *Atascadero, 473 U.S. at 240,* examined whether California could be sued in federal court for violations of section 504. The footnote in Atascadero referenced by the Court in Welch contains an explanation of how the [*25]Court would conduct its analysis. See *Atascadero, 473 U.S. at 244 n.4.* The Court in Atascadero considered whether Congress had validly abrogated the sovereign immunity of the States as if the statute had been enacted pursuant to § 5 and whether California had implicitly waived its immunity by accepting federal funds as if section 504 were Spending Clause legislation. See *id. at 242-247.* Thus, the basis of the congressional authority used in enacting section 504 was not determined by the Supreme Court in Atascadero.

n11 The Defendants concede, however, that the "entire Rehabilitation Act of 1973, of which § 504 is but one section, does have attributes of 'regular' spending clause legislation." (Def. Reply at 6 n.5).

While some courts have concluded that section 504 was enacted pursuant to Congress' power under § 5 of the Fourteenth Amendment, see, e.g., *Clark v. California, 123 F.3d 1267, 1270 (9th Cir. 1997),* cert. denied sub. nom., *Wilson v. Armstrong, 524 U.S. 937, 141 L. Ed. 2d 711, 118 S. Ct. 2340 (1998);*[*26] *Mayer v. Univ. of Minn., 940 F. Supp. 1474, 1476-80 (D. Minn. 1996),* I am persuaded by the reasoning employed by the court in *Bowers v. Nat'l Collegiate Athletic Ass'n, 118 F. Supp. 2d 494, 506 (D.N.J. 2000),* that section 504 is an exercise of Congress' Spending Clause power. n12

In the end, one need only look at the language of section 504, which conditions the application of its bar against discrimination on the receipt of federal funds, and the

fact that section 504 is modeled after Title VI [of the Civil Rights Act of 1964], which was enacted in part under Congress's Spending Clause power, to conclude that section 504 was enacted at least in some measure pursuant to Congress's authority under the Spending Clause.

*Id. at 506-07* (internal citation and quotation omitted). Several other courts have acknowledged that section 504 is a Spending Clause enactment. See, e.g., *Shinault v. Am. Airlines, Inc., 936 F.2d 796, 803 (5th Cir. 1991); Armstrong, 942 F. Supp. at 1263; Moreno v. Consol. Rail Corp., 909 F. Supp. 480, 487 (E.D. Mich. 1994),* aff'd en banc, *99 F.3d 782 (6th Cir. 1996);*[*27] *Rivera Flores v. Puerto Rico Tel. Co., 776 F. Supp. 61, 67 (D.P.R. 1991); Turner v. First Hosp. Corp., 772 F. Supp. 284, 287 n.2 (E.D. Va. 1991).*

n12 I do not evaluate here whether section 504 was a valid exercise of any other congressional authority.

Having found that section 504 was enacted pursuant to the Spending Clause, I now survey the nature of Congress' spending power. In *Dole, 483 U.S. at 206-07,* the Supreme Court acknowledged that incident to its power under Article I, Section 8 of the Constitution, Congress may attach conditions to the receipt of federal funds, thereby allowing Congress to reach objectives not within "Article I's enumerated legislative fields." (citations and quotation omitted). This creates a relationship of a contractual nature between Congress and the States. See *Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17, 67 L. Ed. 2d 694, 101 S. Ct. 1531 (1981)* ("Pennhurst I"). A valid exercise of Congress' [*28] Spending Clause power is dependent upon a State's knowing and voluntary acceptance of the "contractual" terms. See id. Thus, conditions on the grant of federal financial assistance must be stated unambiguously. n13 See id. "By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." Id.

n13 There are other limitations on Congress' spending power: (1) Congress must act in pursuit of "the general welfare;" (2) "federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs;" and (3) other constitutional provisions may create an independent bar to the



conditional grant of federal monies. *Dole, 483 U.S. at 207-08* (citations and quotations omitted). Defendants do not explicitly contend that section 504 violates any of these restrictions, but as discussed in this section, they do suggest that the second limitation invalidates the condition articulated in section 504.

[*29]

The argument that Congress unequivocally stated its intention to solicit a waiver of the States' sovereign immunity through section 504 was rejected in 1985 by the Supreme Court in *Atascadero, 473 U.S. at 246-47.* In Atascadero, the Supreme Court concluded that Congress failed to "manifest[] a clear intent to condition participation in the programs funded under [section 504] on a State's consent to waive its constitutional immunity." *Id. at 245.* Thereafter, Congress enacted the following:

A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Educational Amendments of 1972, and Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provision of any Federal statute prohibiting discrimination by recipients of Federal financial assistance.

*42 U.S.C. § 2000d-7(a)(1) (1994)* ("section 2000d-7(a)(1)"). In *Lane v. Pena, 518 U.S. 187, 189, 135 L. Ed. 2d 486, 116 S. Ct. 2092 (1996),* the Supreme Court evaluated whether[*30] section 2000d-7(a)(1) unmistakably evidenced Congress' intent to waive the federal government's sovereign immunity to damages liability for violations of section 504. In examining this issue, the Court observed "the care with which Congress responded to our decision in Atascadero by crafting an unambiguous waiver of the States' Eleventh Amendment immunity." *Id. at 200.* Several courts of appeals undertaking this inquiry following the enactment of section 2000d-7(a)(1) have reached similar results. See, e.g., *Jim C. v. United States, 235 F.3d 1079, 1082 (8th Cir. 2000)* (holding that Arkansas' Department of Education waived its sovereign immunity for suit brought under section 504); *Stanley v. Litscher, 213 F.3d 340, 344 (7th Cir. 2000)* (concluding that "the Rehabilitation Act is enforceable in federal court against recipients of federal largess"); *Pederson v. Louisiana State Univ., 213 F.3d 858, 875-76 (5th Cir. 2000);*

*Clark, 123 F.3d at 1271* (finding that "the Rehabilitation Act includes an express waiver of Eleventh Amendment immunity which California accepted when it accepted Rehabilitation[*31] Act funds"). Therefore, I conclude that section 504 unambiguously expresses Congress' intent to condition the grant of federal funds on a States' consent to suit through section 2000d-7(a)(1).

Although the Defendants challenge the cases that Plaintiffs offer to support their contention that Congress' intent has been unambiguously manifested (Def. Reply at 9-12), they concede that Congress' expression of its intent in section § 2000d-7(a)(1) is "clear" as required by the Supreme Court. (Mot. to Dismiss at 18).

Defendants suggest that despite its clarity, section 2000d-7(a)(1) cannot serve as the basis for an effective waiver because it is not "program-specific," as it extends to "any claim arising under any program under § 504 and title IX and the Age Discrimination Act of 1975 and title VI and 'any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.'" (Mot. to Dismiss at 18) (emphasis in original) (quoting *42 U.S.C. § 2000d-7(a)(1)*). Defendants provide the Court with no authority for the requirement that Congress state its intention to condition the receipt of federal funds on submission[*32] to suit on a program-by-program basis. As I have stated previously, and the Defendants concede, with regard to section 504, Congress' intent has been expressed unambiguously. No more is required.

Defendants argue that section 2000d-7(a)(1) cannot serve to effect a waiver in this particular case because there is an insufficient "connection between the granting of funds to a state for a certain purpose and the state's agreement to waive its immunity if sued on a related claim." (Def. Reply at 9). During oral argument, counsel for the defendants expounded on this argument:

I think based on Atascadero there needs to be come (sic) kind of connection between the kinds of funds, the kind of case and the kind of waiver and the kind of lawsuit.

(Oral Arg. Trans. at 17, Apr. 26, 2001).

In support of this nexus requirement, Defendants rely on the Supreme Court's instruction in Atascadero: Congress must "manifest[] a clear intent to condition participation in the programs funded under the Act on a State's consent to waive its constitutional immunity," (Def. Reply at 9, 11 n.6) (emphasis in original) (quoting

*Atascadero, 473 U.S. at 247).* [*33]

To the extent Defendants assert that the condition imposed by Congress "must be related to the purpose of the federal funds whose receipt is conditioned," I agree with the reasoning of the District of Columbia Circuit, which rejected that argument, concluding that that "standard is not supported by the case law." *Oklahoma v. Schweiker, 210 U.S. App. D.C. 288, 655 F.2d 401, 406-07 (D.C. Cir. 1981).* After surveying the Supreme Court's pronouncements in this area, the court of appeals observed:

In each of these cases, the condition imposed by Congress, and the behavior of the grant recipient that the condition was designed to affect, were not exactly correlated to the purpose for which the conditioned federal funds were dispensed: the conditions and the general funding programs were aimed at serving different federal interests. Nevertheless, the courts recognized that in each instance Congress had legitimately exercised its power to insist that those receiving federal benefits agree, in exchange, to abide by the condition set by Congress. In none of the cases did the courts require that Congress identify the relationship between the terms imposed and the purposes[*34] of the funding programs conditioned.

*655 F.2d at 407.*

Defendants also point to the Supreme Court's observation in *Dole, 483 U.S. at 207,* "that conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." (quotation omitted). This requirement centers around the relationship between the condition imposed and the federal initiative. Through section 2000d-7(a)(1), Congress linked the federal government's legitimate interest in eliminating discrimination against disabled individuals in the programs it endows to State accountability for such discrimination. Similarly, the congressionally imposed condition in Dole requiring the States to raise their legal drinking ages to twenty-one was sufficiently related to the federal interest in safe interstate travel. See *Dole, 483 U.S. at 208-09.*

After considering this requirement for permissible Spending Clause conditions, a federal district court in Kansas rejected an argument that encompasses at least part of the nexus requirement proposed by Defendants here. See *Robinson v. Kansas, 117 F. Supp. 2d 1124, 1133 (D. Kan. 2000).*[*35] In *Robinson, 117 F. Supp. 2d*

*1124 at 1127-30,* minority, non-U.S. origin, and disabled students sued the state of Kansas and three state officials under, inter alia, Title VI, *42 U.S.C. § 2000d (1994),* and section 504, claiming that its statutory scheme for funding schools has a discriminatory disparate impact on them. The Defendants argued that Congress could not properly condition the receipt of federal funds on the state's waiver of immunity under section 2000d-7(a)(1) because the funds alleged to be distributed in a discriminatory way were not the actual federal funds disbursed to the State under Title VI. *Id. at 1133.* The court in Robinson rejected this argument as to Title VI and section 504 ruling, "No dollar-for-dollar accounting need be made." *Id. at 1133, 1134.*

I reject Defendants' assertion and find that any nexus requirements of Atascadero and Dole have been satisfied.

Defendants also contend there can be no implied waiver because Congress' offer to exchange federal funds for compliance with section 504 is unduly coercive. As the Supreme Court admonished in *Dole, 483 U.S. at 211,*[*36] and reiterated in *College Savings Bank, 527 U.S. at 687,* "the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns to compulsion.'" (quoting *Steward Machine Co. v. Davis, 301 U.S. 548, 590, 81 L. Ed. 1279, 57 S. Ct. 883 (1937)).*

A divided Eighth Circuit rejected this argument in *Jim C., 235 F.3d at 1081,* concluding that with section 504, Congress has not crossed the line separating pressure and compulsion. Section 504 prohibits discrimination against a qualified individual with a disability by any program or activity receiving federal financial assistance. *29 U.S.C. § 794(a).* "Program or activity" is defined as the department or agency that receives or distributes the federal funds. See *29 U.S.C. § 794(b).* Such receipt, however, does not affect other state agencies or the State as a whole. See *Jim C., 235 F.3d at 1081.* "A State and its instrumentalities can avoid Section 504's waiver requirement on a piecemeal basis, by simply accepting federal funds for some departments and declining them for others." Id. At all times, the[*37] State has the option to accept federal funds, which it can choose to exercise or not. See *id. at 1082* (recognizing that "the State may take the money or leave it"). While the incentive at issue here may be a powerful and tempting one, it remains merely an offer.

Lastly, Defendants assert that there cannot be an



effective waiver of immunity in the instant matter because the DPW's participation in federal programs such as the Medical Assistance Program predates the 1986 enactment of section 2000d-7(a)(1). This argument is unavailing for two reasons. First, Plaintiffs claims do not predate 1986. Second, the DPW accepts federal monies annually. Since the enactment of section 2000d-7(a)(1), the DPW has had the option to avoid being governed by the mandates of section 504. The DPW got what it bargained for. It cannot now avoid its obligation.

Therefore, for the above-stated reasons, I find that in this case the Eleventh Amendment is not a bar to suit in federal court for violations of section 504.

2. Congressional Abrogation under the ADA

Defendants argue that the DPW is immune from suit for violations of Title II of the ADA under the Eleventh Amendment. n14 Plaintiffs[*38] argue that their integration mandate claim (Count II) survives Eleventh Amendment scrutiny because Congress effectively abrogated the States' sovereign immunity in enacting Title II of the ADA. n15

n14 Title II of the ADA states:

> No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.
>
> *42 U.S.C § 12132* (1994).

n15 Plaintiffs do not argue that their methods of administration claim under the ADA (Count IV) survives Defendants' Eleventh Amendment challenge. Since the Plaintiffs did not favor the Court with briefing or arguments in support of this claim, I will dismiss Count IV against the DPW.

The Supreme Court recently held that suits for damages brought by state employees against the State alleging failure to comply with Title I of the ADA, which deals with discrimination[*39] in employment, are

barred by the Eleventh Amendment. See *Garrett, 121 S. Ct. at 960.* The Court explicitly declined to decide this issue with regard to Title II, noting that there are differences between the remedial provisions of Title I and Title II. n16 See id. at 960 n.1; see also *Lavia v. Comm. of Pennsylvania, 224 F.3d 190, 195 n.2 (3d Cir. 2000)* (declining to address whether Congress had validly abrogated the immunity of the States with regard to Title II). n17

n16 Because neither party addressed the implications of the Court's comment I will not consider them here.

n17 Prior to the Court's decision in Garrett, some courts of appeals concluded that Congress had effectively abrogated the States' immunity to suit under Title II. See, e.g., *Coolbaugh v. Louisiana, 136 F.3d 430* (5th Cir.), cert. denied, *525 U.S. 819, 142 L. Ed. 2d 45, 119 S. Ct. 58 (1998); Clark, 123 F.3d at 1269.*

A two-pronged[*40] test governs the court's analysis: First, I must consider whether Congress' intent to nullify the States' immunity was expressed unequivocally. See *Garrett, 121 S. Ct. at 962; Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 73, 145 L. Ed. 2d 522, 120 S. Ct. 631 (2000).* Second, I must determine whether Congress acted pursuant to a valid grant of constitutional authority. See *Garrett, 121 S. Ct. at 962.*

a. Unmistakably clear congressional intent

With regard to the first prong, a legitimate abrogation requires that Congress make "its intention unmistakably clear in the language of the statute." Id. (quotations omitted). Section 12202 of the ADA provides:

A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter.

*42 U.S.C. § 12202* (1994). The Third Circuit has recognized that Congress has "unequivocally fulfilled the first requirement by expressly stating its intent to abrogate the states' Eleventh Amendment immunity." *Lavia, 224 F.3d at 196.* [*41]The Defendants do not


dispute that Congress has clearly expressed its intent. (Mot. to Dismiss at 12).

b. Validity of Title II under § 5 of the Fourteenth Amendment

I now turn to the second part of this "simple but stringent test." *Lavia, 224 F.3d at 196* (quoting *Dellmuth v. Muth, 491 U.S. 223, 228, 105 L. Ed. 2d 181, 109 S. Ct. 2397 (1989))*. It is well established that Congress can properly abrogate the sovereign immunity of the States only when acting pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment. See *Garrett, 121  S. Ct. at 962*. Pursuant to § 5, Congress is vested with the authority to enact legislation to enforce § 1 of the Fourteenth Amendment, which, inter alia, guarantees individual freedom from State deprivation of life, liberty, or property without due process of law and State denial of equal protection of the laws. See id. at 963 (citation omitted); U.S. CONST., amend XIV, § 1. Congress' enforcement power encompasses "the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including[*42] that which is not itself forbidden by the Amendment's text." Id. While Congress holds enforcement authority, it is within the purview of the courts to identify the substantive scope of constitutional guarantees. See id.; *Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 81, 145 L. Ed. 2d 522, 120 S. Ct. 631 (2000)*.

i. Defining the constitutional right

I begin here, as the Supreme Court did in Garrett, by identifying the scope of the constitutional right at issue. See id. Plaintiffs posit that the Due Process Clause of the Fourteenth Amendment confers a substantive right to community-based services for disabled individuals when recommended by qualified professionals. n18 According to the Plaintiffs, this right grew out of the Supreme Court's decision in *Youngberg v. Romeo, 457 U.S. 307, 73 L. Ed. 2d 28, 102 S. Ct. 2452 (1982)* and the Third Circuit's decision in *Clark v. Cohen, 794 F.2d 79 (3d Cir.), cert. denied, 479 U.S. 962, 93 L. Ed. 2d 404, 107 S. Ct. 459 (1986)*. In *Youngberg, 457 U.S. at 316*, the Supreme Court recognized that an individual who is involuntarily committed to a psychiatric[*43] institution retains a liberty interest in freedom from bodily restraint. But this constitutional right is not absolute. It is limited "to the extent professional judgment deems [bodily restraint] necessary to assure [] safety or provide needed training." *Id. at 324*. The Court also concluded that those

committed to institutions are entitled to minimally adequate training, defined as training that is "reasonable in light of the individual's liberty interests in safety and freedom from unreasonable restraints." *Id. at 322*. Courts are to be guided by the judgment of a qualified professional in determining what is reasonable. Id.; see *Thomas S. v. Flaherty, 699 F. Supp. 1178, 1199 (W.D.N.C. 1988)* (noting that the "constitutional right of class members to treatment comporting with the judgment of qualified professionals is established" in analyzing the substantive due process rights of mentally retarded adults in public psychiatric institutions under Youngberg), aff'd, *902 F.2d 250 (4th Cir.), cert. denied, 498 U.S. 951, 112 L. Ed. 2d 335, 111 S. Ct. 373 (1990)*.

n18 Defendants urge the Court to decline to entertain this argument citing a decision of the Third Circuit in which the court opted not to consider an alternative basis of congressional authority for the enactment of the Family and Medical Leave Act of 1993 ("FMLA"), *29 U.S.C. §§ 2601-54 (1994 & Supp. IV 1998)*, because Congress had explicitly relied on the Equal Protection Clause. (Def. Reply at 14-15) (citing *Chittister v. Dept. of Cmty. and Econ. Dev., 226 F.3d 223, 228 (3d Cir. 2000)*. With regard to the ADA, Defendants point me to *42 U.S.C. § 12101 (1994)*, which contains no reference to the Equal Protection Clause. Instead, section 12101(b) makes a broader reference to the Fourteenth Amendment. To the contrary, in enacting FMLA, Congress stated its specific intent to "accomplish [its] purposes [] in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex . . ." *29 U.S.C. § 2601*(b)(4).

[*44]

In *Clark, 794 F.2d at 87*, the Third Circuit affirmed the trial court's holding that Ms. Clark's involuntary confinement in a psychiatric institution "in the face of unanimous professional opinion that she be placed in a far less restrictive environment violated her substantive liberty right to appropriate treatment[,]" in that case, placement in a community living arrangement. (citation omitted). The court of appeals agreed with the trial court that Ms. Clark was constitutionally entitled to the training required for community living. See id. Some courts have ruled that this substantive liberty interest encompasses the right to treatment consistent with the judgment of qualified professionals whose recommendations are not affected by funding issues. See

*Thomas S.,* 699 *F. Supp. at 1200* (quotation omitted) (finding that the constitutional rights of those confined in mental institutions include entitlement to "treatment recommended by qualified professionals whose judgment is unsullied by consideration of the fact that the state does not provide appropriate treatment or funding for appropriate treatment"); *Clark v. Cohen,* 613 *F. Supp. 684, 704 n.13*[*45] ("I do not believe that the Youngberg court meant to include decisions motivated out of budgetary constraints in the category of 'professional judgment'").

Defendants correctly observe that cases decided after Youngberg and Clark limit Plaintiffs' argument by clarifying that the substantive due process rights that Plaintiffs seek to assert here are not held by individuals whose institutionalization is voluntary. The Court's holding in Youngberg applies to individuals who are committed against their will. See *DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 199, 103 L. Ed. 2d 249, 109 S. Ct. 998 (1989). "In the substantive due process analysis, it is the States's affirmative act of restraining the individual's freedom to act on his own behalf -- through incarceration, institutionalization, or other similar restraint of personal liberty -- which is the 'deprivation of liberty' triggering the protections of the Due Process Clause." *Id. at 200.* The imposition of constitutional obligations arose in Youngberg because of the "patient's involuntary commitment and total dependence on his custodians." *County of Sacramento v. Lewis,* 523 U.S. 833, 852 n.12, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998).[*46] In *Fialkowski v. Greenwich Home for Children, Inc.,* 921 *F.2d 459, 464 (3d Cir. 1990),* the Third Circuit concluded that no Fourteenth Amendment violation occurred when a mentally retarded individual choked to death at a community living arrangement in which he was voluntarily placed because he was not deprived of his freedom under DeShaney.

Here, Plaintiffs Frederick L. and Steven F. are committed to NSH on a voluntary basis. (First Am. Compl. at PP 20, 41). Consequently, they have no substantive due process right to community-based services. Accordingly, Count II against the DPW is dismissed with regard to Frederick L. and Steven F. n19

n19 Plaintiffs argue that the constitutional right at issue is one sounding in substantive due process. They decline to claim any other constitutional right. Having considered the constitutional right asserted by the Plaintiffs, my evaluation ends.

With regard to Plaintiffs Nina S. and Kevin C., who I will infer remain involuntarily committed (as I must[*47] at this stage), Defendants argue that involuntarily committed individuals with mental disabilities do not have a substantive due process right to community placement even when it is professionally recommended. (Def. Reply at 17). Defendants rely primarily on the Third Circuit's ruling in *Philadelphia Police and Fire Association for Handicapped Children, Inc. v. City of Philadelphia,* 874 F.2d 156 (3d Cir. 1989). In Philadelphia Police and Fire, the court of appeals determined that the substantive due process rights of mentally retarded persons living at home were not violated when the city of Philadelphia reduced the services it would provide to them because of budgetary shortages. See *id. at 158, 160.* Philadelphia Police and Fire did not involve institutionalized individuals. In contrast, Nina S. and Kevin C. are being institutionalized involuntarily.

The instant situation appears to be governed by Clark. Defendants attempt to distinguish Clark by noting that Ms. Clark may not have needed government services at all. Here, as the Defendants correctly observe, Nina S. and Kevin C. need mental health services. This distinction ignores[*48] the critical similarity: Ms. Clark was and Nina S. and Kevin C. are institutionalized against their will. The courts in Youngberg and Clark have recognized, as this Court recognizes today, that a State that involuntarily institutionalizes an individual is saddled with certain constitutional obligations, in this context, the right to appropriate treatment as determined by qualified professionals (perhaps professionals who are not influenced by budgetary concerns). The Defendants cite no cases, nor am I aware of any cases, that abridge the scope of the constitutional rights asserted here with regard to Nina S. and Kevin C.

Not all forays by the States into areas of important human rights rise to the level of constitutional violations. There must be a balance between the interest of the States in regulating certain areas of human life and the interest of individuals in remaining free from governmental interference. State conduct with regard to the mentally disabled is constitutional if the State's actions "bear[] any rational relationship to any interest the state may legitimately promote." n20 *Stern v. Halligan,* 158 F.3d 729, 731 (3d Cir. 1998); see *Garrett*

, *121 S. Ct. at 964;* [*49] *City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 446, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985).* In this context, the DPW may deny community-based services to Plaintiffs who are deemed appropriate for such services if the DPW's actions are rational. The State is not obligated to articulate the reasons for its policy decisions at the time that they are made. See *121 S. Ct. at 964.* The challenging party must bear the heavy burden of negating any reasonably conceivable rational basis for the DPW's actions. See id. For example, the Court in Garrett noted in the context of Title I that the conservation of scarce financial resources is an entirely rational, and thereby constitutional, reason for a state employer to hire individuals who do not have disabilities that prevent them from using existing facilities over disabled individuals who could perform the job with accommodations. See *Garrett, 121 S. Ct. at 966.*

n20 A heightened level of scrutiny is appropriate where a fundamental right is being restricted. The Plaintiffs do not allege that any fundamental right is at issue here. I am not aware of any Supreme Court pronouncement of a fundamental right relevant in this context.

[*50]

ii. Congruence and proportionality

As rehearsed above, Congress is empowered to enact legislation reaching conduct that is not prohibited by § 1 of the Fourteenth Amendment in order to deter violations of the rights guaranteed by § 1. In so doing, Congress cannot dissolve the sovereign immunity of the States for suits involving alleged violations of its legislation unless the "congruence and proportionality" test is satisfied. Id. at 963.

Valid § 5 legislation requires the congressional identification of a "history and pattern" of conduct on the part of the States that transgresses the Fourteenth Amendment's substantive provisions and a legislative scheme tailored to remedying such conduct. Id. at 964; see *Lavia, 224 F.3d at 197* (quotation omitted). If Title II is an effort to substantively redefine the constitutional right at issue here, it is not appropriate prophylactic legislation. See *Kimel, 528 U.S. at 81.*

In enacting the ADA, Congress specifically found that individuals with mental disabilities are isolated and segregated. See *42 U.S.C. § 12101*(a)(2), (5). Congress

observed that "discrimination[*51] against individuals with disabilities persists in such critical areas as . . . institutionalization." *42 U.S.C. § 12101*(a)(3). Congress set forth "the Nation's proper goals regarding individuals with disabilities," including "full participation, independent living, and economic self-sufficiency." *42 U.S.C. § 12101*(a)(8). While it is clear that Congress sought to remedy the segregation of individuals with disabilities, Congress did not specifically note, in statutory text, discriminatory conduct on the part of the States.

In determining whether a particular statutory enactment is appropriate legislation under § 5, the Supreme Court has examined the legislative record. See *Kimel, 528 U.S. at 88.* In crafting the ADA, Congress had before it a report issued by the United States Commission on Civil Rights entitled Accommodating the Spectrum of Individual Abilities. In a chapter describing "ongoing and historical handicap discrimination" under a section devoted to institutionalization, the Commission specifically referenced "public institutions," writing:

There has been increasing acceptance in recent years of the[*52] fact that most training, treatment, and habilitation services can be better provided to handicapped people in small, community-based facilities rather than in large, isolated institutions. Professionals, courts, Congress and more than one President have called for "deinstitutionalization" and the development of appropriate community programs. Because of such official reorientation toward community alternatives and a variety of other factors (such as the emergence of new service philosophies among human service professionals and the development of drug therapies and other novel treatment approaches), the number of handicapped persons in residential facilities has dwindled in the past two decades.

Despite such initiatives, a great many handicapped persons remain in segregative facilities. The Comptroller General has estimated that about 215,500 persons were residing in public mental hospitals in 1974 and that some 181,100 persons were in public institutions for mentally retarded people as of 1971. In 1976 one study estimated that 1,550,120 persons were in long term residential care facilities.

United States Commission on Civil Rights, Accommodating the Spectrum of Individual [*53] Abilities, 34-35 (1983) (footnotes omitted). The



Commission recognized that institutions continue to be "instruments of segregation." Id. at 33. Additionally, in urging the passage of the ADA, Congressman Miller observed that "society has made [people with disabilities] invisible by shutting them away in segregated facilities." 136 Cong. Rec. H2447 (daily ed. May 17, 1990) (statement of Rep. Miller).

The congressional record reveals that in enacting the ADA Congress was concerned about the segregation of individuals with disabilities in institutions. Moreover, while Congress did not specifically reference misconduct by the States, it did note discrimination associated with institutions, which are commonly state-operated facilities. While I think this case presents a close call, I cannot, against the backdrop of Kimel and Garrett, find that Congress sufficiently identified a "history and pattern" of unconstitutional discrimination by the States.

In *Kimel, 528 U.S. at 67,* the Supreme Court concluded that Congress exceeded its authority under § 5 in abrogating the Eleventh Amendment with regard to the Age Discrimination in Employment Act of 1967 ("ADEA"), [*54] *29 U.S.C. § 621,* et seq. In enacting the ADEA, Congress made findings comparable to those it made in enacting the ADA. Without identifying the State as a culprit, Congress found that older workers are disadvantaged in retaining and regaining employment. See *29 U.S.C. § 621*(a)(1) (1994). After examining the legislative record, which included charges of discrimination by government employers, the Court determined that "evidence consisting almost entirely of isolated sentences clipped from floor debates and legislative reports" is insufficient to establish a pattern of unconstitutional discrimination by the States. *Kimel, 528 U.S. at 89.*

In concluding that the States' immunity to suit was not properly abrogated through Title I, the Court in Garrett considered the finding of Congress contained in *42 U.S.C. § 12101*(a)(2) and the record assembled by Congress which included descriptions of incidents to support Congress' finding. See *Garrett,    121 S. Ct. at 965.* The Court determined that the misconduct identified by Congress was not sufficient because it did not reflect misconduct[*55] by the States and it was not clear that the misconduct identified was unconstitutional. See id. at 965. In reviewing the congressional record, the Court noted that "the great majority" of the incidents described therein did not involve State activities. See id. Given the number of individuals employed by the State, the Court emphasized the lack of attention paid to the

States by Congress. See id. at 965-66. "If Congress had truly understood [the] information [before it to reflect] a pattern of unconstitutional behavior by the States, one would expect some mention of that conclusion in the Act's legislative findings." Id. at 966. Moreover, because the incidents of State action that did exist were taken out of context, it was not clear that the conduct described was irrational. As summarized by the Third Circuit in finding that Congress' attempted abrogation of Title I was ineffective, "without more detailed findings concerning a nationwide pattern of arbitrary and illegitimate discrimination against the disabled by the states, the ADA cannot be viewed as a proportional and congruous response to the problem of state-perpetrated[*56] discrimination against the disabled. While the ADA's goal of eliminating discrimination may be a laudable aim for federal legislation, it is not one which serves the purpose of enforcing the protections provided by the Fourteenth Amendment." *Lavia, 224 F.3d at 205.*

Similarly, while I have not been provided with a figure, the number of individuals with disabilities in state-operated institutions is certainly significant. Yet, absent from the ADA's legislative findings with regard to institutionalization is any reference to transgressions on the part of the States. Furthermore, what is lacking here in Congress' bald and generalized conclusions regarding the treatment of the disabled is enough context to determine whether the referenced conduct is irrational and therefore unconstitutional.

Even if I were to find that Congress successfully documented a "history and pattern" of unconstitutional discrimination by the States, Plaintiffs would still have to overcome "congruence and proportionality" concerns regarding the rights and remedies created by Title II, which, with other statutes, have not easily been alleviated. See generally, *Garrett, 121 S. Ct. at 966-68;* [*57] *Kimel, 528 U.S. at 82-3; City of Boerne v. Flores, 521 U.S. 507, 533, 138 L. Ed. 2d 624, 117 S. Ct. 2157 (1997)* (finding that Religious Freedom Restoration Act of 1993, *42 U.S.C. § 2000bb* (1994), et seq., lacks congruence and proportionality).

In considering the narrow issue of whether Title II represents a valid congressional abrogation of the States' immunity to actions brought against a State child welfare agency based on its policy of separating HIV-positive newborns from their HIV-positive mothers when the mother refuses to consent to treatment, a district court in New Jersey concluded that Congress exceeded its

authority under § 5 by placing on the States, inter alia, the affirmative duty to modify rules, policies and practices to accommodate the disabled, see *42 U.S.C. § 12131*(2), a duty which is not constitutionally required. See *Doe v. Div. of Youth and Family Servs., 2001 U.S. Dist. LEXIS 8408, 2001 WL 708444,* at *18 (D.N.J. June 25, 2001). As the implementing regulation explains, "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications[*58] are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *28 C.F.R. § 35.130(b)(7)* (2000).

This obligation far surpasses what is constitutionally mandated in the instant matter as well. State public welfare agencies are not constitutionally required to undergo a comprehensive modification of their rules, policies, and practices in order to accommodate all disabled individuals. While the Constitution does in some instances require that the State act rationally in providing appropriate care, this right is held by disabled individuals who are involuntarily institutionalized, not all disabled individuals. Even with regard to involuntarily institutionalized individuals, enforcement of the substantive due process right asserted here by the Plaintiffs may require modification of State policies that irrationally interfere with the provision of treatment recommended by professionals, but the Constitution does not require the State to make all modifications necessary to prevent discrimination.

I am therefore compelled[*59] to dismiss Count II against the DPW as to Plaintiffs Nina S. and Kevin C.

B. Defendant Houstoun's amenability to suit under the ADA and section 504

Defendants argue that because Houstoun is not a proper defendant under Title II of the ADA (Counts II and IV) and section 504 (Counts I and III) she cannot be properly sued in her official capacity as Secretary of the DPW under the doctrine articulated by the Supreme Court in *Ex parte Young, 209 U.S. 123, 159-60, 52 L. Ed. 714, 28 S. Ct. 441 (1908),* which generally allows private individuals to seek prospective injunctive relief in federal court against state officials for violations of federal law. See *Green v. Mansour, 474 U.S. 64, 68, 88 L. Ed. 2d 371, 106 S. Ct. 423 (1985).*

Defendants contend that because Title II of the ADA

and section 504 direct their prohibitions to a "public entity" and "any program or activity receiving Federal financial assistance," respectively, individuals cannot be proper defendants. Defendants urge me to adopt the reasoning of the district court in the District of New Mexico in *Lewis v. New Mexico Dept. of Health, 94 F. Supp. 2d 1217 (D.N.M. 2000).*[*60] In Lewis, individuals who were eligible to participate in Medicaid and an agency that advocates for the rights of people with disabilities sued two state officials in their official capacities, asserting several claims, including one brought under the ADA. *Id. at 1221-22.* The court concluded that the Plaintiffs could not properly invoke section 1983 to enforce the ADA against the state officials because "Title II claims cannot be maintained against individual defendants." n21 *Id. at 1230.*

n21 The court's decision in Lewis was rendered prior to the Supreme Court's decision in Garrett. Similarly, in other cases cited by Defendants and decided before Garrett, the court reached the same result as the court in Lewis. See, e.g., *Walker v. Snyder, 213 F.3d 344, 347 (7th Cir. 2000)* (claim based on Ex parte Young must be dismissed where individuals are sued in their official capacities in an action brought under Title II). I note, however, that a district court in Illinois recognized the questionable vitality of the Seventh Circuit's holding in Walker in the aftermath of Garrett. See *Boudreau v. Ryan,* No. 00-5392, slip op. at 14 n.5 (N.D. Ill. May 1, 2001).

Other cases cited by Defendants are inapposite here. For example, in *Hallett v. New York State Dept. of Correctional Servs., 109 F. Supp. 2d 190, 200 (S.D.N.Y. 2000),* the court dismissed the plaintiff's ADA and section 504 claims against individual defendants in their official capacities without deciding the issue I must confront here. After noting that some courts have distinguished between persons sued in their individual and official capacities, the court in Hallett opted to dismiss the plaintiff's claim against the individual defendants since it found that the Eleventh Amendment did not bar suit against the state. *Id. at 199-200.* "Because plaintiff is able to assert his ADA and Rehabilitation Act claims against [the New York State Department of Correctional Services] directly, I find that there is no justification for allowing plaintiff to also assert ADA and Rehabilitation Act claims against individual defendants in their official capacities." *Id. at 200.*

[*61]

The Supreme Court's decision in Garrett, however, leads me to a contrary result. The Supreme Court recently acknowledged that Title I of the ADA, n22 dealing with employment discrimination, "still prescribes standards applicable to the States" which can be enforced in actions against state officials for injunctive relief under Ex parte Young. n23 Garrett, 121 S. Ct. at 968 n.9, accord State Police for Automatic Ret. Ass'n v. Difava, 138 F. Supp. 2d 142, 146-47 (D. Mass. 2001) (noting Supreme Court's comments in Garrett and ruling that the Age Discrimination in Employment Act is enforceable under Ex parte Young). Although the Defendants correctly characterize the Court's comments as dicta, "we must consider [the dicta] with deference, given the High Court's paramount position in our 'three-tier system of federal courts.'" Alston v. Redman, 34 F.3d 1237, 1246 (3d Cir. 1994) (quotation omitted).

n22 I note that Title I regulates the conduct of a "covered entity." 42 U.S.C. § 12112(a). The definition of "covered entity" includes "employment agency, labor organization, or joint labor-management committee." 42 U.S.C. § 12111(2).

[*62]

n23 The Court also observed that suits seeking money damages can be brought by the United States against the States. Garrett, 121 S. Ct. at 968 n.9.

Defendants may be correct to the extent they argue that, as a general matter, suits brought against individuals in their individual capacities are not properly brought under the ADA or section 504. See Alsbrook v. Maumelle, 184 F.3d 999, 1005 n.8 (8th Cir. 1998) (state officials cannot be sued under Title II in their individuals capacities); Doe, 2001 WL 708444, at *18 (D.N.J. June 25, 2001) (finding no individual liability under Title II); J.F. v. Sch. Dist. of Philadelphia, 2000 U.S. Dist. LEXIS 4434, 2000 WL 361866, at *17 (E.D. Pa. Apr. 7, 2000) (section 504 does not permit individual liability); Calloway v. Boro of Glassboro Dept. of Police, 89 F. Supp. 2d 543, 556 (D.N.J. 2000) (individuals are not proper defendants under Title II and section 504); Yeskey v. Comm. of Pa., 76 F. Supp. 2d 572, 575 (M.D. Pa. 1999) (individuals are not liable under Title II);

Fitzpatrick v. Comm. of Pa. Dept. of Transp., 40 F. Supp. 2d 631, 638 (E.D. Pa. 1999)[*63] (section 504 does not provide for individual liability). But see, Guckenberger v. Boston Univ., 957 F. Supp. 306, 323 (D. Mass. 1997) (individual who has the authority to accept or reject federal funds can be liable under the Rehabilitation Act); Lee v. Trs. of Dartmouth Coll., 958 F. Supp. 37, 45 (D.N.H. 1997) (individual who violates Rehabilitation Act can be personally liable if he or she is in a position to accept or reject federal funds); Niece v. Fitzner, 922 F. Supp. 1208, 1219 (E.D. Mich. 1996) (prison officials sued in their individual capacities are proper defendants under Title II).

Here, however, Houstoun is being sued in her official capacity. This distinction makes all the difference. See Randolph v. Rogers, 2001 WL 641559, at *4 (8th Cir. June 12, 2001) (affirming the district court's conclusion that plaintiff's action seeking prospective injunctive relief may proceed under Ex parte Young against a state official in her official capacity for violations of ADA and section 504); Berthelot v. Stadler, 2000 U.S. Dist. LEXIS 15615, 2000 WL 1568224, at *2, *3 (E.D. La. Oct. 19, 2000) (dismissing suits brought[*64] against prison officials and employees in their individual capacities under Title II and section 504 while finding those claims against individuals in their official capacities are cognizable).

Because the Defendants do not dispute that, notwithstanding their argument that Houstoun is not amenable to suit under the ADA and section 504, Houstoun can be properly sued under Ex parte Young, n24 I conclude my examination of this issue here and find that suit is appropriately brought under Title II of the ADA against a state official in her official capacity in the context of Ex parte Young. n25 This conclusion extends with equal force to section 504.

n24 Defendants state: "Notwithstanding the Eleventh Amendment, State officials who are alleged to have acted contrary to federal law may be sued in their official capacities for prospective injunctive relief. In this case, plaintiffs seek (only) such relief from Secretary Houstoun. To this limited extent, the Eleventh Amendment is not a bar to plaintiffs' claims, but . . .,even if the Eleventh Amendment does not limit Plaintiffs' ability to pursue their particular claims against Secretary Houstoun, plaintiffs' claims against her cannot go forward for other reasons." (Mot. to Dismiss at 7 n.3) (internal citation omitted). Such "other reasons" include Defendants' contentions that: (1) Houstoun cannot

properly be sued under the ADA and section 504, addressed in this section; (2) Section 504 does not obligate the States to provide community care, addressed in Section III.D., infra; and (3) Olmstead limits Plaintiffs' claims, addressed in Section III.F., infra.

[*65]

n25 Defendants point to my decision in *Moyer v. Conti, 2000 U.S. Dist. LEXIS 14604, 2000 WL 1478791* (E.D. Pa. Oct. 10, 2000), a case brought under Title II. In that case, decided prior to Garrett, I granted summary judgment in favor of the state official defendant after finding that the plaintiff could not open the doors to the federal courts through Ex parte Young. Id. at *7. The plaintiff in that case failed to show that there was a question of material fact as to whether the state official violated the ADA. Id. I confront a different set of circumstances on a different procedural landscape here.

C. Section 1983 (Count V)

Plaintiffs bring suit against Defendant Houstoun in her official capacity, charging that she violated section 1983 by establishing "a policy and practice of the Department of Public Welfare to refuse and fail to provide mental health services to Plaintiffs and the class they represent in the most integrated setting appropriate to their individual needs in violation of both the ADA and Section 504." (First Am. Compl. at P 88). The Defendants claim that section 1983 [*66] may not be used to enforce section 504 or the ADA. Although Defendants concede that Houstoun may properly be sued under section 1983 as a general matter, they argue that suit in this instance has been congressionally foreclosed. (Mot. to Dismiss First Am. Compl. at 3).

Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

C:\DOCS jfb Research research-hattie-eleventh amendment-RTF.RTF

*42 U.S.C. § 1983.*

Suit brought under section 1983 is an appropriate vehicle through which to redress violations of federal statutes as well as constitutional violations. See generally *Maine v. Thiboutot, 448 U.S. 1, 65 L. Ed. 2d 555, 100 S. Ct. 2502 (1980).* Although "the coverage of the statute must be broadly construed," *Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 105, 107 L. Ed. 2d 420, 110 S. Ct. 444 (1989),*[*67] section 1983 is not available for enforcement of every federal law, see *Livadas v. Bradshaw, 512 U.S. 107, 132, 129 L. Ed. 2d 93, 114 S. Ct. 2068 (1994).* Section 1983 is unavailable if: (1) Congress forecloses such enforcement of the particular statute or (2) the statute creates no enforceable rights, privileges or immunities, as defined by section 1983. See *Suter v. Artist M., 503 U.S. 347, 355, 118 L. Ed. 2d 1, 112 S. Ct. 1360 (1992)* (quoting *Wright v. Roanoke Redevelopment and Hous. Auth., 479 U.S. 418, 423, 93 L. Ed. 2d 781, 107 S. Ct. 766 (1987)).*

Since the Defendants do not dispute that both section 504 and the ADA meet the first part of the test, I will turn to a determination of whether Congress has foreclosed enforcement of either section 504 or the ADA through section 1983. The Defendants do not (and cannot) make the argument that Congress expressly precluded the use of section 1983 actions to enforce section 504 or the ADA. Thus, I begin by analyzing whether Congress has precluded Plaintiffs' section 1983 claim by providing a "comprehensive enforcement mechanism" for section 504 or the ADA. *Golden State Transit Corp., 493 U.S. at 106*[*68] (quotation omitted); see *W.B. v. Matula, 67 F.3d 484, 493 (3d Cir. 1995).* In so doing, I am mindful of the Supreme Court's admonishment in Golden State Transit:

The availability of administrative mechanisms to protect the Plaintiff's interests is not necessarily sufficient to demonstrate that Congress intended to foreclose a § 1983 remedy. Rather the statutory framework must be such that allowing a Plaintiff to bring a § 1983 action would be inconsistent with Congress' carefully tailored scheme. The burden to demonstrate that Congress has expressly withdrawn the remedy is on the Defendant. We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right.

*Golden State Transit Corp., 493 U.S. at 106-07* (internal citations and quotations omitted).



Defendants make no reference to any comprehensive enforcement mechanism, such as administrative processes, n26 whose circumvention through section 1983 might have been of concern to Congress. In support of their argument, Defendants observe only that "numerous courts" have ruled that section 1983 is unavailable [*69]in this context and provide a list of six federal cases, none of which, if applicable, would control my decision here. (Mot. to Dismiss First Am. Compl. at 3-4). In response, Plaintiffs list cases in which courts have reached a contrary result. Plaintiffs provide other evidence of congressional intent to permit enforcemet of the ADA and section 504 through section 1983. In addressing the relationship between the ADA and other laws, Congress stated:

Nothing in this chapter shall be construed to invalidate or limit the remedies, rights, and procedures of any federal law . . . that provides greater or equal protection for the rights of individuals with disabilities than are afforded by this chapter.

*42 U.S.C. § 12201(b)*. In discussing the enforcement of section 504 and the ADA, the House Committee on the Judiciary reported that "the ADA does not preempt other applicable laws that include equal or greater protection. For title II, like Section 504 of the Rehabilitation Act, this includes remedies available under *42 U.S.C. 1983* and under state law claims." H.R. Rep. No. 101-485, pt. 3, at 52 (1990).

n26 The remedies available under Title II of the ADA stand in contrast to the remedial scheme established under Title I.

> The enforcement provision of Title II of the ADA . . . incorporates . . . the remedies provision of the Rehabilitation Act. The appropriate remedy under the Rehabilitation Act depends on the status of the Plaintiff. Employees and applicants for employment . . . are subject to the subsection of the ADA that . . . incorporates the remedies of Title VII of the Civil Rights Act of 1964. . . [Those] remedies are highly detailed and constitute a comprehensive remedial scheme.
>
> *Randolph v. Rodgers, 2001 U.S. App. LEXIS 12138, 2001 WL 641559*, at *3 (8th Cir. June 12, 2001).

[*70]

Because the Defendants have not fulfilled their burden of establishing that Congress intended to foreclose relief through section 1983, I cannot make such a finding. Moreover, as the legislative history reveals, it seems that Congress in fact intended to permit redress of ADA and section 504 violations through section 1983.

D. States' obligations under Section 504

Defendants assert that Plaintiffs cannot proceed under section 504 because it does not obligate the States to provide care to Plaintiffs in the community, the most integrated setting appropriate to their needs.

In enacting section 504, Congress intended to provide for the integration of handicapped persons into mainstream society. The legislative history of the provision contains expressions of this goal. See, e.g., 118 CONG. REC. S3320 (statement of Sen. Williams) (section 504 was intended to "achieve the tragically overdue goal of full integration of the handicapped into normal community living, working, and social patterns"). The purpose of section 504 has been confirmed by Congress since its enactment. See, e.g., S. REP. No. 95-890, at 39 (1978) (in adopting section 504, "Congress has made a commitment [*71]to the handicapped that, to the maximum extent possible, they shall be fully integrated into the mainstream of life in America"); 135 CONG. REC. S8507 (statement of Sen. Harkin) ("One of the precepts of section 504 is that segregation of people with disabilities will not be tolerated").

Section 504 was enacted without a provision authorizing rulemaking. See *Clark , 613 F. Supp. at 691*. In 1976, however, President Ford signed an executive order vesting the secretary of the Department of Health, Education, and Welfare n27 with the authority to promulgate regulations for the enforcement of section 504. See id. In 1981, that task was given to the Department of Justice. See *United States Dept. of Trans. v. Paralyzed Veterans of Am., 477 U.S. 597, 612 n.14, 91 L. Ed. 2d 494, 106 S. Ct. 2705)*. One section 504 regulation, which became effective in 1981, states:

Recipients [of federal funds] shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons.

*28 C.F.R. § 41.51(d)* (2000). In *Makin v. Hawaii, 114 F. Supp. 2d 1017, 1035-36 (D. Haw. 1999)*,[*72] a district court in Hawaii recognized the integration mandate of

section 504 through interpretation of *28 C.F.R. § 41.51(d)*.

n27 The Department of Health, Education, and Welfare is now the Department of Health and Human Services. See *Clark, 613 F. Supp. at 691*.

Guided by a regulation promulgated under the ADA, *28 C.F.R. § 35.130(d)*, inter alia, the Third Circuit recognized "unnecessary segregation as a form of illegal segregation against the disabled" under Title II of the ADA. *Helen L. v. DiDario, 46 F.3d 325, 333 (3d Cir. 1995)*. In so doing, the court of appeals noted that *28 C.F.R. § 35.130(d)* is "almost identical" to *28 C.F.R. § 41.51(d)*. n28 *Id. at 332*. See *Kathleen S. v. Dept. of Pub. Welfare, 10 F. Supp. 2d 460, 468, 476 (E.D. Pa. 1998)* (noting similarity between *28 C.F.R. § 35.130(d)* and *28 C.F.R. § 41.51(d)* [*73] in finding that the denial of community placement where it is the most integrated setting appropriate violates the ADA's integration mandate). ADA regulation *28 C.F.R. § 35.130(d)* provides:

A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.

n28 The requirements of section 504 regulation *28 C.F.R. § 41.51(d)* and ADA regulation *28 C.F.R. § 35.130(d)* will be referred to collectively as the "integration mandate."

Defendants suggest that my decision here is controlled by the Supreme Court's decision in *Olmstead v. L.C., 527 U.S. 581, 119 S. Ct. 2176, 144 L. Ed. 2d 540 (1999)*, and the Third Circuit's decision in *Clark, 794 F.2d at 85 n.3*, in which the courts decline to recognize an integration mandate in section 504. With regard to Olmstead, I find to the contrary. In *Olmstead, 527 U.S. at 587*, [*74]the Supreme Court recognized the "qualified" right of individuals with mental disabilities to community placement under Title II of the ADA. In so doing, the Court looked to *28 U.S.C. § 35*.130(d), a regulation "modeled on" *28 U.S.C. § 41*.51(d). n29 *Id. at 592*. The Defendants point to the fact that the Court commented

that in enacting the ADA, Congress made explicit findings regarding the "unjustified segregation" of the disabled, findings Congress did not make in enacting section 504. *Id. at 600 n.11*. The Court's observation is inapposite here.

n29 I note that the Court declined to rule on the validity of the regulations recited as the petitioners were not challenging them as outside the congressional authorization. See *Olmstead, 527 U.S. at 592*.

In *Clark, 794 F.2d at 81*, the defendants appealed the issuance of an injunction directing that Ms. Clark, who was confined in a state-operated institution[*75] caring for individuals who are mentally retarded, be released and provided with certain community services. On appeal, the Third Circuit was confronted with two questions: (1) whether the Eleventh Amendment bars any relief other than release from the institution and, alternatively, (2) whether any relief was appropriate because Clark's constitutional rights were not violated. See *id. at 82*. The court determined that the district court's finding that "Clark failed to prove that she was discriminated against on the basis of her handicap" was not clearly erroneous. *Id. at 85 n.3*. The court also noted, without discussion of *28 U.S.C. 41*.51(d), that section 504 "imposes no affirmative obligations on the states to furnish services." Id. I do not read this footnoted comment as a holding by the Third Circuit that section 504 does not obligate the States to provide community placement for individuals with mental disabilities where appropriate. In 1995, the Third Circuit explained that in Clark, "we were not concerned . . . with the integration mandate of the ADA or the Rehabilitation Act." *Helen L., 46 F.3d at 334*.[*76]

Defendants argue that even if this Court were to determine that section 504 does require community placement where appropriate, the States could not have been aware that they were undertaking an obligation to provide treatment in the most integrated setting as a condition of their acceptance of federal funds because of the unsettled nature of the law in this area. n30 Defendants' argument on this issue is without merit. Dole, Pennhurst I, and their progeny require that Congress clearly state its intention to condition the receipt of federal funds on compliance with a particular statutory scheme. As I observed in Section III.A.1., supra, Congress has successfully done so with section

504. Thus, the States knew that if they opted to accept federal monies they would be required to comply with the requirements of section 504 as defined by the legislature and interpreted by the courts. Moreover, as noted above, the legislative history indicates that the integration mandate was part of the original bargain.

n30 As discussed in Section III.A.1., supra, Congress, pursuant to its Spending Clause power, can impose conditions on the receipt of federal financial assistance. See *Dole, 483 U.S. at 206-07.* In order to secure the States' compliance with such conditions, Congress must unequivocally express the conditions it intends to impose unambiguously. See *Pennhurst I, 451 U.S. at 17.*

[*77]

I note that Defendants' argument is subject to an internal limitation. Even if I were to accept the Defendants' suggestion that the so called "integration mandate" was not clearly expressed when section 504 was enacted, it was certainly unambiguously articulated in 1981 when § 41.51(d) became effective. Furthermore, to the extent the States' obligations under section 504 were made murky in Clark in 1986, Helen L. resolved any confusion. Therefore, since 1995, the DPW can hardly claim to be surprised by the requirements of the integration mandate. Each year, the DPW decides whether to subject itself to federal regulation by accepting federal funds. Thus, following its own argument on its inevitable path, the DPW cannot be said to have been uninformed of its obligations in recent years. It is subject to suit for its current violations of section 504's requirements.

E. Impact of Alexander v. Sandoval n31

n31 It is not clear whether Defendants intend to challenge only Plaintiffs' integration mandate claims (Counts I and II) or also challenge Plaintiffs' methods of administration claims (Counts III and IV). Since Defendants' memorandum on this issue was filed prior to Plaintiffs' amended complaint (in which Plaintiffs divided their original single claim into five counts), I will assume Defendants mean to challenge Counts I-IV.

[*78]

At oral argument, Defendants relied on the Supreme Court's decision in *Alexander v. Sandoval,    U.S.    , 121*

*S. Ct. 1511, 149 L. Ed. 2d 517 (2001),* which had been rendered two days before, to offer another ground to support their argument that Plaintiffs' section 504 and ADA claims fail as a matter of law.

In *Sandoval, 121 S. Ct. at 1515, 1523,* the Court determined that there exists no private right of action to enforce disparate-impact regulations promulgated under Title VI of the Civil Rights Act of 1964 ("Title VI"). According to the Defendants here, application of the Sandoval court's reasoning to the instant matter requires the dismissal of this action. I respectfully disagree.

In *Sandoval, 121 S. Ct. at 1516,* the Court noted that "private individuals may sue to enforce section 601 of Title VI and obtain both injunctive relief and damages." Section 601 provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

*42 U.S.C. § 2000d.*[*79] With regard to section 602 of Title VI, which provides for the promulgation of regulations to effectuate section 601, however, the Court concluded that no private right of action exists because Congress displayed no intent to create such an action in enacting or amending Title VI. n32 See *id. at 1523.*

n32 Section 602 provides:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity . . . is authorized and directed to effectuate the provisions of section [601] . . . with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute

*42 U.S.C. § 2000d-1* (1994).

In canvassing the history of private causes of action, the Court reminded us that "private rights of action to enforce federal law must be created by Congress." *Id. at 1519* (citing *Touche Ross & Co. v. Redington, 442 U.S. 560, 578, 99 S. Ct. 2479, 61 L. Ed. 2d 82 (1979)*[*80]

U:\DOCS\jtb Research\research-barris-eleventh amendment-RTF.RTF

(parenthetical omitted)). It is for the courts to interpret the statute in order to determine, not only whether it displays an intent to create a private right, but also to determine whether it creates a private remedy. See id. (citations omitted). Without this requisite congressional intent, a private cause of action does not exist. See id. Defendants do not contend that there exists no private right of action to enforce section 504 and the ADA.

In order to determine whether a tension similar to the one recognized in Sandoval exists between section 504 and its regulations or the ADA and its regulations, I will begin my inquiry under both section 504 and the ADA by exploring the scope of the prohibition of each statute in order to determine whether the prohibitions articulated in the regulations go beyond the statutory prohibitions.

1. Section 504

Even a casual comparison of the text of section 504, see note 8, supra, and section 601 of Title VI yields the inevitable conclusion that Congress looked to Title VI, at least to some extent, in crafting section 504. The Supreme Court has observed that Congress modeled section 504 on Title VI. See *Alexander v. Choate, 469 U.S. 287, 294, 105 S. Ct. 712, 83 L. Ed. 2d 661.*[*81] n.7; accord *Helen L. v. DiDario, 46 F.3d 325 at 330 n.8* ("The language of section 504 is virtually identical to that of section 601 of Title VI"). As the Supreme Court in Choate, admonished, however, "too facile an assimilation of Title VI law to § 504 must be resisted." *Choate, 469 U.S. at 294 n.7.*

In determining whether section 504 was designed to combat only intentional discrimination, the Supreme Court observed: "Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference -- of benign neglect." *Id. at 295.* Moreover, in discerning congressional intent regarding the formulation of section 504, it is important to note, as the Supreme Court did in Choate, that by the time Congress enacted section 504,

model Title VI enforcement regulations incorporating a disparate-impact standard had been drafted by a Presidential task force and the Justice Department, and every Cabinet Department and about 40 federal agencies had adopted standards in which Title VI was interpreted to bar programs with a discriminatory impact. These regulations[*82] provoked some controversy in Congress, and in 1966 the House of Representatives

rejected a proposed amendment that would have limited Title VI to only intentional discrimination. Thus, when Congress in 1973 adopted virtually the same language for § 504 that had been used in Title VI, Congress was well aware of the intent/impact issue and of the fact that similar language in Title VI had been interpreted to reach disparate-impact discrimination. In refusing to expressly limit § 504 to intentional discrimination, Congress could be thought to have approved a disparate-impact standard for § 504.

*Id. at 294 n.11* (internal citations omitted). Thus, while the conduct regulated by section 601 of Title VI is limited to intentional discrimination, see *Sandoval, 121 S. Ct. at 1516,* the same cannot be said for section 504. With section 504, Congress clearly sought to remedy a problem of a different, and for these purposes broader, nature.

In their first amended complaint, Plaintiffs cite regulations for the implementation of section 504's commands, including *28 C.F.R. § 41.51(b)(3)(i)* (prohibiting methods of administration[*83] which have the effect of discriminating against handicapped individuals on the basis of their handicaps); *45 C.F.R. § 84.4(b)(4)* (2000) (generally same); *28 C.F.R. § 41.51(d)* (requiring federal funding recipients to administer programs in the most integrated setting appropriate); and *45 C.F.R. § 84.4(b)(2)* (generally same). The Defendants argue that because Congress did not authorize the promulgation of implementing regulations in enacting section 504, such regulations cannot be said to embody rights enforceable by private right of action. Defendants' logic does not necessarily follow. In Sandoval, the Court started its analysis with the premise that conduct resulting in a disparate impact, which may properly be prohibited by regulations promulgated under section 602, is permissible under section 601. I am not confronted with an analogous situation here. The regulations at issue in this case do not expand the scope of conduct proscribed by Congress in enacting section 504. Consequently, unlike the task of the Court in Sandoval, my analysis ends without consideration of whether Congress intended to create [*84]a private right of action to enforce the regulations as distinct from the statute. I decline Defendants' invitation to expand Sandoval and dismiss Plaintiffs' section 504 claims.

2. ADA

Importantly, "the protections found in the ADA and in the Rehabilitation Act are interpreted similarly." *Doe v.*

*County of Centre*, 242 F.3d 437, 446 (3d Cir. 2001). The Supreme Court recognized that the courts are required "to construe the ADA to grant at least as much protection as provided by the regulations implementing the Rehabilitation Act." *Bragdon v. Abbott, 524 U.S. 624, 631, 141 L. Ed. 2d 540, 118 S. Ct. 2196 (1998)* (referring to the directive of *42 U.S.C. § 12201*(a) (1994), which provides: "Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 *(29 U.S.C. 790* et seq.) or the regulations issued by Federal agencies pursuant to such title").

In support of their allegations of violations of the ADA, Plaintiffs cite relevant Title II implementing regulations, including[*85] *28 C.F.R. § 35.130(b)(3)(i)* (prohibiting use by public entities from employing methods of administration which have the effect of discriminating against qualified disabled individuals on the basis of their disabilities); and *28 C.F.R. § 35.130(d)* (requiring public entities to administer programs in the most integrated setting appropriate).

Defendants argue that because the so-called integration mandate cannot be found in the statutory text, Plaintiffs' ADA claims must be dismissed in accordance with Sandoval. Sandoval teaches that private individuals cannot bring suit to enforce rights that are forbidden by implementing regulations, but permitted by the statute. The ADA, like section 504 and unlike Title VI, prohibits disparate-impact discrimination. The Defendants would be correct if the integration mandate required action or inaction beyond what is required by the statute itself. That is not the case here. The ADA regulations at issue here are merely rules for the implementation of the statutory directives; they do not prohibit otherwise permissible conduct.

A look at the findings made by Congress in enacting the ADA confirms[*86] this result. Congress enacted the ADA with the goal of assuring "equality of opportunity, full participation, independent living, and economic self-sufficiency for [individuals with disabilities]." *42 U.S.C. § 12101*(a)(8). Congress noted that individuals with disabilities tend to be "isolated and segregated." *42 U.S.C. § 12101*(a)(2). Congress explicitly intended to remedy the "discrimination against individuals with disabilities [that] persists in such critical areas as . . . institutionalization." *42 U.S.C. § 12101*(a)(3). Congress noted that individuals with disabilities tend to be "isolated and segregated." *42 U.S.C. § 12101*(a)(2).

Congress specifically identified "segregation" as a form of discrimination. *42 U.S.C. § 12101*(a)(5); accord 135 Cong. Rec. S4986 (statement of Sen. Harkin) (identifying segregation as "discrimination made illegal under the ADA").

Moreover, Congress intentionally chose "not to list all the types of actions that are included within the term 'discrimination' [under Title II], as was done in titles I and III, because [Title[*87] II] essentially simply extends the anti-discrimination prohibition embodied in section 504 to all actions of state and local governments." H.R. Rep. No. 101-485, pt. 2, at 84 (1990); see H.R. Rep. No. 101-485, pt. 3, at 47 (1990) ("Unlike other titles in this Act, title II does not list all of the forms of discrimination that the title is intended to prohibit."); 135 Cong. Rec. S4986 (daily ed. May 9, 1989) (statement of Sen. Harkin) ("the purposes of the ADA include providing clear, strong, consistent, enforceable standards addressing all forms of discrimination against individuals on the basis of disability . . . This means that discrimination on the basis of disability in any form will not be tolerated").

It is therefore clear that individuals with mental disabilities are protected under the ADA against the type of discrimination Congress intended to remedy with section 504. Consequently, Sandoval does not preclude Plaintiffs' claims.

F. Boundaries of Plaintiffs' ADA claims for violation of the integration mandate under Olmstead

Because I have found that the ADA claims contained in Counts II and IV are cognizable against Houstoun, I now consider whether[*88] the ADA claims for violation of the integration mandate brought on behalf of each Plaintiff can survive under Olmstead. Defendants argue that, taking Plaintiffs' claims as true for purposes of this motion, as they must, there are no set of facts under which any of the individual plaintiffs can recover.

In *Olmstead, 527 U.S. at 587,* the Supreme Court held that Title II of the ADA requires that persons with mental disabilities be placed in community settings rather than in institutions when three conditions have been met:

the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement



can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities.

The Defendants contend that the Plaintiffs run afoul of Olmstead on two fronts. First, "none of the named plaintiffs explicitly avers that he or she actually wishes to leave NSH and receive services in a community setting (although this is, arguably, implicit)." (Mot. to Dismiss[*89] at 27). Defendants parenthetical notation and decision not to discuss this issue in their reply brief or at oral argument leads me to believe they do not mean to seriously pursue it as a ground for dismissing Plaintiffs ADA claims. Yet, because they did raise it in their motion, I will address it in short course.

As the Plaintiffs suggest, their authorization of the instant lawsuit constitutes a statement of non-opposition which is more than sufficient to meet the "liberal" notice pleading requirements of Federal Rule of Civil Procedure 8(a). *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit , 507 U.S. 163, 168, 122 L. Ed. 2d 517, 113 S. Ct. 1160 (1993); see Conley v. Gibson, 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)* (observing "the Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests").

Second, Defendants assert that Plaintiffs Nina S. and Steven F. have[*90] failed to meet the "recommendation" requirement of Olmstead because they have not been recommended for discharge. With regard to Nina S., Plaintiffs assert that a treatment professional has noted that discharge to a small community program would be appropriate. (First Am. Compl. at P 30). Plaintiffs' averments suggest, as is clarified in Plaintiffs' response to Defendants' instant motion, that a formal recommendation for discharge has not been made because the treatment professional believed that an appropriate community placement was not available. I do not read Olmstead to require a formal "recommendation" for community placement, as that term may be used in the mental health field. Olmstead does not allow States to avoid the integration mandate by failing to require professionals to make recommendations regarding the service needs of institutionalized individuals with mental disabilities. In any event, Plaintiffs have adequately plead that Nina S. has been recommended for community placement. This

factual dispute is not ripe for resolution in this procedural posture.

Plaintiffs have also pleaded with enough precision that Steven F. has been recommended for community[*91] placement. (First Am. Compl. at P 44). Defendants argue that Steven F.'s claim fails because after being recommended for community placement, he was rejected from one community program. As a result, the Defendants argue, he can no longer be deemed to be "recommended" for community placement. (Def. Reply at 27). This argument is without merit. Again, any dispute of fact will be resolved at the appropriate time. At this stage, it is enough to say that Steven F.'s claims do not fail as a matter of law.

Defendants do not dispute that Kevin C. has been recommended for community placement. In fact, Kevin C. has been waiting for an opening in a particular program since January of 2000. Defendants claim that they cannot be held liable for violating the integration mandate of the ADA because Kevin C. has been placed on a waiting list to receive community care. In the context of Olmstead, Defendants' argument goes to the third factor -- whether community placement can be reasonably accommodated with the resources available to the State and the needs of others with mental disabilities. n33 Individuals with mental disabilities who are recommended for community placement by treatment professionals[*92] and who do not oppose such placement are not left without recourse under Olmstead simply because the State has secured their indefinite placement on a waiting list. Olmstead certainly does not provide this type of blanket insulation from liability. On the basis of the facts pleaded by Plaintiffs, a reasonable fact finder could conclude that the State failed to act reasonably in accommodating the community placement of Kevin C. n34 As a result, at this stage, I cannot find that Kevin C.'s claim fails as a matter of law.

n33 Since this argument was raised in the context of Olmstead, I will address it here only in that context. To the extent that Defendants' argument implicates issues that extend beyond the purview of Olmstead, such as whether undue delay in discharge to a community program can, by itself, constitute a violation of the integration mandate when all three Olmstead factors are satisfied, I will address those arguments if and when they are clearly and properly raised.

n34 I make no ruling here with regard to who has the burden of proving the elements of a claim under Olmstead. Although the parties' briefings suggest a dispute on this point, resolution of this issue is not required for disposition of this motion.

[*93]

IV. CONCLUSION

The fact that federal judges have a great many constitutional powers and duties which enable them to resolve difficult issues with authority is put to the test in a situation like this where the law is developing and many of the principles are amorphous. Even had I the benefit of the Oracle at Delphi some of these issues will be finally resolved in another forum. Nonetheless, I believe that at this stage of the pleadings plaintiffs are entitled to proceed on several of their claims.

For the above-stated reasons, Defendants' motion is granted to the extent that Counts II and IV are dismissed against the DPW and denied in all other respects. An appropriate order follows.

ORDER

AND NOW, this 23rd day of July, 2001, it is hereby ORDERED as follows:

1. Defendants' motion to dismiss (Document Nos. 4 and 18) is GRANTED IN PART AND DENIED IN PART as follows:

a. Counts II and IV are DISMISSED against the DPW;

b. Defendants' motion is DENIED in all other respects;

2. This Court is of the opinion that this decision and accompanying order involve controlling questions of law as to which there is substantial ground for difference of[*94] opinion (and to which there has been difference of opinion among the courts) and that an immediate appeal from this order may materially advance the ultimate termination of the litigation within the meaning of *28 U.S.C. § 1292*(b);

$53. If no application for interlocutory appeal is made to the Third Circuit within the 10-day period provided for under *28 U.S.C. § 1292*(b), Defendants shall file their response to Plaintiffs' motion for class certification by August 16, 2001. If application for interlocutory appeal is made, this action shall be STAYED pending disposition of the application and ensuing appeal, if any.

BY THE COURT:

Berle M. Schiller, J.

U:\DOCS\jls\Research\research-harris-eleventh amendment-RTF.RTF

G

ELBERTA BERNICE LIEBERMAN, Plaintiff, v. THE STATE OF DELAWARE, and THE FAMILY COURT OF THE STATE OF DELAWARE, Defendants.

Civil Action No. 96-523 GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2001 U.S. Dist. LEXIS 13624

August 30, 2001, Decided

DISPOSITION: [*1] Defendant's Motion to Dismiss for Lack of Jurisdiction GRANTED as to Lieberman's claims under both Title I and Title II of the ADA; Defendants' Motion to Dismiss for Lack of Jurisdiction DENIED as to Lieberman's claims under section 504 of the Rehabilitation Act.

CORE TERMS: Eleventh Amendment, immunity, abrogate, Fourteenth Amendment, Rehabilitation Act, sovereign immunity, disability, disabled, waived, valid exercise, motion to dismiss, abrogated, validly, States' Eleventh Amendment, accommodations, deter, disorder, constitutional authority, failure to comply, state immunity, money damages, federal funds, unequivocally, stringent, tailored, enacting, subject matter jurisdiction, illnesses, immune, appropriate legislation

JUDGES: Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

OPINIONBY: Gregory M. Sleet

OPINION: MEMORANDUM AND ORDER

On May 17, 2001, the plaintiff, Elberta Bernice Lieberman ("Lieberman") filed an amended complaint alleging that the defendants, the Family Court of the State of Delaware and the State of Delaware (collectively, "the defendants") failed to make reasonable accommodations for her disabilities n1 in violation of the Americans with Disabilities Act ("ADA"), *42 U.S.C. § 12101* et seq. (1994), and the Rehabilitation Act of 1973, *29 U.S.C. § 794* (1994). Lieberman also claims that she has been retaliated against for requesting these reasonable accommodations. Specifically, Lieberman claims that she has been reprimanded on numerous occasions and suspended at least once. For these purported wrongs, Lieberman seeks declaratory and monetary relief.

n1 Specifically, Lieberman claims that she suffers from several mental and physical illnesses. These mental illnesses include: attention disorder, dysthymia, and dissasociative identity disorder. D.I. 42, P17. Lieberman's physical illnesses include: osteoarthritis, chronic venous insufficiency, numerous gastrointestinal disorders and a sleep disorder. Id. at P 19-21.

[*2]

Presently before the court is the defendants' motion to dismiss Lieberman's complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Upon consideration of the parties' arguments and the applicable principles of law, the court will grant the defendants' motion as to Lieberman's claims under the ADA, but will deny the defendants' motion as to Lieberman's claims under the Rehabilitation Act. The reasons for the court's decision are set forth in detail below.

Rule 12(b)(1) Standard

A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of the court to address the merits of the plaintiff's complaint. A motion to dismiss under Rule 12(b)(1) may present either a facial or a factual challenge to subject matter jurisdiction. *Mortensen v. First Federal Savings and Loan, 549 F.2d 884, 891 (3d Cir. 1977).* In this case, the defendants are making a facial challenge to the plaintiff's complaint because they do not dispute the existence of any of the jurisdictional facts alleged in the complaint that support the court's subject matter jurisdiction. A motion which makes a facial challenge to a complaint[*3] requires that the court consider the allegations of the complaint as true and make all reasonable inferences in plaintiff's favor. Id. Moreover, the plaintiff bears the burden of persuading the court that it has



jurisdiction. Id.

Discussion

The defendants assert that because they are immune from suit pursuant to Eleventh Amendment, the court lacks jurisdiction over Lieberman's claims under the ADA and the Rehabilitation Act. n2 Generally, pursuant to the Eleventh Amendment, states are immune from suit by private parties in the federal courts. The Eleventh Amendment provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. Although this case involves a suit brought by a citizen against her own state, the Eleventh Amendment has long been interpreted to prohibit such suits as well. See *Board of Trustees of University of Alabama v. Garrett, 531 U.S. 356, 121 S. Ct. 955, 962, 148 L. Ed. 2d 866 (2001)* .

n2 The defendants also argue that suits against a state must be heard by the United Supreme Court and therefore, the court lacks jurisdiction to hear this suit. By virtue of *28 U.S.C. § 1331,* this court is vested with original jurisdiction over all suits arising under the Constitution, laws or treaties of the United States. See *28 U.S.C. § 1331.* Moreover, it has long been established that Congress can give lower federal courts concurrent jurisdiction over matters where the Supreme Court has original jurisdiction. See *Ames v. Kansas, 111 U.S. 449, 28 L. Ed. 482, 4 S. Ct. 437 (1884).* Therefore, under § 1331, the court has jurisdiction over all suits arising under the laws of the United States and presumes that this grant of jurisdiction over all actions includes actions against the States. See *United States v. California, 328 F.2d 729, 738-39 (9th Cir. 1964).*

[*4]

A state will not be entitled to Eleventh Amendment immunity, however, if 1) it has waived its immunity, or 2) Congress has abrogated a state's immunity pursuant to a valid exercise of its power. See *Lavia v. Comm. of Pennsylvania, 224 F.3d 190, 195 (3d Cir. 2000).* In this case, Lieberman claims that as to the ADA, Congress has abrogated the state's Eleventh Amendment immunity, and that as to Section 504 of the Rehabilitation Act, the state

has waived its immunity. The court will address these issues in turn.

A. Whether Lieberman's ADA claims are barred by the Eleventh Amendment

1. Claims under Title I of the ADA

At the outset, the court notes that it is undisputed that the Supreme Court's recent decision in *Board of Trustees of University of Alabama v. Garrett, 531 U.S. 356, 121 S. Ct. 955, 148 L. Ed. 2d 866 (2001)* forecloses any debate as to whether the Eleventh Amendment bars suits for money damages brought by individuals against a state under Title I of the ADA. n3 In Garrett, the Supreme Court held that suits for damages brought by state employees against the State alleging failure to comply with Title I of the ADA are barred by the[*5] Eleventh Amendment. See *121 S. Ct. at 960.* Specifically, the court emphasized that Congress' authority to abrogate Eleventh Amendment immunity under Section 5 of the Fourteenth Amendment is exercised properly only in response to state transgressions which demonstrate a patten of unconstitutional discrimination by the states. See id. at 964. However, the court concluded that "the legislative record of the ADA . . . simply fails to show that Congress did in fact identify a pattern of irrational state discrimination in employment against the disabled." Id. at 965. Because "section 5 does not so broadly enlarge congressional authority," the Supreme Court concluded that individual lawsuits for money damages against a state for failure to comply with Title I of the ADA are barred by the Eleventh Amendment. See id. at 968.

n3 Title I of the ADA concerns employment discrimination and reads in relevant part:
No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

See *42 U.S.C.A § 12112.*

[*6]

Concerning Title II of the ADA, n4 the Supreme Court explicitly declined to decide this issue in Garrett, but noted that there are differences between the remedial provisions of Title I and Title II. See id. at 960 n.1 ("We are not

disposed to decide the constitutional issue whether Title II, which has somewhat different remedial provisions from Title I, is appropriate legislation under [Section 5] of the Fourteenth Amendment when the parties have not favored us with briefing on the statutory question."); see also *Lavia v. Comm. of Pennsylvania, 224 F.3d 190, 195 n.2 (3d Cir. 2000)* (declining to address whether Congress had validly abrogated the immunity of the States with regard to Title II). Thus, the court must determine whether Lieberman's claims for money damages against the state for failure to comply with Title II of the ADA are barred by the Eleventh Amendment.

n4 Title II reads in relevant part:
> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

> See *42 U.S.C.A. § 12132.*

[*7]

2. Claims under Title II of the ADA

Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and "acts pursuant to a valid grant of constitutional authority." *Garrett, 121 S. Ct. at 962.* Congress may subject non-consenting States to suit in federal court when it does so pursuant to a valid exercise of its power under Section 5 of the Fourteenth Amendment. Id. Section 5 of the Fourteenth amendment grants Congress the power to enforce the substantive guarantees contained in Section 1 of the Fourteenth Amendment n5 by enacting appropriate legislation. See id. (citing *City of Boerne v. Flores, 521 U.S. 507, 536, 138 L. Ed. 2d 624, 117 S. Ct. 2157 (1997)*). Congress' power under Section 5 to enforce the Amendment includes the authority both to remedy and deter violation of rights guaranteed by the Amendment. See id.

n5 Section 1 of the Fourteenth Amendment reads: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. 14 § 1.

[*8]

There is a "simple but stringent test" to determine whether Congress has abrogated state immunity under the Eleventh Amendment. *Lavia v. Comm. of Pennsylvania, 224 F.3d at 196* (citing *Dellmuth v. Muth, 491 U.S. 223, 228, 105 L. Ed. 2d 181, 109 S. Ct. 2397 (1989))*. In this two-part test, a court must first consider "whether Congress has 'unequivocally expressed its intent to abrogate the immunity;' and second, whether Congress has acted 'pursuant to a valid exercise of power'" in abrogating state immunity. Id.

a. Whether Congress has expressed a clear intent to abrogate?

With regard to the first prong, a legitimate abrogation requires that Congress make "its intention unmistakably clear in the language of the statute." Id. (quotations omitted). Section 12202 of the ADA provides: "A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." *42 U.S.C. § 12202* (1994). The Third Circuit has recognized that Congress has "unequivocally fulfilled the first requirement by expressly stating[*9] its intent to abrogate the states' Eleventh Amendment immunity." *Lavia, 224 F.3d at 196;* see also *Doe v. Division of Youth and Family Servs., 148 F. Supp. 2d 462, 486 (D.N.J. 2001)* (noting that Congress expressed an intent to abrogate the states' immunity as to Title II of the ADA). The Defendants do not dispute that Congress has clearly expressed its intent to abrogate the States' sovereign immunity, but do contest whether in attempting to abrogate the States' immunity, Congress acted pursuant to a valid exercise of power.

b. Whether Congress acted pursuant to a valid exercise of power?

In this case, the parties dispute whether Congress acted properly under Section 5 of the Fourteenth Amendment. n6 In determining whether Congress has validly exercised its power under Section 5 in abrogating state immunity, the court must first, identify the constitutional right at issue, see *Garrett, 121 S. Ct. at 963.* Next, the court must decide whether Congress identified a history and pattern of unconstitutional discrimination against the disabled by the states that transgresses the Fourteenth Amendment's substantive provisions, and whether[*10] it has proposed a legislative scheme tailored to remedy such conduct. See

id. at 964 (emphasis added).

n6 "Although Congress has the authority to enact legislation under its Article I powers, including its power under the Commerce Clause, such authority does not permit Congress to nullify the States' Eleventh Amendment immunity." *Lavia, 224 F.3d at 196;* see also *Garrett, 121 S. Ct. at 962* (explaining same).

With regard to identifying the relevant constitutional right, the court finds guidance in the Supreme Court's discussion of the issue in Garrett. Specifically, the Court looked to its decision in *City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 87 L. Ed. 2d 313, 105 S. Ct. 3249 (1985),* to explain that "States are not required by the Fourteenth Amendment to make special accommodations for the disabled, so long as their actions towards such individuals are rational. . . . If special accommodations for the disabled are to be required, they[*11] have to come from positive law and not through the Equal Protection Clause." *121 S. Ct. at 964.* In light of the limited protections afforded the disabled under the rational basis standard of the Fourteenth Amendment clause, the court concludes that Congress attempts to impose greater obligations and responsibilities on the States' through Title II of the ADA. See *Lavia, 224 F.3d at 200* (finding same with regard to Title I of the ADA). Therefore, Title II cannot be seen as enforcing direct violations of the Fourteenth Amendment, but rather, Title II attempts to deter and remedy constitutional violations within the "sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional." Id.

"Congress' power 'to enforce' the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." Garrett, at 963; see also Lavia, at 197. Congress can act pursuant to Section 5 to remedy and deter conduct that is not expressly prohibited by Section 1 of the Fourteenth[*12] amendment. In doing so, however, Congress must identify a pattern of discrimination against the disabled by the states and adopt a legislative scheme that is tailored to remedy such conduct. See Garrett, at 964; Lavia, at 201 (explaining that a valid exercise of Section 5 power requires a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end). In deciding,

whether there is a pattern of discrimination by the states and if Title II of the ADA is tailored to remedy such conduct, the court finds guidance from three recent district court decisions that extended Garrett and Lavia to Title II claims of the ADA. These cases include: *Frederick L. v. Department of Public Welfare, 2001 U.S. Dist. LEXIS 10225, Civ. A. No. 00-4510, 2001 WL 830480* (E.D. Pa. July 23, 2001), *Doe v. Division of Youth and Family Servs., 148 F. Supp. 2d 462 (D.N.J. 2001),* and *Moyer v. Conti, 2000 U.S. Dist. LEXIS 14604, Civ. No. 99-744, 2000 WL 1478791,* (E.D.Pa. Oct.5, 2000).

In *Frederick L. v. Department of Public Welfare, 2001 U.S. Dist. LEXIS 10225, Civ. A. No. 00-4510, 2001 WL 830480* (E.D. Pa. July 23, 2001), the court held that Congress did not validly abrogate[*13] the States' sovereign immunity with respect to Title II of the ADA. See id. at *17. Specifically, in addressing the second prong of the "simple but stringent test" for determining if abrogation is valid, the court found that it could not "against the backdrop of Kimel and Garrett, find that Congress sufficiently identified a "history and pattern" of unconstitutional discrimination by the States." Id. at *18.

In *Doe v. Division of Youth and Family Servs., 148 F. Supp. 2d 462 (D.N.J. 2001),* the court rejected the plaintiffs' argument that their Title II claims under the ADA survive Eleventh Amendment scrutiny in light of Garrett. See *id. at 484.* In finding that Congress did not effectively abrogate the States' sovereign immunity with respect to Title II of the ADA, the court also applied the "simple but stringent test." See *Lavia, 224 F.3d at 196.* The court also adopted the reasoning of Garrett and found that Congress did not have constitutional authority under Section 5 of the Fourteenth Amendment because Congress had failed to identify a pattern of discrimination against the disabled by the States. The court concluded[*14] that the remedy imposed by Congress was not congruent and proportional to the targeted violation. See *Doe, 148 F. Supp. 2d at 486.*

Finally, in *Moyer v. Conti, 2000 U.S. Dist. LEXIS 14604, Civ. No. 99-744, 2000 WL 1478791,* (E.D.Pa. Oct.5, 2000), the court found that the reasoning of the Third Circuit's Lavia decision with respect to Title I applies to Title II as well. Thus, the court held that Congress did not validly abrogate state sovereign immunity under Title II of the ADA. See id. at *6 (also relying on the Supreme Court's decision in Kimel). Specifically, the court stated that, "the state of the legislative record, alone, cannot suffice to bring Title II within the ambit of Congress's Section 5 powers if Title II is not 'adapted to the mischief and wrong which the

Fourteenth Amendment was intended to provide against.'" (agreeing with *Alsbrook v. City of Maumelle, 184 F.3d 999, 1008.* (8th Cir. 1999), cert. granted sub nom., *Alsbrook v. Arkansas, 528 U.S. 1146, 145 L. Ed. 2d 947, 120 S. Ct. 1003,* cert. dismissed, *529 U.S. 1001 (2000)* (holding that claim brought under Title II of the ADA against the State was[*15] barred under the Eleventh Amendment)).

One recent Eastern District of Pennsylvania district court case, *Jones v. Pennsylvania, 2000 U.S. Dist. LEXIS 107, Civ. No. 99-4212, 2000 WL 15073* (E.D.Pa. Jan.5, 2000), denied a state defendant's motion to dismiss the plaintiff's claims under Title II if the ADA on Eleventh Amendment grounds. Id. at *1. However, Jones was decided before the Third Circuit's decision in Lavia and the Supreme Court's decision in Garrett. In allowing the plaintiff's Title II claims to proceed, the court relied upon such cases as: *Muller v. Costello, 187 F.3d 298, 307-10 (2d Cir.1999); Kimel v. Florida Bd. of Regents, 139 F.3d 1426, 1433 (11th Cir.1998); Coolbaugh v. Louisiana, 136 F.3d 430, 432-38 (5th Cir.1998);* and *Crawford v. Indiana Dep't Corrections, 115 F.3d 481, 487 (7th Cir.1997).* The court notes that in Lavia, the Third Circuit questioned the validity of all of these cases, stating that they "have now been called into question by the Supreme Court's decision in *Kimel v. Florida Bd. of Regents, 528 U.S. 62, 145 L. Ed. 2d 522, 120 S. Ct. 631 (2000).*" n7 *Id. 224 F.3d at 194 n.1.* [*16]

n7 In Kimel the Supreme Court held that Congress failed to effectively abrogate the States' Eleventh Amendment immunity to suit by private individuals in enacting the ADEA, *29 U.S.C. S 621* et seq. *528 U.S. at 82-83.*

In light of the Supreme Court's decision in Garrett and the Third Circuit's decision in Lavia, n8 the court holds that Congress has not validly abrogated the States' Eleventh Amendment immunity concerning Title II claims under the ADA. Thus, the court will grant the defendants' motion as to all of Lieberman's claims under the ADA.

n8 Other recent Supreme Court decisions have held that Congress has exceeded its authority under Section 5. See e.g., *Kimel v. Bd. Of Regents of Florida, 528 U.S. 62, 120 S. Ct. 631, 145 L. Ed. 2d 522* (holding that Congress acted beyond the scope of its Section 5 powers in enacting the ADEA, and thus did not abrogate the States' Eleventh Amendment Immunity); *United States v. Morrison, 529*

*U.S. 598, 146 L. Ed. 2d 658, 120 S. Ct. 1740 (2000)* (holding the same with regard to the civil remedy provision of the Violence Against Women Act); *Florida Prepaid Postsecondary Ed. Expense Bd. v. College Sav. Bank, 527 U.S. 627, 144 L. Ed. 2d 575, 119 S. Ct. 2199 (1999)* (holding the same with regard to the Patent Remedy Act); *City of Boerne v. Flores, 521 U.S. 507, 138 L. Ed. 2d 624, 117 S. Ct. 2157 (1997)*(holding the same with regard to the Religious Freedom Restoration Act).

[*17]

B. Whether Lieberman's Rehabilitation Act claims are barred by the Eleventh Amendment?

Next, the court turns to the defendants' contention that the they are entitled to Eleventh Amendment immunity from suits by private individuals in federal courts for claims arising under § 504 of the Rehabilitation Act. Section 504 states in part:

No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

*29 U.S.C. § 794*(a) (1994). In this case, Lieberman argues that the State has waived its sovereign immunity. The Court agrees. n9

n9 The parties also dispute whether Section 504 was enacted pursuant to Congress' authority under Section 5 of the Fourteenth Amendment. The court need not address this argument, however, because it finds that the State has waived its sovereign immunity. The court does note that there is "some ambiguity regarding the authority pursuant to which Congress enacted section 504." *Frederick L., 2001 WL 830480,* at *7 (citing *Armstrong v. Wilson, 942 F. Supp. 1252, 1262 (N.D. Cal.1996)* ("the Rehabilitation Act is silent as to the constitutional authority under which it was enacted").

[*18]

The Rehabilitation Act requires that States that accept federal funds waive their Eleventh Amendment Immunity to suits brought in federal court for violations of Section

504. *42 U.S.C. § 2000d-7.* Pursuant to its Spending Clause authority, Congress can legitimately invite the States to consent to suit in exchange for federal funds. See *Frederick L., 2001 WL 830480,* at *6. Specifically, Congress may require a waiver of state sovereign immunity as a condition for receiving federal funds, even though Congress could not order the waiver directly. See *Jim C. v. United States, 235 F.3d 1079, 1081 (8th Cir.2000)* (citing *College Savings Bank v. Florida Prepaid Postsecondary Education Expense Board, 527 U.S. 627, 632, 144 L. Ed. 2d 575, 119 S. Ct. 2199 (1999)).*

In this case, Lieberman has established that as a Family Court mediator and arbitration officer, she worked in an activity or program which received and benefitted from federal financial assistance. D.I. 42, at P8. Thus, the court concludes that the defendants have waived their Eleventh Amendment immunity, and thus, will deny the defendants motion to dismiss[*19] Lieberman's claims under Section 504 of the Rehabilitation Act, *29 U.S.C. S 794.* See *Frederick L, 2001 WL 830480,* at *12 (denying defendants' motion to dismiss plaintiff's Rehabilitation Act claims because Pennsylvania had waived it sovereign immunity);

*Maull v. Division of State Police, 141 F. Supp. 2d 463, 472 (D. Del. 2001).* See also *Jim C. v. United States, 235 F.3d 1079 at 1082* (holding that Arkansas waived its sovereign immunity with respect to Section 504 when it chose to participate in the federal spending program created by the section).

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. The defendants' Motion to Dismiss for Lack of Jurisdiction is GRANTED as to Lieberman's claims under both Title I and Title II of the ADA;

2. The defendants' Motion to Dismiss for Lack of Jurisdiction is DENIED as to Lieberman's claims under Section 504 of the Rehabilitation Act.

Date: August 30, 2001

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE



RONALD C. GULEZIAN v. DREXEL UNIVERSITY
CIVIL ACTION NO. 98-3004

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OFPENNSYLVANIA

1999 U.S. Dist. LEXIS 3276; 79 Fair Empl. Prac. Cas. (BNA)1273

March 19, 1999, Decided
March 19, 1999, Filed

DISPOSITION: [*1] Defendant's Motion to Dismiss GRANTED as to Count II and DENIED as to Count I.
CASE SUMMARY

PROCEDURAL POSTURE:  Defendant moved to dismiss plaintiff's claims against defendant for employment discrimination under the Age Discrimination Employment Act of 1967, *29 U.S.C.S. § 621* et seq., and for breach of contract.

OVERVIEW:  Plaintiff employee was a college professor. Plaintiff asserted claims against defendant employer for employment discrimination under the Age Discrimination Employment Act of 1967 (ADEA), *29 U.S.C.S. § 621,* and for breach of contract. He alleged defendant denied him tenure because of his age. He also alleged defendant violated the tenure criteria from the employee handbook that constituted a contract. Defendant moved to dismiss alleging plaintiff failed to file a timely administrative charge and that his contract claim was facially barred by the statute of limitations. The court denied defendant's motion to dismiss as to the ADEA claim but granted the motion to dismiss the breach of contract claim. Bureaucratic delay in processing plaintiff's ADEA claim warranted the application of equitable tolling thus extending the complaint time limit, but his contract claim was time barred.

OUTCOME:  The court denied defendant's motion to dismiss plaintiff's employment discrimination claim because equitable tolling extended the complaint's statute of limitations. However, the court granted the motion to dismiss the breach of contract claim since the claim was statutorily barred based on the time the notice of tenure denial was received.

CORE TERMS:  tenure, appointment, questionnaire, intake, summary judgment, formal charge, statute of limitations, handbook, age discrimination, breach of contract, notice, interview, follow-up, limitations period, earliest, bureaucratic delay, equitable tolling, contract claim, termination, claimant, written statement, uncontroverted, interviewer, terminated, timeliness, mailed, employment discrimination, filing requirement, begins to run, time barred

CORE CONCEPTS -

Labor & Employment Law: Employment Discrimination: Age Discrimination
The filing of a charge with the Equal Employment Opportunity Commission within 300 days of an alleged discriminatory action is a prerequisite to the maintenance of a suit under the Age Discrimination Employment Act of 1967, *29 U.S.C.S. § 621*(d)(2). The limitations period for a claimant who alleges a discriminatory denial of tenure resulting in subsequent termination begins to run on the day he receives notice of the adverse tenure decision.

Civil Procedure: Summary Judgment: Summary Judgment Standard
In deciding a motion for summary judgment on limitations grounds, a court construes the record in a light most favorable to plaintiff and determines whether there are genuine issues of material fact regarding the timeliness of the plaintiff's claims and whether defendant is entitled to judgment as a matter of law. While the parties draw different legal conclusions from the evidence presented, they rely on the same evidence and the underlying facts are thus essentially uncontroverted.

Labor & Employment Law: Employment Discrimination: Age Discrimination: Coverage &



Definitions
A written communication to the Equal Employment
Opportunity Commission (EEOC), including an intake
questionnaire, may constitute a charge if it is of a kind
that would convince a reasonable person that the
grievant is manifesting an intent to activate the Age
Discrimination Employment Act of 1967, *29 U.S.C.S. §
621*. In making such a determination, courts essentially
consider the content and effect of the communication.
Relevant considerations are what the claimant and the
EEOC personnel state to each other, what the
questionnaire form indicates and what the EEOC
actually does in response to the receipt of the
questionnaire. Intake questionnaires or other
communications do not constitute a charge where the
EEOC advises the grievant that he will need to provide
further information and get back in touch with the
agency to complete a formal charge and commence an
investigation.

Labor & Employment Law: Employment
Discrimination: Age Discrimination: Coverage &
Definitions
The 300 day filing requirement under the Age
Discrimination Employment Act of 1967, *29 U.S.C.S. §
621*(d)(2), however, is not jurisdictional. It is akin to a
statute of limitations and is thus subject to equitable
tolling. Although a plaintiff need not expressly plead the
doctrine, his allegations or averments must be sufficient
to activate the doctrine of equitable tolling. A plaintiff's
uncontroverted averment about his interaction with the
Equal Employment Opportunity Commission are
sufficient to implicate the doctrine.

Labor & Employment Law: Employment
Discrimination: Age Discrimination: Coverage &
Definitions
A plaintiff in an age discrimination case may justifiably
rely on formal communications from the Equal
Employment Opportunity Commission (EEOC). The
time for filing a charge may be extended if the
complainant was prevented by circumstances beyond his
control from submitting the matter within the time limits.
Equitable tolling has been applied where plaintiffs
appeared at the EEOC ready to make a timely charge and
were mistakenly led to believe by the  scheduling of a
follow-up meeting beyond the limitations period that
their subsequent filing of a charge would be proper.
Equitable tolling may be justified when the EEOC's
conduct misleads a plaintiff to delay his filing of a
charge.

Governments: Legislation: Limitation of Actions:
Statutes of Limitations Generally
Under 42 Pa. Cons. Stat. § 5525(8), the statute provides
that a cause of action for breach of a written contract is
subject to a four-year statute of limitations.

COUNSEL: For RONALD C. GULEZIAN, PH.D,
PLAINTIFF: HAROLD I. GOODMAN, RAYNES,
McCARTY, BINDER, ROSS & MUNDY,
PHILADELPHIA, PA.

For DREXEL UNIVERSITY, DEFENDANT:
RAYMOND A. KRESGE, KLETT LEIBER ROONEY
& SCHORLING, PHILADELPHIA, PA USA.

JUDGES: JAY C. WALDMAN, J.

OPINIONBY: JAY C. WALDMAN

OPINION: MEMORANDUM

WALDMAN, J.

March 19, 1999

Plaintiff asserts claims for employment discrimination
under the Age Discrimination Employment Act of 1967
("ADEA"), *29 U.S.C. § 621* et seq. and for breach of
contract. He alleges that he was denied tenure by
defendant because of his age and in violation of the
criteria for tenure set forth in defendant's Faculty and
Administrators Handbook which he states constituted a
contract. Defendant filed a Motion to Dismiss on the
grounds that plaintiff failed to file a timely
administrative charge with the EEOC and that his
contract claim is facially barred by the statute of
limitations.

In his complaint, plaintiff alleges that he was denied
tenure by letter of April 19, 1994 from the Provost of
Drexel and "filed a timely charge of age discrimination
against Drexel with the[*2] Equal Employment
Opportunity Commission ("EEOC") on or about
February 2, 1995." He alleges that he received a right to
sue letter less than ninety days before filing suit in the
summer of 1998.

The filing of a charge with the EEOC within 300 days
of the alleged discriminatory action is a prerequisite to
the maintenance of an ADEA suit. See *29 U.S.C. §
626*(d)(2); *Courtney v. La Salle University, 124 F.3d
499, 502 (3d Cir. 1997)*. The limitations period for a





claimant who alleges a discriminatory denial of tenure resulting in subsequent termination begins to run on the day he receives notice of the adverse tenure decision. See *Delaware State College v. Ricks, 449 U.S. 250, 259, 66 L. Ed. 2d 431, 101 S. Ct. 498 (1980)*. On its face, plaintiff's ADEA claim was not subject to dismissal.

Defendant asserted in its brief that the date of February 2, 1994 was "an error" and submitted evidence to substantiate the assertion. In its brief, defendant invited the court to consider matters beyond the complaint and to treat the motion as one for summary judgment. With his response, plaintiff submitted an affidavit as well as various exhibits and asked that the motion be treated as one[*3] for summary judgment. In its reply brief, defendant treated the motion as one for summary judgment.

Plaintiff acknowledged in his affidavit that he did not in fact file an EEOC charge on February 2, 1994. It would be impractical and unfair to predicate a ruling on timeliness on a facial allegation which plaintiff has now abandoned. As the parties have submitted the evidence on which each relies for their respective positions on the question of timeliness, it is appropriate to treat the instant motion as one for summary judgment and the court will do so.

In deciding a motion for summary judgment on limitations grounds, a court construes the record in a light most favorable to plaintiff and determines whether there are genuine issues of material fact regarding the timeliness of the plaintiff's claims and whether defendant is entitled to judgment as a matter of law. While the parties draw different legal conclusions from the evidence presented, they rely on the same evidence and the underlying facts are thus essentially uncontroverted. n1 The pertinent facts are as follow.

n1 Defendant does contend that the portion of plaintiff's affidavit regarding the date he received notice of the denial of tenure should be disregarded because it consists of conclusory statements and speculation. The court disagrees. While plaintiff does not have a specific recollection of the date he received the letter providing such notice, he avers that the earliest day would have been April 25, 1994. He bases this on his contemporaneous knowledge of the internal mail system through which it was delivered and the days he was at work in April 1994. These are matters he is competent to testify about and which provide an uncontroverted factual basis for his conclusion. Plaintiff's statement that

he "may" have received notice as late as April 27, 1994 is more speculative, but is immaterial in view of the court's analysis.

[*4]

Plaintiff was an assistant professor in defendant's College of Business and Administration. His services were engaged on an annual basis successively for the academic years of 1988-89 through 1994-95. By letter of April 19, 1994, defendant's Provost informed plaintiff that he would not receive tenure and that as a result his services would be terminated at the conclusion of the next academic year. At the time, plaintiff was 54 years old and satisfied the criteria for tenure described in defendant's Faculty and Administrators Handbook. The Provost's letter was sent through the University's internal mail delivery system. Plaintiff did not receive the letter until April 25, 1994.

Plaintiff sought assistance in reversing the tenure decision from the American Association of University Professors and on December 19, 1994 engaged legal counsel. Plaintiff telephoned the EEOC on February 2, 1995 and again on February 7, 1995 to request an appointment to present a charge of age discrimination. He was offered an appointment for February 16, 1995. On February 16, 1995, plaintiff went to the EEOC to file a charge of age discrimination against Drexel. At that time he completed an Intake Questionnaire. [*5] In this form, plaintiff checked boxes indicating he was discriminated against by Drexel because of age. He stated that he was denied tenure, resulting in termination of employment. He provided no substantive details.

Plaintiff then met with an EEOC employee who was unable to complete a formal charge that day because of a backlog of interviews. The employee scheduled plaintiff for a follow-up interview on February 25, 1995. Plaintiff was given an appointment notice which stated the appointment was "to have an intake interview with an Investigator concerning the possible filing of a charge of employment discrimination."

On February 21, 1995, plaintiff appeared for his appointment and related the basis of his charge to the EEOC interviewer. The interviewer told plaintiff to submit a written statement describing the basis he had related for the charge of discrimination. Plaintiff telefaxed a statement detailing the basis for his claim on February 23, 1995. After receiving this information, the

EEOC officer drafted a formal charge and affidavit and mailed them to plaintiff with a cover letter dated March 7, 1995. The cover letter informed plaintiff that he should proceed promptly as[*6] "a charge must be filed within time limits imposed by law." Plaintiff executed the charge and affidavit on March 9, 1995 and delivered them to the EEOC on March 10, 1995. n2 The charge was filed and assigned a charge number on that day. On March 31, 1995, the EEOC notified Drexel of the charge and offered to provide conciliation. Internal EEOC intake records list February 16, 1995 as the "inquiry date" and "received date" for plaintiff's charge.

n2 It may reasonably be inferred that it took two days for plaintiff to receive the EEOC letter of March 7th. It thus appears he executed and delivered the charge form within 24 hours of receiving it.

Contrary to plaintiff's contention, the presentation of an intake questionnaire does not automatically satisfy the administrative filing requirement. See, e.g., *Diez v. Minnesota Mining and Mfg. Co., 88 F.3d 672, 677 (8th Cir. 1996)* (questionnaire not charge absent evidence to show it was intended to function as charge); *Early v. Bankers Life and Cas. Co., 959[*7] F.2d 75, 80 (7th Cir. 1992)* (to treat intake questionnaires automatically as charges would dispense with the requirement of notification of prospective defendant); *Kocian v. Getty Refining & Marketing Co., 707 F.2d 748, 754-55 (3d Cir.)* (Title VII claim time barred where intake form presented within limitations period but formal charge filed after period expired), cert. denied, *464 U.S. 852, 78 L. Ed. 2d 150, 104 S. Ct. 164 (1983).*

A communication to the EEOC in or reduced to writing, including an intake questionnaire, may constitute a charge if it is "of a kind that would convince a reasonable person that the grievant has manifested an intent to activate the Act's machinery." *Bihler v. Singer Co., 710 F.2d 96, 99 (3d Cir. 1983).* In making such a determination, courts essentially consider the content and effect of the communication. Relevant considerations are "what the claimant and the EEOC personnel said to each other, what the questionnaire form said and what the EEOC actually did in response to the receipt of the questionnaire." *Diez, 88 F.3d at 676* (noting Seventh Circuit test which "distinguishes between questionnaires that are preliminary to a charge and those[*8] that function as a charge").

Courts have held that intake questionnaires or other communications do not constitute a charge where the EEOC advises the grievant that he will need to provide further information and get back in touch with the agency to complete a formal charge and commence an investigation. See *Diez, 88 F.3d at 677; Perkins v. Silverstein, 939 F.2d 463.* 470 (7th Cir. 1991); *Michelson v. Exxon Research and Engineering co., 808 F.2d 1005, 1010 (3d Cir. 1987)* (writing alleging age discrimination by employer did not constitute charge although it was assigned a charge number where EEOC advised complainant more information was needed and to get back in touch with the agency); *Berger v. Institute of Pennsylvania Hospital , 1989 U.S. Dist. LEXIS 4956, 1989 WL 48076,* *1 (E.D. Pa. May 8, 1989) (conclusory intake questionnaire did not constitute charge where EEOC informed complainant more information was required and after follow-up communications she filed a formal charge).

The EEOC clearly alerted plaintiff on February 16, 1995 that further information and follow-up on his part were required to initiate a charge and gave plaintiff a written notice of a future appointment for an interview[*9] "concerning the possible filing of a charge of discrimination." It is clear that the EEOC at that time did not regard or treat plaintiff's intake questionnaire as a charge and no reasonable complainant could have perceived otherwise. The EEOC interviewer made clear to plaintiff on February 21, 1995 that he needed to provide the agency with a written statement describing the basis for his claim of age discrimination. The first submission by plaintiff to the EEOC which may reasonably be characterized as a charge was the statement telefaxed on February 23, 1995. This was 304 days after plaintiff received the Provost's letter. n3

n3 Even assuming plaintiff received the Provost's letter on April 27, 1994, this would be 302 days later.

The 300 day filing requirement, however, is not jurisdictional. It is akin to a statute of limitations and is thus subject to equitable tolling. See *Zipes v. Trans World Airlines, 455 U.S. 385, 393, 71 L. Ed. 2d 234, 102 S. Ct. 1127 (1982); Robinson v. Dalton, 107 F.3d 1018, [*10] 1021 (3d Cir. 1997).* Although a plaintiff need not expressly plead the doctrine, his allegations or averments must be "sufficient to activate the doctrine of equitable tolling." *Oshiver v. Levin, Fishbein, Sedran & Berman,*

*38 F.3d 1380, 1392 (3d Cir. 1994)*. Plaintiff's uncontroverted averments about his interaction with the EEOC are sufficient to implicate the doctrine in this case.

A plaintiff may justifiably rely on formal communications from the EEOC. See *Robinson, 107 F.3d at 1023*. The time for filing a charge may be extended if the complainant "was prevented by circumstances beyond his control from submitting the matter within the time limits." *Id. at 1022* (citing EEOC regulations). Equitable tolling has been applied where plaintiffs appeared at the EEOC ready to make a timely charge and were mistakenly led to believe by the scheduling of a follow-up meeting beyond the limitations period that their subsequent filing of a charge would be proper. See *Gray v. Phillips Petroleum Co., 858 F.2d 610, 616 (10th Cir. 1988)*.

Equitable tolling may be justified when the EEOC's conduct misleads a plaintiff to delay his filing of a charge. *Kocian, 707 F.2d at 754 n.9*. [*11]The plaintiff in Kocian filled out an EEOC intake form within the limitations period and met with an EEOC officer to prepare a formal charge. The officer mailed the charge to the plaintiff for her signature one day after the time limit. It was at least fourteen days later that the plaintiff mailed a signed formal charge to the EEOC. EEOC records showed that the charge was not received by the agency until twenty-five days later. The Court found that equitable tolling in these circumstances was not justified.

Significantly, however, the Court in Kocian noted that the result might well be different if the plaintiff had filed her charge several days late because of "bureaucratic delay" rather than her own neglect. *Id. at 754*. The Court noted that "there is no allegation that the EEOC refused to process Ms. Kocian's charge when she initially visited the agency." *Id. at 755 n.10*.

Plaintiff timely appeared at the EEOC to file a discrimination charge. He first sought an appointment for that purpose on February 2, 1995 but the earliest appointment he was offered was February 16th. A charge could not be completed on that date because of a backlog of interviews. Plaintiff returned [*12]on February 21, 1995, the earliest follow-up appointment he was offered. Rather than completing a charge at that time, the EEOC officer asked plaintiff to submit a written statement detailing the basis of his claim as related to the officer. Plaintiff did so within 48 hours. When he received the March 7th letter with the charge form and affidavit

prepared by the EEOC, he executed and returned them with alacrity.

Plaintiff was diligent in his interaction with the EEOC. He was led to believe at each turn from February 2, 1995 that he was properly following EEOC procedures. He went to the EEOC on February 16, 1995 for the purpose of filing a charge. But for the bureaucratic delay in providing the initial requested appointment and in processing plaintiff's claim when he did appear, he clearly could have filed a timely charge. That he was prevented from doing so for reasons of bureaucratic delay beyond his control is a sufficiently extraordinary circumstance to warrant the application of equitable tolling from February 16, 1995 to the filing of a charge. n4

n4 Defendant fairly notes the distinction some courts have drawn between unrepresented claimants and those represented by counsel who are presumed to be knowledgeable about applicable filing requirements. It would be prudent for counsel to count 300 days from the earliest date notice conceivably could be found and to ensure his client contacts the EEOC well in advance of the close of that period. As a review of numerous reported cases shows, however, the filing of charges in the last few days of the period is not unusual and scheduling an appointment on the 288th day for the purpose of filing a charge on the 297th day is not per se dilatory.

[*13]

Accordingly, the motion for summary judgment on the ADEA claim will be denied. The contract claim is another matter.

Under Pennsylvania law a cause of action for breach of a written contract is subject to a four year statute of limitations. See 42 Pa. C.S. § 5525(8); *Packer Soc'y Hill Travel Agency, Inc. v. Presbyterian Univ. of Pa. Med. Ctr., 430 Pa. Super. 625, 635 A.2d 649, 652 (Pa. Super. 1993)* (action for breach of written services agreement subject to four year statute of limitations). A claim for breach of contract accrues at the time of the alleged breach. See *Romeo & Sons v. P.C. Yezbak & Son, 539 Pa. 390, 652 A.2d 830, 832 (Pa. 1995)* ("in an action for breach of contract the statute of limitations begins to run from the time of the breach"). Plaintiff argues that his claim did not accrue until the final day before his services were terminated on June 30, 1995.

Plaintiff alleges that defendant's "refusal to grant Dr. Gulezian tenure and its resulting termination of his employment constituted a breach of Dr. Gulezian's contract with the University." The only contract set forth is the alleged agreement to provide tenure consistent with criteria articulated in [*14]defendant's Handbook. Apart from this alleged right to tenure, plaintiff presents nothing to show or even suggest that defendant had any contractual duty to retain him beyond the next academic year. The termination of plaintiff's services and any damages related thereto resulted from the denial of tenure and it is this action, if any, which constitutes a breach of contract. As such, plaintiff's claim accrued no later than his receipt of the notice of denial of tenure on April 25, 1994 and his claim is time barred. n5

n5 The cases cited by plaintiff to the contrary are inapposite. In *Kenis v. Perini Corp., 452 Pa. Super. 634, 682 A.2d 845, 849 (Pa. Super. 1996)*, the Court merely determined that a lawyer's quantum meruit claim arose once his representation was terminated by his client. In *Baird v. Marley Co., 537 F. Supp. 156, 157 (E.D. Pa. 1982)* and *DeLuca v. Mountain View School Dist., 72 Pa. D. & C.2d 350, 355 (1974)*, the Courts determined that an employee's action for breach of a services contract against an employer who changed the level of compensation arose when the employee was first paid at the reduced rate. This, of course, was the first time that each employee was denied compensation to which he was allegedly entitled. This is not an anticipatory breach case. Plaintiff was denied the tenure to which he claims contractual entitlement in April 1994.

[*15]

Because plaintiff's contract claim is clearly barred by the statute of limitations, it is not necessary to resolve defendant's contention that the Handbook plainly did not create an enforceable contract. The court does note,

however, that an employer's handbook does not create contractual rights absent a clear representation that it is to have such an effect. See *Luteran v. Loral Fairchild Cor., 455 Pa. Super. 364, 688 A.2d 211, 215 (Pa. Super. 1997)*, appeal denied, *701 A.2d 578 (Pa. 1997); Small v. Juniata College, 452 Pa. Super. 410, 682 A.2d 350, 353 (Pa. Super. 1996); Martin v. Capital Cities Media, Inc., 354 Pa. Super. 199, 511 A.2d 830, 840 (Pa. Super. 1985)*, appeal denied, *523 A.2d 1132 (Pa. 1987)*. See also *Gronowicz v. Pennsylvania State University, 1997 U.S. Dist. LEXIS 20811, 1997 WL 799438*, *3 (E.D. Pa. Dec. 29, 1997); Miller v. University of Pennsylvania, 1993 U.S. Dist. LEXIS 13141, 1993 WL 313508*, *3 (E.D. Pa. July 30, 1993). It appears from the pertinent language in the Handbook that defendant merely articulated in generalized terms the factors considered when making tenure decisions, that there was a tenure quota, that tenure was discretionary and that no professor was assured of obtaining tenure. [*16]

Consistent with the foregoing, defendant's motion will be granted in part and denied in part. An appropriate order will be entered.

ORDER - ENTERED 3-22-99

AND NOW, this 19th day of March, 1999 upon consideration of defendant's Motion to Dismiss (Doc. # 4), which, at the invitation of the parties who submitted matters beyond the pleadings, the court has treated as a motion for summary judgment, consistent with the accompanying memorandum, IT IS HEREBY ORDERED that said Motion is GRANTED as to Count II (plaintiff's breach of contract claim) and DENIED as to Count I (plaintiff's ADEA claim).

BY THE COURT:

JAY C. WALDMAN, J.



SUSAN GETZ v. COMMONWEALTH OF PENNSYLVANIA BLINDNESS andVISUAL SERVICES, et al.
CIVIL ACTION NO. 97-7541

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OFPENNSYLVANIA

1999 U.S. Dist. LEXIS 14911

September 28, 1999, Decided

DISPOSITION: [*1] Defendants' Motion GRANTED in part and DENIED in part.
CASE SUMMARY

PROCEDURAL POSTURE: Defendants filed a motion for summary judgment to dismiss plaintiff's complaint which alleged various violations of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. Ann. § 951 et seq.

OVERVIEW: Plaintiff sued defendants alleging various violations of Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e* et seq., and the Pennsylvania Human Relations Act (PHRA), 43 Pa. Cons. Stat. Ann. § 951 et seq. Defendants filed a motion for summary judgment. The court denied defendants' motion as to plaintiff's religious discrimination claim because plaintiff stated a prima facie case of religious discrimination, and defendants failed to offer legitimate, nondiscriminatory reasons for its actions as rebuttal. Also, there was a genuine issue of material fact as to the timeliness of plaintiff's allegations of unlawful discriminatory conduct that precluded summary judgment. The court granted defendants' motion in part and dismissed with prejudice plaintiff's PHRA claims, claims against defendants in their individual capacities, retaliation claim, hostile work environment claim, and race and gender discrimination claims.

OUTCOME: Defendants' motion for summary judgment denied as to plaintiff's religious discrimination claim because plaintiff stated a prima facie case of religious discrimination and defendants failed to offer legitimate, nondiscriminatory reasons for its actions as rebuttal, but defendants' motion granted on all of plaintiff's other claims.

CORE TERMS: summary judgment, prima facie case, hostile work environment, retaliation, formal charge, amend, hostile, religious discrimination, questionnaire, nondiscriminatory, matter of law, moving party, defendant-employer, administrative remedies, religion, protected class, genuine issue, pervasive, gender, discrimination claim, filing requirement, reasonable person, direct evidence, discriminatory, cognizable, machinery, favorable, favorably, sex, genuine issue of material fact

CORE CONCEPTS -

Civil Procedure: Summary Judgment: Summary Judgment Standard
Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

Civil Procedure: Summary Judgment: Burdens of Production & Proof
The party moving for summary judgment has the initial burden of showing the basis for its motion.

Civil Procedure: Summary Judgment: Burdens of Production & Proof
Once the movant adequately supports its motion pursuant to Fed. R. Civ. P. 56(c), the burden shifts to the nonmoving party to go beyond the mere pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. A genuine issue is one in which the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is "material" only if it might affect the outcome of the suit under applicable rule of law.

  


Civil Procedure: Summary Judgment: Summary Judgment Standard
When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the nonmovant. Moreover, a court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent.

Civil Procedure: Summary Judgment: Burdens of Production & Proof
A party opposing summary judgment must do more than rest upon mere allegations, general denials, or vague statements.

Civil Procedure: Summary Judgment: Summary Judgment Standard
A court may grant an unopposed motion for summary judgment where it is "appropriate." Fed. R. Civ. P. 56(e).

Civil Procedure: Summary Judgment: Summary Judgment Standard
Where the moving party has the burden of proof on the relevant issues, the district court must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law. Where the moving party does not have the burden of proof on the relevant issues, the district court must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law.

Administrative Law: Judicial Review: Reviewability: Exhaustion
Before a civil action based on alleged violations of the rights provided and protected by the Pennsylvania Human Relations Act (PHRA) may be judicially resolved, the plaintiff must exhaust the administrative remedies available through the Pennsylvania Human Relations Commission. The PHRA expressly requires that a complainant file an administrative charge within 180 days of the alleged act of discrimination. 43 Pa. Cons. Stat. Ann. §§ 959(a) & 962.

Administrative Law: Judicial Review: Reviewability: Exhaustion
Failure to file a charge with the Pennsylvania Human Relations Commission (PHRC) prevents a complainant from filing suit under the Pennsylvania Human Relations Act (PHRA), 42 Pa. Cons. Stat. Ann. § 951 et seq. Pennsylvania courts strictly interpret the PHRA's 180

day filing requirement, having repeatedly held that persons with claims that are cognizable under the PHRA must avail themselves of the administrative process of the PHRC or be barred from the PHRA's judicial remedies.

Labor & Employment Law: Employment Discrimination
Title VII of the Civil Rights Act of 1964 provides that it shall be an unlawful employment practice for an employer to discriminate against any individual with respect to his or her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. *42 U.S.C.S. § 2000e-2*(a). "Employer" is defined as a person engaged in an industry affecting commerce who has fifteen or more employees and any agent of such a person. *42 U.S.C.S. § 2000e*(b).

Labor & Employment Law: Employment Discrimination
Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e* et seq., liability does not attach to individuals. Thus, while Title VII liability may lie against an employer, liability may not attach to individual employees whose actions otherwise constitute a civil rights violation.

Labor & Employment Law: Employment Discrimination
Generally, Title VII of the Civil Rights Act of 1964 requires a plaintiff to file his or her claim of unlawful discrimination within 180 days of the unlawful discriminatory act. *42 U.S.C.S. § 2000e5*-(c). Where a state has established an agency or agencies to monitor and enforce civil rights laws, a plaintiff must file his or her claim of unlawful discrimination within 300 days of the unlawful discriminatory act. *42 U.S.C.S. § 2000e5*-(c). Logically, therefore, unlawful discriminatory acts that occurred more than 300 days prior to the date of plaintiff's administrative filing generally are not cognizable.

Labor & Employment Law: Employment Discrimination
29 C.F.R. § 1601.9 provides that an employment discrimination charge shall be in writing and signed and shall be verified.

Labor & Employment Law: Employment Discrimination: Sexual Harassment: Hostile Work Environment
Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., provides to an employee a cause of action where she was subjected in her work place to sexual harassment so pervasive that it created a hostile,



intimidating, or offensive work environment. To sustain a hostile work environment claim, plaintiff must show severe or pervasive conduct. A hostile environment claim must show that the environment was such that not only would a reasonable person find the environment hostile and abusive but that the actual plaintiff found it in fact to be hostile and abusive.

Labor & Employment Law: Employment Discrimination: Sexual Harassment: Hostile Work Environment
The Third Circuit employs a five-factor test to evaluate a hostile environment claim: (1) the employee suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. Whether a hostile working environment existed can be ascertained only upon an examination of the totality of the circumstances.

Labor & Employment Law: Employment Discrimination: Actionable Discrimination: Retaliation
Title VII of the Civil Rights Act of 1964 (Title VII) makes it unlawful for an employer to retaliate against an employee who has opposed any practice unlawful under Title VII. *42 U.S.C.S. § 2000e*-(3)a. Plaintiff must show the following to prove a Title VII retaliation claim: (1) she engaged in conduct protected under Title VII; (2) her employer took an adverse employment action against her; and (3) a causal link exists between her protected conduct and her employer's adverse action.

Labor & Employment Law: Employment Discrimination: Actionable Discrimination: Retaliation
Retaliatory conduct other than discharge or refusal to hire is proscribed by Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., only if it alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.

Labor & Employment Law: Employment Discrimination
Claims of Title VII of the Civil Rights Act of 1964 (Title VII), *42 U.S.C.S. § 2000e* et seq., discrimination may be substantiated by presentation of direct evidence of discrimination, or evidence which creates an inference of discrimination. Indirect evidence is that from which the trier of fact infers discrimination. Where a plaintiff does

not present direct evidence of discrimination, her Title VII claims must be evaluated under the McDonnell Douglas/Burdine burden-shifting framework.

Labor & Employment Law: Employment Discrimination
The Supreme Court established the following four-part test for establishing a prima facie Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., discrimination case: Plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) others who are not members of her protected class were more favorably treated.

Labor & Employment Law: Employment Discrimination
Once a plaintiff satisfies the four-part test, thereby establishing a prima facie case of discrimination, there arises a presumption of discriminatory intent by the defendant-employer. Although the ultimate burden of persuasion remains with the plaintiff, the burden of production shifts to the defendant-employer who must explicate a nondiscriminatory, legitimate justification for its treatment of the plaintiff. To satisfy its burden, the defendant-employer must clearly set forth through the introduction of admissible evidence, the reasons for the plaintiff's allegedly unlawful treatment. The defendant-employer must only explain clearly the nondiscriminatory reasons for its actions, however. If the defendant-employer satisfies its burden, the presumption is rebutted and thereafter drops from the case.

Labor & Employment Law: Employment Discrimination
The plaintiff, to prevail on his or her discrimination claim, must prove by a preponderance of the evidence the legitimate reasons proffered by the employer were not its true reasons, but were a pretext for discrimination. Therefore, to survive summary judgment where an employer-defendant articulates a legitimate nondiscriminatory reason for its actions, the plaintiff must point to evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

COUNSEL: SUSAN GETZ, PLAINTIFF, Pro se, MERION, PA.

For COMMONWEALTH OF PENNSYLVANIA BLINDNESS AND VISUAL SERVICES, DEFENDANT: KIERSTEN M. MURRAY, OFFICE OF



ATTORNEY GENERAL, PHILA, PA USA.

COMMONWEALTH OF PENNSYLVANIA, DEPARTMENT OF PUBLIC WELFARE TO THE COMMONWEALTH OF PENNSYLVANIA, FEATHERS HOUSTON, JOYCE TAYLOR, DEFENDANTS: DENISE KUHN, KIERSTEN M. MURRAY, DALINDA E. CARRERO, OFFICE OF ATTORNEY GENERAL, PHILA, PA USA.

JUDGES: HERBERT J. HUTTON, J.

OPINIONBY: HERBERT J. HUTTON

OPINION: MEMORANDUM AND ORDER

HUTTON, J.

September 28, 1999

Presently before this Court is Defendants' unopposed Motion for Summary Judgment (Docket No. 23). For the reasons stated below, it is hereby ordered that Defendants' Motion is GRANTED in part and DENIED in part.

I. BACKGROUND

Pro se plaintiff Susan Getz ("Plaintiff") brought the underlying action against her employer, the Commonwealth of Pennsylvania Bureau of Blindness and Visual Services ("BVS"), and two individuals, Feather Houston ("Houston"), the Secretary of the Department of Public Welfare, and Joyce Taylor ("Taylor"), the District Manager of the Philadelphia[*2] BVS office. Plaintiff alleges various violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e et seq.* and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. § 951 et seq.

Plaintiff specifically alleges that her supervisor, Taylor, who is an African-American woman, discriminated against her on the basis of her race (white), gender (female), and religion (Judaism). Plaintiff also claims that Taylor retaliated against her after she filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff's Amended Complaint fails to make any allegations against Houston.

On July 16, 1998, in response to Defendant's Motion to

Dismiss or for [a] More Definite Statement, Plaintiff filed an Amended Complaint. On March 26, 1999, Defendant filed the instant Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c). Plaintiff failed to file a response to Defendants' instant Motion.

II. DISCUSSION

A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions[*3] on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* Once the movant adequately supports its motion pursuant to Rule 56(c), the burden shifts to the nonmoving party to go beyond the mere pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. See *id. at 324.* A genuine issue is one in which the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* A fact is "material" only if it might affect the outcome of the suit under applicable rule of law. Id.

When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the nonmovant. *Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992),* [*4] cert. denied, *507 U.S. 912, 122 L. Ed. 2d 659, 113 S. Ct. 1262 (1993).* Moreover, a court may not consider the credibility or weight of the evidence in deciding a motion for summary judgment, even if the quantity of the moving party's evidence far outweighs that of its opponent. Id. Nonetheless, a party opposing summary judgment must do more than rest upon mere allegations, general denials, or vague statements. *Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884, 890 (3d Cir. 1992).*

Furthermore, a court may grant an unopposed motion for summary judgment where it is "appropriate." Fed. R. Civ. Pro. 56(e). This determination has been described as follows:

Where the moving party has the burden of proof on the relevant issues, . . . the district court must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law. Where the moving party does not have the burden of proof on the relevant issues, . . . the district court must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter[*5] of law.

*Anchorage Assocs. v. Virgin Islands Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990).*

B. Defendant's Motion to Dismiss

Defendant moved for summary judgment on Plaintiff's Title VII and PHRA claims. The Court, drawing all reasonable inferences in the light most favorable to Plaintiff, considers whether Plaintiff's federal and state law claims survive Defendants' Rule 56(c) motion.

1. Plaintiff's PHRA claims

Plaintiff's Amended Complaint alleges various PHRA violations. Defendant argues that this Court has several grounds on which to grant summary judgment: (1) the Eleventh Amendments bars Plaintiff's suit; (2) the PHRA does not permit suit against Taylor and Houston as they are not "employers" within the meaning of the statute; and (3) Plaintiff failed to exhaust her administrative remedies as required by the PHRA. The Court first considers Defendant's third argument.

a. Exhaustion of administrative remedies

Before a civil action based on alleged violations of the rights provided and protected by the PHRA may be judicially resolved, the plaintiff must exhaust the administrative remedies available through[*6] the Pennsylvania Human Relations Commission ("PHRC"). *Woodson v. Scott Paper, 109 F.3d 913, 925 (3d Cir. 1997); Clay, 522 Pa. 86, 559 A.2d 917.* The PHRA expressly requires that a complainant file an administrative charge within 180 days of the alleged act of discrimination. 43 Pa. Cons. Stat. Ann. §§ 959(a) & 962 (West 1999).

The purpose of this filing requirement is that it allows the PHRC to employ its specialized knowledge to

remedy such claims thereby averting judicial involvement in the parties' controversy. *Woodson, 109 F.3d at 925.* As a practical matter, the administrative scheme is designed to also assist the unsophisticated and unlearned enforce their statutory civil rights without resort to costly, lengthy, and complicated litigation.

In the instant matter, Plaintiff submitted a complete, signed EEOC Intake Questionnaire to the Equal Employment Opportunity Commission ("EEOC") on or about March 31, 1995, and filed a formal charge with the EEOC on or about September 9, 1995. On or about December 20, 1995, the EEOC sent a letter to Plaintiff notifying her of her right to file a charge with the PHRC. (Pl.'s Dep. at 175-78). [*7] Plaintiff's deposition testimony establishes that she received, read, and understood said letter. Nevertheless, Plaintiff did not file a charge with the PHRC.

As a general matter, failure to file a charge with the PHRC prevents a complainant from filing suit under the PHRA. *Woodson, 109 F.3d at 925; Van Cleve v. Nordstrom, Inc., 64 F. Supp. 2d 459, 1999 U.S. Dist. LEXIS 13951, 1999 WL 712588,* at *3 (E.D. Pa. 1999). Pennsylvania courts strictly interpret the PHRA's 180 day filing requirement, having repeatedly held that "persons with claims that are cognizable under the [PHRA] must avail themselves of the administrative process of the [PHRC] or be barred from the [PHRA's] judicial remedies. . . ." *Woodson, 109 F.3d at 925* (citing *Vincent v. Fuller, 532 Pa. 547, 616 A.2d 969, 974 (Pa. 1992); Clay v. Advanced Computer Applications, Inc., 522 Pa. 86, 559 A.2d 917, 919 (Pa. 1989).* By foregoing her right to file a charge with the PHRC, Plaintiff now cannot circumvent the PHRA's filing requirements, thereby abrogating the legislative scheme established by Pennsylvania legislature and observed heretofore by state and[*8] federal courts. Plaintiff is therefore foreclosed from pursuing the PHRA remedies prayed for in her Amended Complaint. Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's PHRA claims is granted as a matter of law as to all Defendants. n1

n1 This Court need not consider Defendants' Eleventh Amendment and statutory interpretation arguments as Plaintiff's PHRA claims are properly disposed of on the basis of her failure to exhaust administrative remedies.



2. Plaintiff's Title VII claims

Plaintiff's Amended Complaint alleges various Title VII violations. Defendant argues that this Court has several grounds on which to grant summary judgment: (1) Title VII does not permit suit against Taylor and Houston as they are not "employers" within the meaning of the statute; (2) Plaintiff failed to completely exhaust her administrative remedies as required by Title VII; and (3) Plaintiff cannot make out a prima facie case of discrimination, hostile work environment, or retaliation under Title VII. [*9] The Court first considers Defendants' argument that Taylor and Houston are not "employers" under Title VII and are therefore immune from suit.

a. Houston and Taylor are not "employers" under Title VII

Title VII provides that "it shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . ." *42 U.S.C. § 2000e-2*(a) (1999). "Employer" is defined as a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person." *42 U.S.C. § 2000e*(b) (1999).

It is well established that Title VII liability does not attach to individuals. *Kachmar v. Sundard Data Sys., Inc., 109 F.3d 173, 184 (3d Cir. 1997); Sheridan v E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1077 (3d Cir. 1996); Irizarry v. Pennsylvania Dep't of Transp., 1999 U.S. Dist. LEXIS 5890, No. CIV.A. 98-6180, 1999 WL 269917*, at *3 (E.D. Pa. April 19, 1999); *Wils v. Phillips, 1999 U.S. Dist. LEXIS 4625, No. CIV.A. 98-5752, 1999 WL 200674*, [*10]at *2 (E.D. Pa. April 8, 1999); *Goodwin v. Seven-Up Bottling Co. of Phila., 1996 U.S. Dist. LEXIS 15448, No. CIV.A. 96- CV-2301, 1996 WL 601683*, at *3 (E.D. Pa. Oct. 18, 1996). Thus, while Title VII liability may lie against an employer, liability may not attach to individual employees whose actions otherwise constitute a civil rights violation. *Goodwin, 1996 WL 601683*, at *3. Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's Title VII claims against Taylor and Houston in their individual capacities.

b. The Plaintiff's lack of timeliness with respect to certain allegations and the appropriateness of Judicial review

Generally, Title VII requires a plaintiff to file his or her claim of unlawful discrimination within 180 days of the unlawful discriminatory act. *42 U.S.C. § 2000e5-*(c) (1999). Where a state has established an agency or agencies to monitor and enforce civil rights laws, a plaintiff must file his or her claim of unlawful discrimination within 300 days of the unlawful discriminatory act. *42 U.S.C. § 2000e5-*(c) (1999). Logically, therefore, unlawful discriminatory acts[*11] that occurred more than 300 days prior to the date of Plaintiff's administrative filing generally are not cognizable. n2

n2 There are equitable doctrines that may in appropriate circumstances modify the statutory tolling period. In the instant matter, Plaintiff did not respond to Defendant's Motion for Summary Judgment and, consequently, did not argue that any equitable doctrines should be employed.

Defendants argue that Plaintiff did not submit to the EEOC a valid charge of discrimination until September 11, 1995. Defendants, applying Title VII's 300 day rule, then argue that Plaintiff cannot state a cognizable Title VII claim concerning any allegedly discriminatory acts that occurred before November 16, 1994. Defendants therefore conclude that they are entitled to judgment as a matter of law on Plaintiff's allegations of unlawful discriminatory conduct that occurred in September and October 1994.

Although Plaintiff did not respond to Defendant's Motion for Summary Judgment, the record reveals that she filed[*12] a completed and signed EEOC Intake Questionnaire on or about May 1, 1995. (See Plaintiff's Allegations of Employment Discrimination). The record also reveals, however, that Plaintiff did not file a formal charge with the EEOC until September 9, 1995. (See Plaintiff's Charge of Discrimination). In a letter to Plaintiff dated September 18, 1997, an EEOC investigator wrote that "the [EEOC] can only investigate matters that occurred within the most recent 300 days prior to the filing of your charge. Even considering the date on which your questionnaire was returned to [the EEOC], April 30, 1995, the dates on which you were denied training are untimely." n3 (See Ltr. of 9/18/99 to Plaintiff from EEOC investigator, Susan M. Kelly, at 2

(emphasis added)). The EEOC investigator's letter indicates that the EEOC possibly considered Plaintiff's charge "filed" as of April 30, 1995. If this was the case, Plaintiff's claims dating back to September and October 1994 fall within the 300 day statutory tolling period.

n3 The reference to "training" is not borne out by the record supplied to the Court.

[*13]

   In cases that challenge the timeliness of an EEOC filing, there often arises a dispute over whether plaintiff's submission of a completed EEOC Intake Questionnaire satisfied the requirements of 29 C.F.R. § 1601.9. Section 1601.9 provides that "[a] charge shall be in writing and signed and shall be verified." 29 C.F.R. § 1601.9 (1999). The submission of an EEOC Intake Questionnaire generally precedes the filing of a formal charge and describes the alleged improper conduct. Courts are split on how to treat EEOC Intake Questionnaires and formal EEOC Charges in the context of 29 C.F.R. § 1601.9. n4 While the Third Circuit Court of Appeals has not spoken directly on this issue, at least one Eastern District of Pennsylvania court discussed the interplay of EEOC Intake Questionnaires and formal EEOC charges.

n4 For example, the Seventh Circuit Court of Appeals held that a timely filed questionnaire followed by an untimely verified charge may be sufficient to constitute a charge in some circumstances, such as where the plaintiff and the EEOC both treated the questionnaire as the charge. *Philbin v. General Elec. Capital Auto Lease, 929 F.2d 321, 324 (7th Cir. 1991).* The Tenth Circuit Court of Appeals held that a subsequently filed formal charge may amend the plaintiff's unverified but timely EEOC "questionnaire," at least where there is no prejudice to the accused party. *Peterson v. City of Wichita, 888 F.2d 1307, 1308-09 (10th Cir. 1989).* The Eighth Circuit Court of Appeals rejected the notion that the questionnaire and the charge should be read together such that a verified charge filed after the filing deadline relaters back to the date of that the intake questionnaire was completed. *Shempert v. Harwick Chem. Corp., 151 F.3d 793, 796-98 (8th Cir. 1998),* cert. denied, *143 L. Ed. 2d 38, 525 U.S. 1139, 119 S. Ct. 1028 (1999).*

[*14]

   In *Gulezian v. Drexel Univ., 1999 U.S. Dist. LEXIS*

3276, No. CIV.A. 98-3004, 1999 WL 153270 (E.D. Pa. March 19, 1999), defendant denied tenure to plaintiff professor. Soon thereafter, on February 16, 1995, plaintiff submitted an EEOC Intake Questionnaire in which he provided no substantive details regarding his Title VII discrimination claim. *Gulezian, 1999 WL 153270,* at *2. On February 16, 1995, plaintiff also met with an EEOC employee to file a formal charge but the employee was unable to complete the charge that day. *Gulezian, 1999 WL 153270,* at *2. On February 23, 1995, plaintiff faxed to the EEOC a statement detailing the basis of his allegations of discrimination. *Gulezian, 1999 WL 153270,* at *2. An EEOC employee used this information to draft a formal charge for plaintiff. *Gulezian, 1999 WL 153270,* at *2. After further communications between plaintiff and the EEOC, plaintiff's charge was filed on March 10, 1995. *Gulezian, 1999 WL 153270,* at *2. Internal EEOC records indicated, however, that plaintiff's charge was received on February 16, 1995. *Gulezian, 1999 WL 153270,* at *2[*15] (emphasis added).

   The Gulezian court considered and rejected plaintiff's argument that the presentation of an EEOC Intake Questionnaire automatically satisfies Title VII's administrative filing requirement. *Gulezian, 1999 WL 153270,* at *2. The court reasoned that a communication to the EEOC in "writing, including an Intake Questionnaire, may constitute a charge if it is of a 'kind that would convince a reasonable person that the grievant has manifested an intent to activate [Title VII's] machinery.'" *Gulezian, 1999 WL 153270,* at *3 (quoting *Bihler v. Singer, 710 F.2d 96, 99 (3d Cir. 1983)).* The court stated that in making such a determination courts essentially consider the effect and content of the communication. *Gulezian, 1999 WL 153270,* at *3. The court recognized, however, that courts generally do not equate Intake Questionnaires to formal charges where the EEOC advises the grievant that he or she must provide more information or get back in touch with EEOC personnel before a formal charge to be executed. *Gulezian, 1999 WL 153270,* at *3 (citations omitted).

   In the instant matter, there[*16] is no evidence that the EEOC either advised Plaintiff that she needed to provide more information or that she needed to get back in touch with EEOC personnel before a formal charge could be executed. Moreover, Plaintiff submitted a signed EEOC Intake Questionnaire that was accompanied by seven single-spaced, typed pages which substantively detailed Plaintiff's allegations of Title VII violations. In the absence of Plaintiff's response to the instant motion,

reasonable people may differ as to whether Plaintiff manifested an intent to activate Title VII's machinery when she submitted her Intake Questionnaire to the EEOC.

Therefore, there is a genuine issue of material fact as to whether Plaintiff timely filed her allegations of unlawful discriminatory conduct for the September and October 1994 occurrences. The Court holds that Defendant's Motion for Summary Judgment is denied with regard to the untimeliness of Plaintiff's allegations of unlawful discriminatory conduct that occurred in September and October 1994. n5

n5 This Court's holding is particularly appropriate in this circumstance where Plaintiff is proceeding pro se and is likely to be unfamiliar with the complexities of the EEOC's administrative procedures. See *Kocian Getty Refining & Mktg. Co., 707 F.2d 748, 754 (3d Cir. 1983); Wassem v. Romac Int'l, Inc., 1998 U.S. Dist. LEXIS 18847, No. CIV.A. 97-7825, 1998 WL 834094,* at *4 (E.D. Pa. Dec. 1, 1998).

[*17]

c. Plaintiff's claims of hostile work environment, discrimination, and retaliation under Title VII

(1) Hostile work environment

Defendant argues that Plaintiff fails to raise a genuine issue of material fact as to her hostile work environment claim. In the absence of a response to the instant Motion from Plaintiff, this Court evaluates whether it is "appropriate" to grant Defendants' Motion for Summary Judgment on this claim.

Title VII provides to an employee a cause of action where she was subjected in her work place to sexual harassment so pervasive that it created a hostile, intimidating, or offensive work environment. *Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990).* To sustain a hostile work environment claim, Plaintiff must show severe or pervasive conduct. *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 2265, 141 L. Ed. 2d 633 (1998).* A hostile environment claim must show that the environment was as such that not only would a reasonable person find the environment hostile and abusive but that the actual plaintiff found it in fact to be hostile and abusive. *Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2283, 141 L. Ed.*

2d 662 (1998).[*18]

The Third Circuit employs a five-factor test to evaluate a hostile environment claim: "(1) the employee[] suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. *Andrews, 895 F.2d at 1482.* Whether a hostile working environment existed can be ascertained only upon an examination of the totality of the circumstances. *Id. at 1485; Afrassiabian v. ProCredit Holdings, Inc., 1999 U.S. Dist. LEXIS 12238, No. CIV.A.98-4757, 1999 WL 605589* (E.D. Pa. Aug. 9, 1999).

The record before the Court does not demonstrate that a genuine issue of material fact exists concerning Plaintiff's claim that she suffered severe or pervasive sexual harassment. Plaintiff provides absolutely no evidence that there existed a hostile work environment at BVS or that the terms, conditions, or privileges of her employment were adversely impacted in any unlawful manner. Indeed, when asked about the harassment she allegedly[*19] suffered as a woman working in BVS' Philadelphia office, Plaintiff responded that the basis of her discrimination claim is that she is who she is, a "Jewish white female." (Pl.'s Dep. at 196-97). Therefore, the only evidence in the record that supports Plaintiff's hostile work environment claim are Plaintiff's conclusory and vague allegations in her Amended Complaint and deposition testimony. The conduct described by Plaintiff does not rise to unlawful activity proscribed by Title VII and no reasonable fact-finder presented with the materials currently before this Court could return a verdict for Plaintiff on her hostile work environment claim. Accordingly, the Court grants Defendants' Motion for Summary Judgment on Plaintiff's hostile work environment claim.

(2) Retaliation

Defendants argue that Plaintiff cannot raise a genuine issue of fact as to her retaliation claim because, inter alia, Defendants never took an adverse employment action against Plaintiff after she invoked Title VII's administrative machinery. Title VII makes it unlawful for an employer to retaliate against an employee who has opposed any practice unlawful under Title VII. *42 U.S.C. § 2000e[*20]* -(3)a. Plaintiff must show the following to prove a Title VII retaliation claim: (1) she

engaged in conduct protected under Title VII; (2) her employer took an adverse employment action against her; and (3) a causal link exists between her protected conduct and her employer's adverse action. *Charlton v. Paramus Bd. of Educ., 25 F.3d 194, 201 (3d Cir. 1994).*

Plaintiff alleges that the following unlawful retaliatory acts occurred at her work place after she submitted to the EEOC her Intake Questionnaire: (1) on May 4, 1995, Taylor imitated Plaintiff's walk and smile and charged Plaintiff with gross insubordination (Pl.'s Amend. Compl. P 31); (2) on May 18, 1995, Plaintiff was charged with gross insubordination for "disrupting the office" although Taylor allegedly disrupted the office by preventing Plaintiff from leaving her office (Pl.'s Amend. Compl. P 32); (3) on October 3, 1996, Plaintiff was charged with "making false statements which are slanderous and defamatory in regard to another Commonwealth employee." (Pl.'s Amend. Compl. P 34).

Plaintiff clearly satisfied the first prong of the Andrews test for filing an EEOC charge is a protected activity under Title[*21] VII. In examining the second prong of the Andrews test, the Court considers the Third Circuit's definition of the nature of conduct that amounts to an "adverse employment action:"

Retaliatory conduct other than discharge or refusal to hire is thus proscribed by Title VII only if it alters the employee's "compensation, terms, conditions, or privileges of employment," deprives him or her of "employment opportunities," or "adversely affects his [or her] status as an employee." It follows that "not everything that makes an employee unhappy" qualifies as retaliation, for otherwise minor and even trivial employment actions that 'an irritable chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'"

*Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)* (citations omitted); *Kidd v. Pennsylvania, 1999 U.S. Dist. LEXIS 7918, No. Civ. 97-5577, 1999 WL 391496,* at *8 (E.D. Pa. May 20, 1999).

Plaintiff fails to allege any acts that amount to an "adverse employment action" under the Robinson court's standard. Moreover, the Court finds no evidence whatsoever that Plaintiff suffered an adverse employment action for she remains[*22] employed in the position she held at the time she initiated the instant matter, she alleges no diminution of compensation or benefits and the Court finds no evidence to the contrary,

and the record reveals that Plaintiffs' employment opportunities have not been compromised. Therefore, Plaintiff fails to state a prima facie case of retaliation actionable under Title VII. Having failed to allege facts or evidence sufficient to state a Title VII retaliation claim, Plaintiff's claim is dismissed.

(3) Religious, gender, and race discrimination

Defendants argue that even if Plaintiff could make out prima facie cases of race, gender, and religious discrimination, her claims ultimately must fail because Defendants had legitimate, nondiscriminatory, and nonpretextual reasons for its actions. In the absence of a response from Plaintiff to the instant Motion, this Court evaluates whether it is "appropriate" to grant Defendants' Motion for Summary Judgment on these claims.

Claims of Title VII discrimination may be substantiated by presentation of direct evidence of discrimination, *Price Waterhouse v. Hopkins, 490 U.S. 228, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989),*[*23] or evidence which creates an inference of discrimination. *United States Postal Service Bd. Of Governors v. Aikens, 460 U.S. 711, 714 n.3, 75 L. Ed. 2d 403, 103 S. Ct. 1478 (1983).* Indirect evidence is that from which the trier of fact infers discrimination. *Torre v. Casio, Inc., 42 F.3d 825, 829 (3d Cir. 1994).* Where a plaintiff does not present direct evidence of discrimination, her Title VII claims must be evaluated under the McDonnell Douglas/Burdine burden shifting framework. The Supreme Court established the following four-part test for establishing a prima facie Title VII discrimination case: Plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) other who are not members of her protected class were more favorably treated. *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817(1973).*

Once a plaintiff satisfies the now familiar four-part test, thereby establishing a prima[*24] facie case, there arises a presumption of discriminatory intent by the defendant-employer. *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).* Although the ultimate burden of persuasion remains with the plaintiff, the burden of production shifts to the defendant-employer who must explicate a nondiscriminatory, legitimate justification for its



treatment of the plaintiff. *Id. at 507.* To satisfy its burden, the defendant-employer must clearly set forth through the introduction of admissible evidence, the reasons for the plaintiff's allegedly unlawful treatment. *Burdine, 450 U.S. at 255.* The defendant-employer must only explain clearly the nondiscriminatory reasons for its actions, however. *Id. at 260.* If the defendant-employer satisfied its burden, the presumption is rebutted and thereafter drops from the case. *Id. at 255 & n.10.*

The plaintiff, to prevail on his or her discrimination claim, must prove by a preponderance of the evidence the legitimate reasons proffered by the employer "were not its true reasons, but were a pretext for discrimination." *McDonnell Douglas, 411 U.S. at 802.*[*25] Therefore, to survive summary judgment where an employer-defendant articulated a legitimate nondiscriminatory reason for its actions,

the plaintiff must point to evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).*

In the instant case, Plaintiff neither alleges nor offers any direct evidence of race, gender, or religious discrimination. Accordingly, Plaintiff's claims are analyzed pursuant to the McDonnell Douglas/Burdine burden shifting framework. Therefore, Plaintiff must establish a prima facie case of discrimination per said framework. See *Burdine, 450 U.S. at 252-53.*

Defendants fail to argue that Plaintiff is not a member of a protected class. Thus, the Court finds that the first element of Plaintiff's prima facie case is satisfied. Second, upon review of the record, that Plaintiff remains a BVS employee is evidence sufficient to show that she[*26] is qualified for her position at BVS. Plaintiff therefore satisfies the second element of her prima facie case. The Court now turns to the third and fourth elements of Plaintiff's prima facie case.

Upon consideration of Plaintiff's pro se status and her failure to respond to the instant Motion, the record before the Court indicates that Plaintiff may have suffered an adverse employment action in that the "privileges" of her employment were different from the "privileges" enjoyed by her co-workers. Plaintiff claims

that she was denied time-off when she requested such time to observe the tenets of her religion, Judaism. (See Pl.'s Amend. Compl. PP 11-16). Plaintiff claims that other employees were treated more favorably than her and were given requested time-off on the exact days she requested time-off to celebrate Jewish holidays or observe the Jewish Sabbath. (Pl.'s Amend. Compl. PP 11-16). That Plaintiff's requests were denied when she was wished to observe her religious beliefs suggest that she suffered adverse employment actions because of her religion. Thus, the Court finds that Plaintiff satisfied the third element of her prima facie case of religious discrimination.[*27] n6 Finally, that other BVS employees outside of Plaintiff's protected class benefitted from the privileges requested by and denied to Plaintiff indicates that Plaintiff satisfied the fourth element of her prima facie case. (See Pl.'s Amend. Compl. PP 11-16). After drawing all inferences in the light most favorable to Plaintiff, the Court holds that Plaintiff stated a prima facie case of religious discrimination under the McDonnell Douglas/Burdine framework. The Court now considers whether Defendants proffered a sufficient nondiscriminatory, legitimate reason for its conduct toward Plaintiff to rebut the presumption raised by Plaintiff's prima facie case.

n6 The Court, however, finds nothing in the record available to support whatsoever Plaintiff's claims that she suffered race or gender discrimination while a BVS employee. Specifically, the record does not support Plaintiff's claim that she was treated less favorably than men or people of other races. Accordingly, the Court grants Defendant's Motion for Summary Judgement on Plaintiff's claims of race and gender discrimination.

[*28]

It is Defendants' burden to offer legitimate, nondiscriminatory reasons for its actions. Defendants fail to meet this burden, thereby failing to rebut the presumption raised by Plaintiff's satisfaction of her prima facie case. Defendant does not proffer legitimate nondiscriminatory reasons for its conduct toward Plaintiff but instead baldly asserts that Getz cannot substantiate that the actions she complains about were taken because of her, inter alia, religion. (Def.s' Mot. for Summ. J. at 28). Accordingly, Defendant's Motion for Summary judgment on Plaintiff's religious discrimination claim is denied.

An appropriate Order follows.

ORDER

AND NOW, on this 28th day of September, 1999, upon consideration of Defendants' unopposed Motion for Summary Judgment (Docket No. 23), IT IS HEREBY ORDERED that:

(1) Plaintiff's PHRA claims are DISMISSED with prejudice;

(2) Plaintiff's claims against Defendants Houston and Taylor in their individual capacities are DISMISSED with prejudice;

(3) Plaintiff's Title VII retaliation claim is DISMISSED with prejudice;

(4) Plaintiff's Title VII hostile work environment claim is DISMISSED with prejudice;

(5) [*29] Plaintiff's Title VII gender discrimination claim is DISMISSED with prejudice;

(6) Plaintiff's Title VII race discrimination claim is DISMISSED with prejudice;

(7) Defendants' Motion for Summary Judgment on Plaintiff's Title VII religious discrimination claim is DENIED; and

(8) Defendants' Motion for Summary Judgment on Plaintiff's Title VII claims of discrimination in September 1994 and October 1994 claim is DENIED.

BY THE COURT

HERBERT J. HUTTON, J.

LARRY LANTZ v. HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA, et al.
CIVIL ACTION NO. 96-2671

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OFPENNSYLVANIA

1996 U.S. Dist. LEXIS 11154

July 29, 1996, Decided
July 30, 1996, FILED

CORE TERMS: age discrimination, notice of right, public policy, intentional infliction of emotional distress, workshare, wrongful discharge, favorable, administrative remedies, non-employer, accommodation, public policy exception, individual liability, state agency, et seq, disability, transmitted, clarify, amplify, at-will, leave of absence, third party, definition of employer, failure to exhaust, judicial decision, statutory remedy, complaints filed, cause of action, timely manner, timely filed, filing date

COUNSEL: [*1] For LARRY LANTZ, PLAINTIFF: THOMAS M. HOLLAND, MC CALLUM & HOLLAND, PHILA, PA USA.

For HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA, MICHAEL SANTORO, DEFENDANTS: KRISTINE M. DEREWICZ, BUCHANAN INGERSOLL PROFESSIONAL CORPORATION, PHILA, PA USA. NEIL J. HAMBURG, PHILADELPHIA, PA. For ARCAP, DEFENDANT: ROBERT G. HANNA, JR., MARSHALL, DENNEHEY, WARNER, COLEMAN AND GOGGIN, PHILA, PA USA. DANIEL V. DI LORETTO, PHILA, PA USA. For VOCATIONAL REHABILITATION SERVICES, INC., DEFENDANT: CHARLES J. DALY, LAW OFFICES OF ROHDE, DAY & CAMPBELL, PHILADELPHIA, PA USA.

JUDGES: LOUIS C. BECHTLE, J.

OPINIONBY: LOUIS C. BECHTLE

OPINION: MEMORANDUM AND ORDER

BECHTLE, J.

JULY 29, 1996

Presently before the court are separate Motions to Dismiss Plaintiff's Amended Complaint, filed by the Hospital of the University of Pennsylvania ("HUP") and two individuals employed by HUP, Linda Gradwell ("Gradwell"), and Michael Santoro ("Santoro") (collectively, "the HUP Defendants") (Document # 12); Vocational Rehabilitation Services, Inc. ("VRS") (Document # 18); and Affiliated Risk Control Administrators of Pennsylvania, Inc. ("ARCAP") (Document # 17); a Supplemental Motion to Dismiss filed by the HUP Defendants (Document[*2] # 20); and Plaintiff's responses thereto (Documents # 21, # 24, # 25, # 26). For the reasons set forth below, the Motions to Dismiss will be granted in part and denied in part.

I. BACKGROUND

The facts set forth in Plaintiff's Amended Complaint are as follows. On June 6, 1992, Plaintiff began employment with Defendant HUP as a graduate respiratory therapist. On March 20, 1993, Plaintiff sustained a work-related injury to his lower back. Plaintiff submitted a request for accommodation of his injury, which was received by the Director of the Respiratory Therapy Department, Defendant Gradwell, on March 26, 1993. The request for accommodation was disregarded by Gradwell. Defendant was subsequently assigned tasks which were more physically demanding than his recommended accommodation. Plaintiff's injury was further exacerbated by performance of these tasks. Plaintiff took a leave of absence and returned to work on August 2, 1993. At that time, he again requested accommodation of his injury, including avoidance of heavy lifting and straining. Plaintiff was not accommodated and he took another leave of absence on or about August 27, 1993. During this leave of absence, Plaintiff obtained[*3] additional employment

certifications. On April 1, 1994, HUP terminated Plaintiff's employment. Plaintiff subsequently requested and was denied reinstatement on a number of occasions.

On June 13, 1994, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that HUP had violated the American With Disabilities Act, *42 U.S.C. § 12111*, et seq. ("ADA"), by terminating Plaintiff's employment and refusing to rehire him. On January 31, 1995, Plaintiff requested a status report and determination from the EEOC in order to proceed with a private cause of action.

Although the EEOC had not issued a Notice of Right to Sue, Plaintiff filed suit with this court on April 1, 1996. On April 8, 1996, the complaint was withdrawn. On April 25, 1996, an amended complaint was filed with this court alleging that Defendants had violated the ADA; n1 the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951-963; and the Age Discrimination in Employment Act ("ADEA"), *28 U.S.C. § 621*, et seq. Plaintiff also included in his amended complaint state common law claims of wrongful discharge and intentional infliction of emotional distress, pursuant[*4] to *28 U.S.C. § 1367.*

n1 This court has jurisdiction pursuant to *28 U.S.C. § 1331* over claims arising under federal statutes, and supplemental jurisdiction over state law claims that form a "part of the same case or controversy. . . . " *42 U.S.C. § 1367.*

Plaintiff maintains that at all times he was able to perform the essential functions of a pulmonary respiratory therapist. Plaintiff alleges that HUP failed to accommodate reasonable requests, unlawfully terminated his employment, classified him in a manner that has deprived him of employment opportunities and refused to reinstate him because of his disability. He further alleges that Santoro and Gradwell are personally liable for actions taken as supervisory employees of HUP and that VRS and ARCAP are liable as agents of HUP.

## II. LEGAL STANDARD

For the purposes of a motion to dismiss, the court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom and view them in the light most favorable to[*5] the non-moving party." *Rocks v. City of Philadelphia, 868 F.2d*

*644, 645 (3d Cir. 1989)* (citations omitted). However, "conclusory allegations of law, unsupported conclusions and unwarranted inference need not be accepted as true." *Flanagan v. Shively, 783 F. Supp. 922, 927 (M.D. Pa. 1992)* (citing *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)),* aff'd, *980 F.2d 722 (3d Cir. 1992),* cert. denied, *510 U.S. 829 (1993).* The court may dismiss the complaint "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984)* (citation omitted).

## III. DISCUSSION

Defendants VRS, ARCAP, n2 and the HUP Defendants have all filed Motions to Dismiss alleging that Plaintiff has failed to exhaust his administrative remedies in that (1) he did not pursue a claim with the Pennsylvania Human Rights Commission ("PHRC"), and (2) he filed this suit prior to receiving a Notice of Right to Sue from the EEOC. n3

n2 The HUP Defendants' Supplemental Motion to Dismiss incorporates all of ARCAP's arguments except those contained in sections B and F of ARCAP's brief. Section B is ARCAP's argument that administrative remedies under the PHRA were not exhausted. Section F is ARCAP's argument that there is no proper federal claim against it.

[*6]

n3 Defendant ARCAP also argues that the claim with the EEOC is untimely in that it was filed on February 1, 1995, not on June 13, 1994. (ARCAP Mem. Supp. Mot. Dismiss at 3.) According to the Amended Complaint and the affidavit filed in this case, the EEOC complaint was filed on June 13, 1994. (See Am. Compl. P 40; Pl. Aff., attached to file document 27.) This court must accept Plaintiff's allegation at this stage.

## A. THE ADA (COUNT I)

To proceed with an employment discrimination suit under the ADA, a complainant must follow the procedure set forth in Title VII, *42 U.S.C. § 2000e-5.* Federal courts have no jurisdiction to hear discrimination claims unless a timely charge has been filed with the EEOC. *42 U.S.C. §*

2000e-5(e)(1). In a deferral state such as Pennsylvania, which has a state agency to adjudicate discrimination cases, the ADA generally requires complainants to file a complaint with the state agency and wait until the state agency either reaches a determination, or allows sixty (60) days to pass without a decision, before filing a complaint with the EEOC. *42 U.S.C. § 2000e-5*(c); [*7]*Brennan v. National Tel. Dir. Corp., 881 F. Supp. 986, 993 (E.D. Pa. 1995).* Pennsylvania's Human Relations Commission ("PHRC"), has, like many other similar state agencies, entered into a workshare agreement with the EEOC, pursuant to which the PHRC has waived its right to exclusive jurisdiction over Title VII discrimination cases during the 60-day period. Id. These waivers have been construed as self-executing, and allow a complaint which otherwise would have been brought first to the PHRC to be processed immediately by the EEOC if it is first filed with the EEOC. Id. Provided there is a workshare agreement, the aggrieved employee meets the statutory filing requirement as long as the complaint is filed with the EEOC within 300 days of the alleged discriminatory conduct. Id. Plaintiff alleges that he was discharged on April 1, 1994 and that he filed the complaint with the EEOC on June 13, 1994. Accepting Plaintiff's allegations as true, his complaint was filed in a timely manner.

After filing with the EEOC, a complainant must await the EEOC's determination and issuance of a Notice of Right to Sue prior to filing suit in federal court. Courts have dismissed cases in[*8] which the Plaintiff filed suit but failed to receive a Notice of Right to Sue. See, e.g. *Kent v. Director, Missouri Dep't Elem. and Secondary Educ., 792 F. Supp. 59, 62 (E.D. Mo. 1992).* However, the Third Circuit has held that it is proper to waive the EEOC administrative process in a suit filed prematurely where the notice of right to sue is issued before trial. *Molthan v. Temple University, 778 F.2d 955, 960 (3d Cir. 1985).* While suit was filed prematurely in the instant case, the Notice of Right to Sue was received shortly after filing and this court therefore denies the Motions to Dismiss Count I.

## B. THE PHRA (COUNT II)

The PHRA created the PHRC specifically to deal with complaints filed pursuant to this statute. 43 Pa. Stat. §§ 956, 957(f); *Kedra v. Nazareth Hosp., 857 F. Supp. 430, 432 (E.D. Pa. 1994).* In order to proceed with an action under the PHRA, the PHRA requires a complainant to file a complaint with the PHRC within 180 days after the alleged discriminatory act occurred. 43 P.S. § 959(a), (h) (Supp. 1995). An individual may file a civil action if, "within one year after filing of the complaint with the

PHRC, the PHRC dismisses the complaint with the PHRC[*9] or has not entered into a conciliation agreement." 43 P.S. § 962(c)(1) (Supp. 1995). Failure to exhaust remedies under the PHRA would preclude this court from exercising jurisdiction over a claim for violation of the PHRA. *Parsons v. Philadelphia Coordinating Office of Drug & Alcohol Abuse Programs, 833 F. Supp. 1108, 1112 (E.D. Pa. 1993).* Plaintiff does not allege that he filed a complaint with the PHRC. Instead, he argues that his EEOC filing was intended to be a dual filing with the PHRC and that his burden to file has been fulfilled because of the worksharing agreement between the PHRC and the EEOC. (Pl. Resp. to VRS Mot. Dismiss at 2.)

Pennsylvania courts have held that a complaint that has been forwarded by the EEOC to the PHRC pursuant to the worksharing agreement is sufficient to comply with the PHRA's requirements. *Id. at 1112; Lukus v. Westinghouse Elec. Corp., 276 Pa. Super. 232, 419 A.2d 431, 452 (Pa. Super. 1980).* It is the transmittal of the claim that acts as the filing in those cases, and the date of filing with the PHRC is the date of transmittal. Id. at 451. There is no evidence before this court, however, that Plaintiff's EEOC complaint was ever[*10] transmitted.

Plaintiff points to the workshare agreement between the EEOC and the PHRC in support of his argument. However, existence of the workshare agreement alone is not evidence that the complaint was transmitted. *Parsons, 833 F. Supp. at 1114.* Further, the Notice of Right to Sue issued by the EEOC is only evidence that exhaustion of remedies in a Title VII claim has occurred. Id. Although the federal statutes permits filing with the EEOC exclusively in certain circumstances, that is not the case for complaints filed under the state statute, the PHRA. See *Parsons, 833 F. Supp. at 1113* (stating, "there is no paragraph (in the workshare agreement) which suggests . . . that a charge filed with the EEOC will be considered by the PHRC for dual-filing.") Pennsylvania courts have construed the PHRA's requirements strictly. See *Fye v. Central Trans., Inc., 487 Pa. 137, 409 A.2d 2, 5 (Pa. 1979)* (holding that filing and investigation by the EEOC was not substantial compliance with the PHRA). See also *Bruffett v. Warner Communications, Inc., 692 F.2d 910, 919 (3d Cir. 1982)* (holding that PHRA procedures must be strictly followed). At this stage the court must construe[*11] all allegations in the light most favorable to Plaintiff. Therefore, because it is possible that the complaint was transmitted in a timely manner to the PHRC, this court denies the Motions to Dismiss Count II for failure to exhaust administrative remedies.



## C. THE ADEA (COUNT III)

As with an ADA claim, a charge of age discrimination must be timely filed with the EEOC prior to the initiation of an action in federal court. *Hall v. Ametek, Inc., 668 F. Supp. 417, 419 (E.D. Pa. 1987)* citing *Love v. Pullman, 404 U.S. 522, 30 L. Ed. 2d 679, 92 S. Ct. 616 (1972).* In Pennsylvania, a charge of age discrimination must be filed with the EEOC within 300 days from the date of the unlawful employment practice and not less than sixty (60) days before filing suit. *Seredinski v. Clifton Precision Prods. Co., 776 F.2d 56, 63 (3d Cir. 1985).*

Plaintiff alleges that he properly filed a complaint of discrimination with the EEOC on June 13, 1994. (Am. Compl. P 40; Pl. Mem. Resp. to HUP Defs.' Not. Dismiss at 6-7.) That complaint, however, does not mention or allege any facts to support a claim of age discrimination. In his response to the HUP Defendants' Motion to Dismiss, Plaintiff states[*12] that, "on December 14, 1995, Plaintiff filed allegations of Age Discrimination and requested that the [EEOC] charge be reformulated . . . ." (Pl. Resp. to HUP Defs.' Mot. Dismiss at 6.) n4 The date of this letter is over 300 days after the date of the allegedly discriminatory discharge (April 1, 1994).

n4 The single-page letter which is dated December 20, 1995, contains no factual allegations to support an age discrimination claim. Without further documentation this court finds it difficult to understand how the EEOC could reformulate and evaluate this claim.

Only if the attempted amendment to include the ADEA claim related back to the original filing date could it be considered timely filed. The EEOC permits technical amendments which clarify or amplify allegations in the complaint to relate back to the original filing. *29 C.F.R. §§ 1626.8(c), 1601.12(b).* n5 The EEOC does not permit amendments that add an entirely new and distinct claim to relate back to the original filing date. See, e.g. *Hornsby v. Conoco, [*13] Inc., 777 F.2d 243, 247 (5th Cir. 1985)* (finding that claim of sexual harassment filed as an amendment beyond time period did not relate back to claim of age and sex discrimination claim), rehearing denied, *780 F.2d 530 (5th Cir. 1985); Conroy v. Boston Edison Co., 758 F. Supp. 54, 58 (D. Mass. 1991)* (disallowing new age discrimination claim that did not clarify or amplify original complaint).

n5 *29 C.F.R. § 1601.12(b)* reads,

"A charge may be amended to cure technical defects or omissions . . . or to clarify or amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received."

There was no allegation of age discrimination in the original EEOC complaint and a claim of age discrimination does not logically flow from a claim of disability discrimination such that Defendants would be on[*14] notice from the complaint filed. There is no indication that the EEOC ever considered a claim of age discrimination. n6 The court therefore grants the Motions to Dismiss Count III of the Amended Complaint for failure to exhaust administrative remedies.

n6 Plaintiff's attorney's letter requesting reformulation is the only document that references an ADEA claim. There is no response from the EEOC, and there is no mention of an ADEA claim in the EEOC's Determination or in the Notice of Right to Sue.

## D. WRONGFUL DISCHARGE (COUNT IV)

The law in Pennsylvania is that an at-will employee may be discharged for any reason, or no reason at all. *Carlson v. Arnot-Ogden Mem. Hosp., 918 F.2d 411, 414 (3d Cir. 1990)* (citation omitted). There is an exception recognized where the discharge violates a clearly mandated public policy. *Mulgrew v. Sears, Roebuck & Co., 868 F. Supp. 98, 102 (E.D. Pa. 1994).* However, this exception is very limited and has been recognized in few instances. Id. The Pennsylvania state courts[*15] have only applied the public policy exceptions in cases where no statutory remedy existed. *Bruffett, 692 F.2d at 912.* In order to state a public policy exception to the at-will employment doctrine, the employee must point to a clear public policy articulated in the constitution, in legislation, an administrative regulation or a judicial decision. *Hunger v. Grand Central Sanitation, 670 A.2d 173, 175 (Pa. Super. 1996)* (citation omitted). The stated mandate must be directly related to the employee and the employee's actions,

id., and must "strike at the heart of a citizen's social right, duties, and responsibilities." *Raykovitz v. K Mart Corp., 445 Pa. Super. 378, 665 A.2d 833, 835 (Pa. Super. 1995).*

Plaintiff claims the public policy violated by HUP was "promoting injured workers to seek medical treatment." (Am. Compl. at P 79; Pl. Resp. to HUP Defs' Mot. to Dismiss at 10.) Defendants claim that this is not a recognized public policy and that Count IV should be dismissed. (HUP Mem. Supp. Mot. Dismiss at 13). Plaintiff has failed to state a policy articulated in the constitution, legislation, administrative regulations or a judicial decision. Further, the policy that he purports to state[*16] does not relate to his cause of action for discrimination--he has not alleged that he was prevented from seeking medical treatment.

Pennsylvania courts have recognized discrimination as one public policy exception. See *Jacques v. AKZO Int'l Salt, Inc., 422 Pa. Super. 419, 619 A.2d 748, 751 (Pa. Super. 1993).* However, Pennsylvania courts have also determined that the PHRA is an exclusive statutory remedy which preempts claims of wrongful discharge. *Clay v. Advanced Computer Applications, 522 Pa. 86, 559 A.2d 917, 918 (Pa. 1989)* (citation omitted); *Bruffett, 692 F.2d at 915.* It is the existence of a remedy, not the success of a claim, that determines preemption. *Jacques, 619 A.2d at 753* (citation omitted). Therefore, if a plaintiff fails to pursue the available remedies, he is nonetheless barred.

The other limited instances in which Pennsylvania courts have recognized the public policy exception are: discharge for performing a function that is required to be performed by law; discharge for serving on jury duty; and denial of employment to a person who was been pardoned for a conviction. *Mulgrew, 868 F. Supp. at 102.* Viewing the facts in the light most favorable[*17] to the Plaintiff, neither his stated policy nor his allegations fall under the categories recognized as public policy exceptions to the at-will employment doctrine by the Pennsylvania courts (except for his preempted discrimination claim). See *Mulgrew, 868 F. Supp. at 103* (dismissing wrongful discharge claim because it did not fall under any of the categories recognized by the Pennsylvania courts). Therefore this court must grant the Motions to Dismiss Count IV.

## E. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT V)

In Pennsylvania, an action for intentional infliction of emotional distress must be based on extreme or outrageous

behavior. *Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988).* Liability has only been found in Pennsylvania where the conduct is so extreme in nature as to go beyond all possible bounds of decency. *Id. at 395.* Conduct in the employment context will very rarely rise to the required level of outrageousness. Id. (citation omitted).

Plaintiff's allegations, the facts provided, and all reasonable inferences therefrom only indicate that the discharge may have been improperly motivated. Improper motive does not meet the extreme and[*18] outrageous standard in Pennsylvania. *Doe v. Kohn, Nast & Graf, P.C., 862 F. Supp. 1310, 1329 (E.D. Pa. 1994); Doe v. William Shapiro, Esq., P.C., 852 F. Supp. 1246, 1255 (E.D. Pa. 1994)* (same). See also *E.E.O.C. v. Chestnut Hill Hosp., 874 F. Supp. 92, 96 (E.D. Pa. 1995)* (finding that racial discrimination alone is not enough where emotional distress claim is based on same facts as underlying claim); *Cox, 861 F.2d at 391* (finding that discharge of an employee returning from triple bypass surgery in order to deprive him of medical benefits does not rise to the required level of outrageousness).

Further, employment-based claims of intentional infliction of emotional distress are generally precluded by the exclusivity features of the Workmen's Compensation Act, 77 P.S. § 1, et seq. *Winterberg v. Transportation Ins. Co., 72 F.3d 318, 322 (3d Cir. 1995); Adams v. US Air, Inc., 438 Pa. Super. 190, 652 A.2d 329, 330 (Pa. Super. 1994).* Intentional wrongs not normally expected in the workplace are actionable. 77 P.S. § 72 (& Supp. 1996); *Holdamp v. Fidelity & Cas. Co. of New York, 793 F. Supp. 111 (W.D. Pa. 1992),* aff'd, *16 F.3d 403 (3d Cir. 1993).* Plaintiff has alleged no such[*19] conduct. Therefore, the court must grant the Motions to Dismiss Count V.

## F. INDIVIDUAL NON-EMPLOYERS SANTORO AND GRADWELL

Plaintiff has sued two individual supervisors employed by HUP. In doing so, he relies on the wording in *42 U.S.C. § 2000e* (b), which defines employer as "a person engaged in an industry affecting commerce who has 15 or more employees . . . and any agent of such person . . . ." *42 U.S.C. § 2000e* (b). n7

n7 The definition of employer under the ADA mirrors that of the definition under the ADEA and Title VII of the Civil Rights Act of 1964, *42 U.S.C. 2000e* (b) (1994). Therefore, courts routinely apply the arguments regarding individual liability under each interchangeably. *Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 157 (3d Cir. 1995); U.S.*



*E.E.O.C. v. AIC Security Investigations, Ltd., 55 F.3d 1276, 1279-80 (7th Cir. 1995); Clarke v. Whitney, 907 F. Supp. 893 (E.D. Pa. 1995).*

The HUP Defendants argue that the federal claims against the individual defendants, Santoro and Gradwell, [*20] should be dismissed because the statutes do not impose personal liability and further argue that this court lacks jurisdiction to hear the remaining pendent state law claims against the individuals. Defendants claim that as non-employer individuals, Santoro and Gradwell cannot be held liable under the ADA, the ADEA, or the PHRA. n8

n8 As with the ADA, courts apply Title VII case law in assessing PHRA claims. *Doe v. Kohn, Nast & Graf, P.C., 862 F. Supp. 1310, 1323 (E.D. Pa. 1994)* (stating that the PHRA was modelled after Title VII and is analyzed in the same manner, thus, achieving the same results as analysis under the ADA).

The Supreme Court has not ruled on the question of individual liability under Title VII for non-employers. In a case that has been vacated for rehearing, the United States Court of Appeals for the Third Circuit recently held that non-employer individuals cannot be held liable in these circumstances. *Sheridan v. E.I. DuPont de Nemours and Co., Civ. A. No. 94-7509, 1996 WL 36283 (3d [*21]Cir. Jan. 31, 1996), vacated for rehearing en banc, 74 F.3d 1459 (February 28, 1996).* The majority of circuits that have addressed this issue in the context of the three statutes have rejected Plaintiff's interpretation. These courts have interpreted the statute as imposing respondeat superior liability on employers for the actions of their employees. See, e.g., *Tomka v. Seiler Corp., 66 F.3d 1295, 1313-17 (2d Cir. 1995); Gary v. Long, 313 U.S. App. D.C. 403, 59 F.3d 1391, 1399 (D.C. Cir.), cert. denied 116 S. Ct. 569 (1995); U.S. E.E.O.C. v. AIC Security Investigations, Ltd., 55 F.3d 1276, 1279-82 (7th Cir. 1995); Smith v. Lomax, 45 F.3d 402, 403 n.4 (11th Cir. 1995); Grant v. Lone Star Co., 21 F.3d 649, 651-53 (5th Cir.) cert. denied, 130 L. Ed. 2d 491, 115 S. Ct. 574 (1994); Miller v. Maxwell's Int'l, Inc., 991 F.2d 583, 587 (9th Cir. 1993), cert. denied, 114 S. Ct. 1049 (1994).*

The majority of decisions in this circuit have also held that individual non-employers cannot be held liable. See

*Johnakin v. City of Philadelphia, Civ. A. No. 95-1288, 1996 WL 18821, at *6 (E.D. Pa. Jan. 18, 1996)* (listing cases in this circuit which have limited[*22] liability to the employer). See also *Clarke v. Whitney, 907 F. Supp. 893, 895 (E.D. Pa. 1995)* (holding specifically that there is no individual liability under the ADA or the PHRA) n9; *Verde v. City of Philadelphia, 862 F. Supp. 1329, 1332-35 (E.D. Pa. 1994)* (analyzing the definition of employer under Title VII). This court finds the reasoning in these cases persuasive and grants the Motion to Dismiss the federal claims against the individual defendants, Santoro and Gradwell. As the state claims have already been dismissed, this court need not address their status.

n9 The concept of official capacity is not relevant under Title VII or the ADA, a suit against an individual in his or her official capacity is merely another way to sue the employer. See *Clarke, 907 F. Supp. at 895* (citing *Doe v. William Shapiro, Esq., P.C., 852 F. Supp. 1246, 1252-53 (E.D. Pa. 1994)* (Gawthrop, J.). Because the employer, HUP, is named, there is no reason to keep the individual defendants in on that basis.

## G. ARCAP'S[*23] ADDITIONAL ARGUMENTS

ARCAP argues that Plaintiff does not qualify under the ADA. (ARCAP Mem. Supp. Mot. Dismiss at 7-9.) ARCAP alleges that Plaintiff's averments that he cannot perform the functions of his pre-injury position but can perform the essential functions of the position are inconsistent and the complaint should therefore be dismissed. (Id. at 8-9.) These statements are not wholly inconsistent in that the tasks that Plaintiff cannot perform because of his injury are not necessarily the essential functions of the position. This court will not dismiss on that basis.

ARCAP also argues that Plaintiff is not disabled as defined by the ADA because he has not shown that his impairment restricts his ability to perform either a class of jobs or a broad range of jobs and that Plaintiff has not sufficiently alleged that his disability "substantially limits a major life activity." (ARCAP Mem. Supp. Mot. Dismiss at 10). The ADA defines major life activities as manual tasks, walking, seeing, hearing, speaking, breathing, taking care of oneself, learning, and working. *29 C.F.R. § 1630.2(i)*. Plaintiff alleges that he cannot perform activities that involve heavy lifting or straining. [*24] (Am. Compl. P 26.) These activities fall under the major life activity of "manual tasks." The court will not dismiss on this ground.



ARCAP also argues that there are no proper federal claims alleged against it in this case because it is not a covered entity, it was not the Plaintiff's employer, it is not an employment agency or a labor organization. (Mem. Supp. Mot. Dismiss at 11.)

Plaintiff alleges that ARCAP is liable as an agent for the employer, HUP, because ARCAP and VRS "performed the functions of the employer . . . in an effort to facilitate the vocational transfer of Plaintiff" and "acted for and as the functional equivalent of Plaintiff's employer . . . ." (Am. Compl. PP 93, 95.) ARCAP is HUP's third party administrator for worker's compensation claims. (ARCAP Mem. Supp. Dismiss at 13.) According to Plaintiff, ARCAP shares responsibilities with HUP by exercising control with respect to evaluating Plaintiff's medical records and scheduling employer physician evaluations which have formed a basis for the employer's failure to provide reasonable accommodation." (Pl. Resp. to ARCAP Mot. Dismiss at 17-18.)

The test of agency in discrimination claims is whether the alleged[*25] agent has participated in the decision-making process that forms the basis of the discrimination. *Hamilton v. Rodgers, 791 F.2d 439, 443 (5th Cir. 1986)* (citation omitted) (quoted with approval in *Levendos v. Stern Entertainment, Inc., 909 F.2d 747, 752 (3d Cir. 1990)*). See also *Morgan v. Safeway Stores, Inc., 884 F.2d 1211, 1214-15 (9th Cir. 1989)* (holding that an employer was not liable as an agent for acts of a third party unless there was control over the actions of the third party such that the employer could be said to have perpetuated the discrimination); *Crawford v. West Jersey Health Sys., 847 F. Supp. 1232, 1236 (D. N.J. 1994)* (dismissing discriminatory termination claims against defendants named as agents because they did not make "final decisions regarding employment matters.") (citation omitted); *Crowder v. Fieldcrest Mills, Inc., 569 F. Supp. 825, 827 (M.D.N.C. 1983)* (holding that an insurance carrier that advised an employer in the employer's administration of health care program but exercised no control over the program was not liable as an agent).

Viewing the allegations in the light most favorable to Plaintiff, he has alleged that the discriminatory[*26] actions by HUP were based on the information provided by ARCAP. Plaintiff has not alleged that either ARCAP or VRS actually participated in the discriminatory discharge or the decision not to accommodate Plaintiff's requests. Supplying information that the employer considered in its decision to discriminate is not sufficient to establish agency. Therefore, the court dismisses all counts against ARCAP.

IV. CONCLUSION

For all the foregoing reasons, the court grants Defendants' Motions to Dismiss Counts III, IV, V, and all Counts against Defendants Santoro, Gradwell and ARCAP. The court denies Defendants' Motions to Dismiss Counts I and II.

An appropriate order follows.

ORDER

AND NOW, TO WIT, this 29 day of July, 1996, upon consideration of Defendants' Motions to Dismiss and Plaintiff's responses thereto, it is ORDERED as follows:

(1) Motions to Dismiss Count I (ADA) are DENIED;

(2) Motions to Dismiss Count II (PHRA) are DENIED;

(3) Motions to Dismiss Count III (ADEA) are GRANTED;

(4) Motions to Dismiss Count IV (Wrongful Discharge) are GRANTED;

(5) Motions to Dismiss Count V (Intentional Infliction of Emotional Distress) are GRANTED;

(6) [*27] The HUP Defendants' Motion to Dismiss all claims against individual defendants Santoro and Gradwell is GRANTED.

(7) ARCAP's Motion to Dismiss all claims against ARCAP is GRANTED.

LOUIS C. BECHTLE, J.